685 F.2d 547
 110 L.R.R.M. (BNA) 2676, 222 U.S.App.D.C. 97
 PROFESSIONAL AIR TRAFFIC CONTROLLERS ORGANIZATION, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent,
Federal Aviation Administration, Ronald W. Haughton, Albert
Shanker, Henry B. Frazier, III, Leon B.
Applewhaite, Intervenors.
PROFESSIONAL AIR TRAFFIC CONTROLLERS ORGANIZATION, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent,
Federal Aviation Administration, Intervenor.
 No. 81-2135.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 3, 1981 and April 13, 1982.
Decided June 11, 1982.
 
 Petition for Review of an Order of the Federal Labor Relations authority.
 Review of Findings of Specially Appointed Administrative Law Judge.
 Richard J. Leighton, Washington, D. C., with whom Neal Goldfarb, Washington, D. C., was on the brief, for petitioner. R. Russell Bailey, Washington, D. C., also entered an appearance for petitioner.
 Anthony J. Skirlick, Jr., pro se, as amicus curiae urging reversal.
 Mary Elizabeth Medaglia, Acting Sol., Federal Labor Relations Authority, Washington, D. C., with whom William E. Persina and William R. Tobey, Attys., Federal Labor Relations Authority, Washington, D. C., were on the brief, for respondent.
 
 
 1
 Mark H. Gallant, Atty., Dept. of Justice, Washington, D. C., with whom Stanley S. Harris, U. S. Atty., Charles F. C. Ruff, U. S. Atty., at the time the briefs were submitted, William Kanter and Frederick Geilfuss, Attys., Dept. of Justice, Washington, D. C., were on the brief, for intervenor, F. A. A.
 
 
 2
 James R. Rosa, Washington, D. C., was on the brief for amicus curiae, American Federation of Government Employees, urging reversal.
 
 
 3
 Stephen A. Weitzman, Washington, D. C., for amici curiae, Hugh McClure, John Hough and Jerrold Tierney, urging remand.
 
 
 4
 Barry L. Leibowitz, Washington, D. C., for intervenor, Ronald W. Haughton.
 
 
 5
 John G. Kester, Michael S. Sundermeyer, Washington, D. C., for intervenor, Henry B. Frazier, III.
 
 
 6
 Nathan Lewin, Washington, D. C., with whom Jonathan B. Sallet, Washington, D. C., was on the brief, for intervenor, Albert Shanker.
 
 
 7
 Peter G. Nash, Washington, D. C., for intervenor, Leon B. Applewhaite.
 
 
 8
 Before ROBINSON, Chief Judge, MacKINNON and EDWARDS, Circuit Judges.
 
 
 9
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 
 
 10
 Concurring opinions filed by Chief Judge SPOTTSWOOD W. ROBINSON, III and Circuit Judge MacKINNON.
 
 
 11
 TABLE OF CONTENTS
 Page
 I. Background .................................... 551
 A. The PATCO Strike ........................... 551
 B. Federal Labor Relations Authority
 Proceedings ................................ 552
 II. Ex Parte Communications During the FLRA
 Proceedings ................................... 556
 A. A.L.J. Vittone's Findings .................. 557
 1. The Meeting Between Member
 Applewhaite and FLRA General
 Counsel Gordon .......................... 557
 2. Secretary Lewis' Telephone Calls
 to Members Frazier and Applewhaite ...... 558
 3. Member Applewhaite's Dinner with
 Albert Shanker .......................... 559
 B. The Parties' Positions ..................... 561
 C. Applicable Legal Standards ................. 561
 1. The Statutory Prohibitions of Ex
 Parte Contacts and the FLRA
 Rules ................................... 561
 2. Remedies for Ex Parte Communications .... 564
 D. Analysis of the Alleged Ex Parte
 Communications with FLRA Members ........... 565
 1. The Meeting Between Member
 Applewhaite and FLRA General
 Counsel Gordon .......................... 566
 2. Secretary Lewis' Telephone Calls
 to Members Frazier and Applewhaite ...... 568
 3. Member Applewhaite's Dinner with
 Albert Shanker .......................... 569
 E. Member Applewhaite Alleged "Personal
 Interest" in the PATCO Case ................ 573
 F. Conclusion ................................. 574
III. PATCO's Violation of the Ban on Federal
 Employee Strikes .............................. 575
 A. The Scope of Review ........................ 575
 B. Violation of Section 7116(b)(7)(A) ......... 576
 C. Violation of Section 7116(b)(7)(B) ......... 577
 IV. Revocation of PATCO's Exclusive Recognition
 Status ........................................ 578
 A. The FLRA's Discretion Under Section
 7120(f) .................................... 578
 1. The Statutory Basis of the FLRA's
 Revocation Power ........................ 579
 2. The Legislative History of the
 FLRA's Revocation Power ................. 580
 B. The FLRA's Exercise of Its Discretion ...... 585
 C. Evidence of Mitigating Factors ............. 586
 V. Arguments of the Amici Curiae ................. 589
 A. Arguments of the American Federation
 of Government Employees .................... 589
 B. Argument of Anthony J. Skirlick, Jr......... 590
 VI. Conclusion .................................... 591
 
 HARRY T. EDWARDS, Circuit Judge:
 
 12
 Federal employees have long been forbidden from striking against their employer, the federal government, and thereby denying their services to the public at large.[1] The United States Code presently prohibits a person who "participates in a strike ... against the Government of the United States" from accepting or holding a position in the federal government, 5 U.S.C. § 7311(2) (1976), and violation of this section is a criminal offense, 18 U.S.C. § 1918(3) (1976). Newly hired federal employees are required to execute an affidavit attesting that they have not struck and will not strike against the government, 5 U.S.C. § 3333(a) (1976). In addition, since the inception of formal collective bargaining between federal employee unions and the federal government, unions have been required to disavow the strike as an economic weapon.[2] Since 1969, striking has been expressly designated a union unfair labor practice.[3]
 
 
 13
 In 1978, Congress enacted the Civil Service Reform Act, Title VII of which provides the first statutory basis for collective bargaining between the federal government and employee unions. Title VII in no way reduced the existing legal proscriptions against strikes by federal employees and unions representing employees in the federal service. Rather, the Act added a new provision applicable to federal employee unions that strike against the government. Under section 7120(f) of Title VII, Congress provided that the Federal Labor Relations Authority ("FLRA" or "Authority") shall "revoke the exclusive recognition status" of a recognized union, or "take any other appropriate disciplinary action" against any labor organization, where it is found that the union has called, participated in or condoned a strike, work stoppage or slowdown against a federal agency in a labor-management dispute. 5 U.S.C. § 7120(f) (Supp. IV 1980).
 
 
 14
 In this case we review the first application of section 7120(f) by the FLRA. After the Professional Air Traffic Controllers Organization ("PATCO") called a nationwide strike of air traffic controllers against the Federal Aviation Administration ("FAA") in the summer of 1981, the Authority revoked PATCO's status as exclusive bargaining representative for the controllers. For the reasons set forth below, we affirm the decision of the Authority.
 
 I. BACKGROUND
 A. The PATCO Strike
 
 15
 The Professional Air Traffic Controllers Organization has been the recognized exclusive bargaining representative for air traffic controllers employed by the Federal Aviation Administration since the early 1970s. Faced with the expiration of an existing collective bargaining agreement, PATCO and the FAA began negotiations for a new contract in early 1981. A tentative agreement was reached in June, but was overwhelmingly rejected by the PATCO rank and file. Following this rejection, negotiations began again in late July. PATCO announced a strike deadline of Monday, August 3, 1981.
 
 
 16
 Failing to reach a satisfactory accord, PATCO struck the FAA on the morning of August 3. Over seventy percent of the nation's federally employed air traffic controllers walked off the job, significantly reducing the number of private and commercial flights in the United States.[4]
 
 
 17
 In prompt response to the PATCO job actions, the Government obtained restraining orders against the strike,[5] and then civil and criminal contempt citations when the restraining orders were not heeded.[6] The Government also fired some 11,000 striking air traffic controllers who did not return to work by 11:00 a. m. on August 5, 1981.[7] In addition, on August 3, 1981, the FAA filed an unfair labor practice charge against PATCO with the Federal Labor Relations Authority. On that same day, an FLRA Regional Director issued a complaint on the unfair labor practice charge, alleging strike activity prohibited by 5 U.S.C. § 7116(b)(7) (Supp. IV 1980) and seeking revocation of PATCO's certification under the Civil Service Reform Act. The complaint noticed a hearing for one week later, August 10, 1981. Complaint and Notice of Hearing, Jt. App. 9-11.
 
 
 18
 B. Federal Labor Relations Authority Proceedings
 
 
 19
 John H. Fenton, Chief Administrative Law Judge of the FLRA, conducted hearings on the unfair labor practice charge on the afternoon of August 10. The General Counsel of the FLRA presented testimony establishing that on the morning of August 3 pickets assembled at entrances to Air Traffic Control Centers in Leesburg, Virginia, Chicago, Illinois, Ronkonkomo, New York, and Longmont, Colorado, and at the Airport Tower in Atlanta, Georgia. In each instance, the picketers carried signs that informed the public that they were air traffic controllers belonging to a particular PATCO Local and that PATCO was on strike. Attendance records presented by FAA witnesses indicated that only 2,308 of the 9,304 air traffic controllers scheduled to work nationwide on August 3 actually reported. ALJ at 3. FAA officials from the various facilities also identified striking air traffic controllers, including PATCO Local officers, in photographs of the picketing outside of the Air Traffic Control Centers. In several cases the persons identified, including the PATCO Local officers, were scheduled for work at the times the photographs were taken.
 
 
 20
 In addition to this evidence, an FAA official identified PATCO National President Robert E. Poli in two videotaped news conferences. In one videotape Mr. Poli was recorded as stating:
 
 
 21
 If we have not received a settlement proposal which our negotiating team determines should be offered to the membership, I will order the count to begin. After the tallying has been completed and following verification of the necessary support, the strike will begin on the day shift of Monday, August the 3rd.
 
 
 22
 In the second videotape, apparently made after the strike had begun and after a temporary restraining order had issued, Mr. Poli was recorded as saying: "The question is will the strike continue. The answer is yes."[8]
 
 
 23
 In response, PATCO offered no evidence to suggest that a strike had not occurred, to substantiate its assertion that the FLRA's evidence only demonstrated a number of separate strikes by PATCO Locals, or to establish that PATCO had made any efforts to prevent or stop the strike. Based on this record, and taking official notice of United States v. Professional Air Traffic Controllers Organization, 107 L.R.R.M. (BNA) 3210 (D.D.C.1981) (holding PATCO and Robert Poli in civil contempt for failing to comply with a temporary restraining order against the strike), Chief A.L.J. Fenton found that PATCO called and participated in a strike, a violation of 5 U.S.C. § 7116(b)(7)(A) (Supp. IV 1980), and that PATCO condoned the strike by failing to take action to prevent or stop it, a violation of 5 U.S.C. § 7116(b)(7)(B) (Supp. IV 1980). ALJ at 2-5.
 
 
 24
 At the proceedings before Chief A.L.J. Fenton, PATCO complained of insufficient time to prepare a defense, particularly with regard to matters potentially in mitigation of the remedy to be imposed by the FLRA. PATCO suggested, but did not promise,[9] that if granted a continuance it might offer evidence in support of a claim of mitigation by attempting to show that the working conditions for PATCO members were unsafe, that the FAA had committed an unfair labor practice by refusing to bargain in good faith,[10] and that the strike had been caused by anti-union animus in the FAA.[11] Judge Fenton recessed the hearing overnight to allow PATCO to decide whether to pursue a defense against the unfair labor practice charge, including a possible proffer with respect to mitigating circumstances. When the hearing reconvened on August 11, PATCO counsel declined to proceed with any specific defense on behalf of the union.[12] Rather, union counsel merely suggested that unsafe working conditions and the FAA's refusal to bargain should be considered in mitigation; however, no testimony or other evidence was offered on these matters. Judge Fenton allowed PATCO to include arguments regarding mitigation based on these alleged "proffers" in its closing brief.[13]
 
 
 25
 On August 14, PATCO filed its post-hearing brief; the ALJ Decision issued on the same day. In his recommended decision, Chief A.L.J. Fenton concluded that PATCO's arguments in mitigation could have no effect on the appropriate penalty:
 
 
 26
 (PATCO's) contentions regarding mitigating circumstances, however real and serious they may be, find no echo in either the Statute or the legislative history. Congress gave only one example of the kind of circumstances in which the lesser remedy would be appropriate, and it goes to the nature and seriousness of the violation rather than to sorrounding (sic) events which arguably constitute serious provocation or other miltigating (sic) circumstances.
 
 
 27
 ALJ at 8. For this reason, and because PATCO produced no evidence that it had in any way attempted to comply with the statutory ban on strikes, Judge Fenton recommended that the FLRA revoke PATCO's exclusive recognition status and that PATCO "immediately cease to be legally entitled and obligated to represent employees in the unit." ALJ at 8-9.
 
 
 28
 The FLRA General Counsel, the FAA and PATCO all filed exceptions to the A.L.J.'s recommended findings of fact and conclusions of law. The FLRA General Counsel and the FAA both excepted to the ALJ Decision to the extent that it failed to recommend a permanent revocation of PATCO's status as a labor organization under Title VII of the Civil Service Reform Act. PATCO excepted to the ALJ Decision on three principal grounds: (1) that the expedited hearing schedule had afforded PATCO inadequate time to prepare its defense; (2) that the FLRA General Counsel and the FAA had failed to produce sufficient evidence at the hearing to establish that PATCO had called, participated in, or condoned a strike in violation of Title VII; and (3) that Judge Fenton had unfairly precluded PATCO from introducing relevant evidence in mitigation of the remedy.[14] The FLRA heard oral argument from PATCO, the FLRA General Counsel and the FAA on September 16, 1981.[15]
 
 
 29
 In seriatim opinions issued on October 22, 1981, the FLRA Members rejected the exceptions filed by the parties and affirmed the ALJ Decision. All three Members of the Authority agreed that the expedited proceedings had not violated PATCO's due process rights, any statute or agency regulation.[16] ] All three agreed that the FLRA General Counsel had proven by a preponderance of the evidence that PATCO had committed unfair labor practices by striking against the FAA. Similarly, all three agreed that it was unnecessary to determine whether, at some time in the future, PATCO might again meet Title VII's definition of a labor organization; they thus declined to decide whether PATCO's revocation was permanent. The FLRA Members disagreed, however, over the extent of discretion granted to the Authority by section 7120(f) of the Civil Service Reform Act.
 
 
 30
 FLRA Member Frazier took a limited view of the discretion afforded the Authority under section 7120(f). He concluded, upon reading the relevant legislative history, that "(t)he only circumstances which the Authority may take into account in assessing a lesser remedy than revocation for a willful and intentional violation of section 7116(b)(7) are those instances in which the union made efforts to prevent or stop the illegal activity." PATCO at 22. Since there was no such evidence, Member Frazier decided that "the facts of this case permit( ) nothing less than revocation of PATCO's exclusive recognition status." Id. at 23.[17]
 
 
 31
 Member Applewhaite concurred in Member Frazier's disposition of the case. He disagreed, however, with Member Frazier's limited view of the Authority's remedial discretion. He interpreted the language of section 7120(f) to vest the FLRA with broad discretion, but held that the only appropriate exercise of that discretion in this case was to revoke PATCO's exclusive recognition status. PATCO at 31.[18]
 
 
 32
 Chairman Haughton, like Member Applewhaite, interpreted the statutory language of section 7120(f) and its legislative history as vesting the Authority with broad remedial discretion. Chairman Haughton thus expressed concern about the completeness of the record compiled by the A.L.J. In particular, he opined that the A.L.J.'s denial of a continuance for PATCO to gather evidence of mitigating circumstances potentially relevant to the remedy was erroneous because it may have deprived the Authority of evidence relevant to its decision. PATCO at 35. Nonetheless, Chairman Haughton found one fact of overriding importance: PATCO had made no attempt to end the strike. He therefore concluded that unless PATCO ended the strike within five days of the issuance of the FLRA Decision, and unless PATCO represented to the Authority that it intended to abide by the no-strike provisions of Title VII, any additional evidence could have no mitigating effect on the remedy. Pending PATCO's response, Chairman Haughton conditionally dissented from the decision of Members Frazier and Applewhaite to revoke PATCO's exclusive recognition status. Id. at 35-36.
 
 
 33
 In an attempt to comply with Chairman Haughton's condition on his dissent, the PATCO Executive Board issued a statement on October 27, 1981. The statement averred that PATCO was then unable to end the strike because its members had been locked out by the FAA and were therefore unable to return to work. The statement further represented that "when the FAA ends its lock-out, PATCO would immediately order all of its members to return to work." Statement of the PATCO Executive Board (October 27, 1981), Jt.App. 334 (emphasis in original).[19] On November 8, Chairman Haughton issued a supplemental opinion retracting his dissent and concurring in the FLRA Decision to revoke PATCO's exclusive recognition status. Chairman Haughton noted that PATCO had not disavowed the strike and had made no attempt to end it. Moreover, he noted that his dissent had not provided for the type of strike termination offered by PATCO, conditioned as it was on certain actions by the FAA. Professional Air Traffic Controllers Organization, 7 F.L.R.A.No. 10 (Nov. 3, 1981) (Supplemental Opinion of Chairman Haughton); Jt.App. 335-37.
 
 
 34
 On the same day that the Federal Labor Relations Authority issued its decision, PATCO petitioned for review in this court.[20] Concurrently, PATCO moved for an emergency stay of the FLRA Decision. A temporary administrative stay was granted by the court, and the FLRA was directed to submit a prompt response. Professional Air Traffic Controllers Organization v. FLRA, No. 81-2135 (D.C.Cir. Oct. 23, 1981) (order granting temporary stay). Upon receiving and considering the FLRA's response, the court dissolved the temporary stay and denied PATCO's motion for a stay pending a decision on the merits. In recognition of the urgency of the case and the public interest in a prompt disposition, the court ordered sua sponte expedited briefing and oral argument. Id. (D.C.Cir. Oct. 27, 1981) (order dissolving temporary stay, denying motion for stay pending review, and ordering expedited briefing and oral argument). The court also granted motions by the American Federation of Government Employees and by Anthony J. Skirlick, Jr. to file briefs as amicus curiae. On December 3, 1981, the court heard oral arguments by petitioner PATCO, respondent FLRA, intervenor FAA and amicus Skirlick.
 
 
 35
 II. EX PARTE COMMUNICATIONS DURING THE FLRA PROCEEDINGS
 
 
 36
 Unfortunately, allegations of improprieties during the FLRA's consideration of this case forced us to delay our review on the merits. Only a day before oral argument, the Department of Justice, which represents the FAA in this review, informed the court that the Department of Justice Criminal Division and the FBI had investigated allegations of an improper contact between a "well-known labor leader" and FLRA Member Applewhaite during the pendency of the PATCO case. We were understandably concerned about the suggestion that attempts had been made to influence the Authority improperly and about the possible inference that the Authority's decision might have been affected by these attempts.
 
 
 37
 Because our concerns extended beyond the presence or absence of criminal wrongdoing to the protection of the integrity of the administrative and judicial decisionmaking processes, we were not prepared to rely solely on the decision of the Criminal Division to close its investigation as proof that no improper influence had been exercised. Instead, we invoked a procedure that this court has occasionally employed in like situations in the past.[21] Without assuming that anything improper had in fact occurred or had affected the FLRA Decision in this case, we ordered the FLRA "to hold, with the aid of a specially-appointed administrative law judge, an evidentiary hearing to determine the nature, extent, source and effect of any and all ex parte communications and other approaches that may have been made to any member or members of the FLRA while the PATCO case was pending before it." Professional Air Traffic Controllers Organization v. FLRA, 672 F.2d 109, 113 (D.C.Cir.1982) (per curiam) (order directing special evidentiary hearing).
 
 
 38
 Following our remand on the ex parte communications issue, John M. Vittone, an Administrative Law Judge with the Civil Aeronautics Board, was appointed to preside over an evidentiary proceeding. Subsequently, Judge Vittone conducted a hearing from March 4 to March 17. Pursuant to the order of this court, the parties to this review, the FLRA Members, and all persons alleged to have contacted any Authority Member during the pendency of the PATCO case were allowed to participate fully in the hearing. A.L.J. Vittone made extensive findings regarding all possibly relevant approaches to and communications with FLRA Members. After the record of the hearing and A.L.J. Vittone's recommended findings were filed with the court, the parties submitted briefs on the recommended findings and on the appropriate remedial action. On April 13, 1982, the court heard further oral argument, limited to the issue of ex parte contacts.
 
 A. A. L. J. Vittone's Findings
 
 39
 A. L. J. Vittone's inquiry led to the disclosure of a number of communications with FLRA Members that were at least arguably related to the Authority's consideration of the PATCO case. We find the vast majority of these communications unobjectionable. See notes 38-41 infra. Three occurrences, however, are somewhat more troubling and require our careful review and discussion. We first summarize A. L. J. Vittone's findings regarding them.
 
 
 40
 1. The Meeting Between Member Applewhaite and FLRA General Counsel Gordon[22]
 
 
 41
 On August 10, 1981 (one week after the unfair labor practice complaint against PATCO was filed), H. Stephan Gordon, the FLRA General Counsel, was in Member Applewhaite's office discussing administrative matters unrelated to the PATCO case. During Gordon's discussion with Member Applewhaite, Ms. Ellen Stern, an attorney with the FLRA Solicitor's office, entered Member Applewhaite's office to deliver a copy of a memorandum entitled "Decertification of Labor Organization Participating in the Conduct of a Strike in Violation of Section 7116(b)(7) of the Statute." Ms. Stern had prepared the memo at the request of Member Frazier.[23] With General Counsel Gordon present, Ms. Stern proceeded to discuss her memorandum, which dealt with whether the Civil Service Reform Act makes revocation of a striking union's exclusive recognition status mandatory or discretionary and, assuming it is discretionary, what other disciplinary actions might be taken.
 
 
 42
 During Ms. Stern's discussion, both Member Applewhaite and General Counsel Gordon asked her general questions (e.g., regarding the availability of other remedies and whether she had researched the relevant legislative history). General Counsel Gordon did not ask Member Applewhaite any questions or express any views on the issues discussed in the memorandum. Nor did Member Applewhaite express any opinion on the correct statutory interpretation. While the conversation at least implicitly focused on the PATCO case, the facts of the case and the appropriate disposition were not discussed. The discussion ended after ten or fifteen minutes.
 
 
 43
 A. L. J. Vittone concluded that "(t)he conversation had no effect or impact on Member Applewhaite's ultimate decision in the PATCO case." Findings at 7, P 15.
 
 
 44
 2. Secretary Lewis' Telephone Calls to Members Frazier and Applewhaite[24]
 
 
 45
 During the morning of August 13, 1981, Secretary of Transportation Andrew L. Lewis, Jr. telephoned Member Frazier. Secretary Lewis stated that he was not calling about the substance of the PATCO case, but wanted Member Frazier to know that, contrary to some news reports, no meaningful efforts to settle the strike were underway. Secretary Lewis also stated that the Department of Transportation would appreciate expeditious handling of the case. Not wanting to discuss the PATCO case with Secretary Lewis, Member Frazier replied, "I understand your position perfectly, Mr. Secretary." Secretary Lewis then inquired whether Member Applewhaite was in Washington, D.C. at that time. Member Frazier replied that he was, but that Chairman Haughton was out of town. Although Member Frazier offered to convey the Secretary's message to Member Applewhaite, Secretary Lewis stated that he would call personally.
 
 
 46
 Member Frazier discussed Secretary Lewis' call with FLRA Solicitor Robert Freehling, describing it as relating to status and settlement. Solicitor Freehling advised Member Frazier that the communication did not fall within the ex parte prohibitions of the FLRA Rules.
 
 
 47
 Member Frazier also advised Member Applewhaite of Secretary Lewis' telephone call. In anticipation of a call, Member Applewhaite located the FLRA Rules regarding the time limits for processing an appeal from an A. L. J. decision in an unfair labor practice case. When Secretary Lewis telephoned and stated his concern that the case not be delayed, Member Applewhaite interrupted the Secretary to inform him that if he wished to obtain expedited handling of the case, he would have to comply with the FLRA Rules and file a written motion. Secretary Lewis stated that he was unaware that papers had to be filed and that he would contact his General Counsel immediately. The conversation ended without further discussion.
 
 
 48
 During the afternoon of August 13, the FAA filed a Motion to Modify Time Limits for Filing Exceptions, requesting that the time limit be reduced from the usual twenty-five days to seven days. On August 14, the FLRA General Counsel filed a similar motion. On August 17, PATCO filed an opposition to these motions and a motion to extend the time for filing exceptions to sixty days. On August 18, 1981, the FLRA Members considered the three pending motions, denied all three, and decided instead to reduce the usual twenty-five day period for filing exceptions to nineteen days.
 
 
 49
 Upon considering this evidence, Judge Vittone concluded that: (1) the FAA's filing of a motion to expedite may have been in response to Secretary Lewis' conversation with Member Applewhaite, Findings at 12, P 34; (2) Chairman Haughton was unaware of Secretary Lewis' telephone calls when he considered the motions on August 18, id. at 12, P 33; (3) "Secretary Lewis' call had an undetermined effect on Member Applewhaite's and Member Frazier's decision to reduce the time period for filing exceptions," id. at 12, P 35; and (4) the telephone calls "had no effect on Member Applewhaite's or Member Frazier's ultimate decision on the merits of the PATCO case," id. at 12, P 36.
 
 
 50
 3. Member Applewhaite's Dinner with Albert Shanker[25]
 
 
 51
 Since 1974 Albert Shanker has been President of the American Federation of Teachers, a large public-sector labor union, and a member of the Executive Council of the AFL-CIO.[26] Since 1964 Mr. Shanker has been President of the AFT's New York City Local, the United Federation of Teachers. Before joining the FLRA, Member Applewhaite had been associated with the New York Public Employment Relations Board. Through their contacts in New York, Mr. Shanker and Member Applewhaite had become professional and social friends.
 
 
 52
 The Applewhaite/Shanker Dinner. During the week of September 20, 1981, Mr. Shanker was in Washington, D. C. on business. On September 21, Mr. Shanker made arrangements to have dinner with Member Applewhaite that evening. Although he did not inform Member Applewhaite of his intentions when he made the arrangements, Mr. Shanker candidly admitted that he wanted to have dinner with Member Applewhaite because he felt strongly about the PATCO case and wanted to communicate directly to Member Applewhaite his sentiments, previously expressed in public statements, that PATCO should not be severely punished for its strike. In particular, Mr. Shanker believed that revocation of PATCO's exclusive recognition status would be an excessive punishment. After accepting the invitation, Member Applewhaite informed Member Frazier and Chairman Haughton that he was having dinner with Mr. Shanker.
 
 
 53
 Member Applewhaite and Mr. Shanker talked for about an hour and a half during their dinner on September 21. Most of the discussion concerned the preceding Saturday's Solidarity Day Rally, an upcoming tuition tax credit referendum in the District of Columbia, and mutual friends from New York. Near the end of the dinner, however, the conversation turned to labor law matters relevant to the PATCO case. The two men discussed various approaches to public employee strikes in New York, Pennsylvania and the federal government. Mr. Shanker expressed his view that the punishment of a striking union should fit the crime and that revocation of certification as a punishment for an illegal strike was tantamount to "killing a union." The record is clear that Mr. Shanker made no threats or promises to Member Applewhaite; likewise, the evidence also indicates that Member Applewhaite never revealed his position regarding the PATCO case.
 
 
 54
 Near the end of their conversation, Member Applewhaite commented that because the PATCO case was hotly contested, he would be viewed with disfavor by whichever side he voted against. Member Applewhaite also observed that he was concerned about his prospects for reappointment to the FLRA in July 1982. Mr. Shanker, in turn, responded that Member Applewhaite had no commitments from anyone and urged him to vote without regard to personal considerations. The dinner concluded and the two men departed.
 
 
 55
 The FLRA Decisional Process. On the afternoon of September 21, before the Applewhaite/Shanker dinner, the FLRA Members had had their first formal conference on the PATCO case, which had been argued to them five days earlier. Members Frazier and Applewhaite both favored revocation of PATCO's exclusive recognition status and took the position that PATCO would no longer be a labor organization within the meaning of the Civil Service Reform Act. Member Frazier favored an indefinite revocation; Member Applewhaite favored a revocation for a fixed period of one to three years. Chairman Haughton agreed that an illegal strike had occurred, but favored suspension, not revocation, of PATCO's collective bargaining status.
 
 
 56
 After September 21, Member Applewhaite considered other remedies, short of revocation, to deal with the PATCO strike. For over two weeks Member Applewhaite sought to find common ground with Chairman Haughton. Those efforts to agree on an alternative solution failed and, on October 9, Member Applewhaite finally decided to vote with Member Frazier for revocation. (Member Applewhaite apparently was concerned that the FLRA have a majority favoring one remedy, rather than render three opinions favoring three different dispositions.) All three Members drafted their final opinions by October 19. The drafts were exchanged and responses inserted. With some polishing, but no substantive change of positions, the opinions issued on October 22, 1981.
 
 
 57
 The Members' Responses to the Applewhaite/Shanker Dinner. While these negotiations within the Authority were going on, Member Frazier became concerned that Mr. Shanker might have influenced Member Applewhaite's position in the case. On September 22, Member Frazier visited Member Applewhaite to inquire about his dinner with Mr. Shanker. Member Frazier understood Member Applewhaite to say that Shanker had said that if Member Applewhaite voted against PATCO, then Applewhaite would be unable to get work as an arbitrator when he left the FLRA. Member Frazier also understood Member Applewhaite to say that he was then leaning against voting for revocation. (A. L. J. Vittone found that Shanker had made no such threats during the dinner, and concluded that Member Frazier reached this conclusion based on some miscommunication or misunderstanding.)
 
 
 58
 On September 22 and again on September 28, Member Frazier advised Member Applewhaite to talk to Solicitor Freehling about his dinner with Mr. Shanker. Member Applewhaite did so on September 28, and they concluded that no promises of benefits or threats had occurred and, therefore, that no crime had been committed. Solicitor Freehling also advised Member Applewhaite of the FLRA Rules on ex parte contacts. Member Applewhaite then told Chairman Haughton that he had discussed the dinner meeting with Solicitor Freehling and that there were no problems.
 
 
 59
 Member Frazier later asked Solicitor Freehling if Member Applewhaite had discussed his dinner with Mr. Shanker. Solicitor Freehling told Member Frazier that they had talked and that Member Applewhaite had concluded that there were no problems involved. Despite these assurances, Member Frazier contacted his personal attorney. Sometime in early October, Member Frazier's attorney contacted the FBI. The FBI interviewed Member Frazier on October 17 and then other FLRA Members and staff. FBI agents interviewed Member Applewhaite on October 22, the day the FLRA Decision issued. (Member Applewhaite was thus unaware of the FBI investigation until after he reached his final decision in the PATCO case.)
 
 
 60
 The A. L. J.'s Conclusions. A. L. J. Vittone concluded: "The Shanker-Applewhaite dinner had no effect on the ultimate decision of Mr. Applewhaite in the PATCO case. Member Applewhaite's final decision in the PATCO case was substantially the same as the position he discussed at the September 21 meeting of the members." Findings at 28, P 51. Later in his recommended findings, A. L. J. Vittone commented:
 
 
 61
 It is clear that Mr. Shanker's message to Mr. Applewhaite was that revocation of certification was a drastic remedy out of proportion to the violation. However, as I stated in my findings, I do not believe tht (sic) the dinner had any effect on the final decision of the FLRA in the PATCO case. At the very most, the effect was transitory in nature, and occurred from September 21 to October 9.
 
 
 62
 Id. at 49.
 
 B. The Parties' Positions
 
 63
 Each of the FLRA Members argue that their individual contacts with persons outside of the Authority were not improper. In addition, each of the Members supports A. L. J. Vittone's findings that the various contacts, their own and their colleagues', had no effect on the ultimate decision of the PATCO case.[27] Member Applewhaite alone disputes A. L. J. Vittone's finding that his dinner with Mr. Shanker may have had a transitory effect on his consideration of the case. Mr. Shanker also argues that his dinner with Member Applewhaite was not inappropriate and that it had no effect on the decision. In addition to the individual Members and Mr. Shanker, the FLRA (represented by its Acting Solicitor) and the FAA agree with the finding of no effect on the decision in the case.
 
 
 64
 PATCO, amicus Skirlick, and amici McClure, Hough and Tierney are less sanguine about the implications of Judge Vittone's findings. Each of them argue that the disclosed communications were improper and require remedial action. The amici contend that, due to the ex parte contacts, the Authority had an irrational sense of urgency about the case. This, they argue, prejudiced their ability to participate in the unfair labor practice proceeding and to protect the interests of nonstriking controllers. PATCO contends that the contacts with Authority Members by General Counsel Gordon and Secretary Lewis require a remand with instructions that the FLRA General Counsel and the FAA be required to show cause why the complaint should not be dismissed.
 
 
 65
 Based on their agreement with A. L. J. Vittone's finding of no effect on the ultimate outcome, the FLRA, the FAA, Chairman Haughton and Member Applewhaite all argue that no further action regarding ex parte contacts need be taken and that the court may now consider the PATCO decision on the merits. In his brief to this court, Member Frazier urged that the FLRA Decision be vacated and the case remanded to the Authority for proceedings anew. Member Frazier's position was premised on the assumption that Member Applewhaite had acted pursuant to a personal bias, thereby denying the parties an impartial tribunal. Member Frazier therefore initially urged reconsideration with Member Applewhaite disqualified from participation. However, at the oral argument held before this court on April 13, 1982, counsel for Member Frazier conceded that, since a full hearing already had been held on the matter of ex parte communications, it was not essential that the case be remanded. Member Frazier thus now appears to argue that, so long as the sanctity of the administrative and judicial processes is preserved, the court may properly consider the PATCO decision on the merits.
 
 C. Applicable Legal Standards
 
 66
 1. The Statutory Prohibition of Ex Parte Contacts and the FLRA Rules
 
 
 67
 The Civil Service Reform Act requires that FLRA unfair labor practice hearings, to the extent practicable, be conducted in accordance with the provisions of the Administrative Procedure Act. 5 U.S.C. § 7118(a)(6) (Supp. IV 1980). Since FLRA unfair labor practice hearings are formal adjudications within the meaning of the APA, see 5 U.S.C. § 551(7) (1976), section 557(d) governs ex parte communications. Id. § 557(d).
 
 
 68
 Section 557(d) was enacted by Congress as part of the Government in the Sunshine Act, Pub.L.No. 94-409, § 4(a), 90 Stat. 1241, 1246 (1976). The section prohibits ex parte communications "relevant to the merits of the proceeding" between an "interested person" and an agency decisionmaker, 5 U.S.C. § 557(d)(1)(A), (B) (1976), requires the agency decisionmaker to place any prohibited communications on the public record, id. § 557(d)(1)(C), grants the agency the authority to require an infringing party "to show cause why his claim or interest should not be dismissed, denied, disregarded, or otherwise adversely affected on account of (a) violation," id. § 557(d)(1)(D), and defines the time period during which the statutory prohibitions are applicable, id. § 557(d)(1)(E).[28] The FLRA has adopted rules that, with minor variations, parallel the requirements of section 557(d). See 5 C.F.R. pt. 2414 (1981).
 
 
 69
 Three features of the prohibition on ex parte communications in agency adjudications are particularly relevant to the contacts here at issue. First, by its terms, section 557(d) applies only to ex parte communications to or from an "interested person." Congress did not intend, however, that the prohibition on ex parte communications would therefore have only a limited application. A House Report explained:
 
 
 70
 The term "interested person" is intended to be a wide, inclusive term covering any individual or other person with an interest in the agency proceeding that is greater than the general interest the public as a whole may have. The interest need not be monetary, nor need a person to (sic) be a party to, or intervenor in, the agency proceeding to come under this section. The term includes, but is not limited to, parties, competitors, public officials, and nonprofit or public interest organizations and associations with a special interest in the matter regulated. The term does not include a member of the public at large who makes a casual or general expression of opinion about a pending proceeding.
 
 
 71
 H.R.Rep.No. 880, Pt. I, 94th Cong., 2d Sess. 19-20 (1976), U.S.Code Cong. & Admin.News 1976, p. 2183, 2201, reprinted in Senate Comm. on Government Operations & House Comm. on Government Operations, 94th Cong., 2d Sess., Government in the Sunshine Act-S. 5 (Public Law 94-409): Source Book: Legislative History, Texts, and Other Documents 530-31 (Jt. Comm. Print 1976) (hereinafter cited as Sunshine Act Sourcebook). Accord, S.Rep.No. 354, 94th Cong., 1st Sess. 11, 36 (1975), Sunshine Act Sourcebook at 206, 231; see also 5 C.F.R. § 2414.3(a) (1981).
 
 
 72
 Second, the Government in the Sunshine Act defines an "ex parte communication" as "an oral or written communication not on the public record to which reasonable prior notice to all parties is not given, but ... not includ(ing) requests for status reports on any matter or proceeding ...." 5 U.S.C. § 551(4) (1976).[29] Requests for status reports are thus allowed under the statute, even when directed to an agency decisionmaker rather than to another agency employee. See Raz Inland Navigation Co. v. ICC, 625 F.2d 258 (9th Cir. 1980). Nevertheless, the legislative history of the Act cautions:
 
 
 73
 A request for a status report or a background discussion may in effect amount to an indirect or subtle effort to influence the substantive outcome of the proceedings. The judgment will have to be made whether a particular communication could affect the agency's decision on the merits. In doubtful cases the agency official should treat the communication as ex parte so as to protect the integrity of the decision making process.
 
 
 74
 S.Rep.No. 354, supra, at 37, Sunshine Act Sourcebook at 232. Accord, H.R.Rep.No. 880, Pt. I, supra, at 20-21, Sunshine Act Sourcebook at 531-32.
 
 
 75
 Third, and in direct contrast to status reports, section 557(d) explicitly prohibits communications "relevant to the merits of the proceeding." The congressional reports state that the phrase should "be construed broadly and ... include more than the phrase 'fact in issue' currently used in (section 554(d)(1) of) the Administrative Procedure Act." S.Rep.No. 354, supra, at 36, Sunshine Act Sourcebook at 231; H.R.Rep.No. 880, Pt. I, supra, at 20, U.S.Code Cong. & Admin.News 1976, p. 2202, Sunshine Act Sourcebook at 531. While the phrase must be interpreted to effectuate the dual purposes of the Government in the Sunshine Act, i.e., of giving notice of improper contacts and of providing all interested parties an opportunity to respond to illegal communications, see S.Rep.No. 354, supra, at 37, Sunshine Act Sourcebook at 232, the scope of this provision is not unlimited. Congress explicitly noted that the statute does not prohibit procedural inquiries, see id. at 36, Sunshine Act Sourcebook at 231, or other communications "not relevant to the merits," S.Rep.No. 1178, 94th Cong., 2d Sess. 29 (1976) (Conference Report), Sunshine Act Sourcebook at 811.
 
 
 76
 In sum, Congress sought to establish common-sense guidelines to govern ex parte contacts in administrative hearings, rather than rigidly defined and woodenly applied rules. The disclosure of ex parte communications serves two distinct interests. Disclosure is important in its own right to prevent the appearance of impropriety from secret communications in a proceeding that is required to be decided on the record. Disclosure is also important as an instrument of fair decisionmaking; only if a party knows the arguments presented to a decisionmaker can the party respond effectively and ensure that its position is fairly considered. When these interests of openness and opportunity for response are threatened by an ex parte communication, the communication must be disclosed. It matters not whether the communication comes from someone other than a formal party or if the communication is clothed in the guise of a procedural inquiry. If, however, the communication is truly not relevant to the merits of an adjudication and, therefore, does not threaten the interests of openness and effective response, disclosure is unnecessary. Congress did not intend to erect meaningless procedural barriers to effective agency action. It is thus with these interests in mind that the statutory prohibition on ex parte communications must be applied.
 
 2. Remedies for Ex Parte Communications
 
 77
 Section 557(d) contains two possible administrative remedies for improper ex parte communications. The first is disclosure of the communication and its content. 5 U.S.C. § 557(d)(1)(C) (1976). The second requires the violating party to "show cause why his claim or interest in the proceeding should not be dismissed, denied, disregarded, or otherwise adversely affected on account of (the) violation." Id. § 557(d)(1)(D); see also id. § 556(d). Congress did not intend, however, that an agency would require a party to "show cause" after every violation or that an agency would dismiss a party's interest more than rarely. See S.Rep.No. 354, supra, at 37-39, Sunshine Act Sourcebook at 232-34. Indeed, the statutory language clearly states that a party's interest in the proceeding may be adversely affected only "to the extent consistent with the interests of justice and the policy of the underlying statutes." 5 U.S.C. § 557(d)(1)(D) (1976).[30]
 
 
 78
 The Government in the Sunshine Act contains no specific provisions for judicial remedy of improper ex parte communications. However, we may infer from approving citations in the House and Senate Reports that Congress did not intend to alter the existing case law regarding ex parte communications and the legal effect of such contacts on agency decisions. See S.Rep.No. 354, supra, at 3, 35, Sunshine Act Sourcebook at 198, 230; H.R.Rep.No. 880, Pt. I, supra, at 4, Sunshine Act Sourcebook at 515 (citing Jacksonville Broadcasting Corp. v. FCC, 348 F.2d 75 (D.C.Cir.), cert. denied, 382 U.S. 893, 86 S.Ct. 186, 15 L.Ed.2d 150 (1965), and Sangamon Valley Television Corp. v. FCC, 269 F.2d 221 (D.C.Cir.1959)).
 
 
 79
 Under the case law in this Circuit, improper ex parte communications, even when undisclosed during agency proceedings, do not necessarily void an agency decision. Rather, agency proceedings that have been blemished by ex parte communications have been held to be voidable. See, e.g., Home Box Office, Inc. v. FCC, 567 F.2d 9, 58 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); United Air Lines v. CAB, 309 F.2d 238, 240-41 (D.C.Cir.1962); WORZ, Inc. v. FCC, 268 F.2d 889, 890 (D.C.Cir.1959).[31] In enforcing this standard, a court must consider whether, as a result of improper ex parte communications, the agency's decisionmaking process was irrevocably tainted so as to make the ultimate judgment of the agency unfair, either to an innocent party or to the public interest that the agency was obliged to protect.[32] In making this determination, a number of considerations may be relevant: the gravity of the ex parte communications;[33] whether the contacts may have influenced the agency's ultimate decision;[34] whether the party making the improper contacts benefited from the agency's ultimate decision;[35] whether the contents of the communications were unknown to opposing parties, who therefore had no opportunity to respond;[36] and whether vacation of the agency's decision and remand for new proceedings would serve a useful purpose.[37] Since the principal concerns of the court are the integrity of the process and the fairness of the result, mechanical rules have little place in a judicial decision whether to vacate a voidable agency proceeding. Instead, any such decision must of necessity be an exercise of equitable discretion.
 
 
 80
 D. Analysis of the Alleged Ex Parte Communications with FLRA Members
 
 
 81
 With the foregoing considerations in mind, we have analyzed A. L. J. Vittone's findings thoroughly and given careful thought to the positions urged by the parties. As we noted earlier, the vast majority of the reported contacts between FLRA Members and persons outside the Authority are not troubling. They relate to inquiries about the expected date of issuance of the FLRA's opinion,[38] information from a third party regarding settlement efforts,[39] statements regarding the running of PATCO's time to respond to Chairman Haughton's conditional dissent,[40] and other communications unrelated to the merits of the case.[41]
 
 
 82
 After extensive review of the three troubling incidents that we describe in Part II.A. supra, we believe that they too provide insufficient reason to vacate the FLRA Decision or to remand this case for further proceedings before the Authority. The special evidentiary hearing before Judge Vittone was ordered by this court not because we assumed that the A. L. J. would find serious wrongs or improprieties, but because the allegations of misconduct were serious enough to require full exploration. Public officials are held to high standards of behavior, and only through a special inquiry could we clear the air of any doubt that the FLRA Decision in this case was not unfairly influenced.
 
 
 83
 After unavoidable time, effort and expense, both by the parties and by the individual FLRA Members, A. L. J. Vittone formulated his findings. Except as otherwise noted below, we accept them. We conclude that at least one and possibly two of the contacts documented by the A. L. J. probably infringed the statutory prohibitions on ex parte communications. The incidents reported by the A. L. J. also included some evident, albeit unintended, indiscretions in a highly charged and widely publicized case. Nevertheless, we agree with A. L. J. Vittone that the ex parte contacts here at issue had no effect on the ultimate decision of the FLRA. Moreover, we conclude that the statutory infringements and other indiscretions are not so serious as to require us to vacate the FLRA Decision or to remand the case to the Authority. On the facts of this case, we believe that to vacate and remand would be a gesture of futility.
 
 
 84
 1. The Meeting Between Member Applewhaite and FLRA General Counsel Gordon
 
 
 85
 When General Counsel Gordon met with Member Applewhaite on August 10, the General Counsel's office was prosecuting the unfair labor practice complaint against PATCO before Chief A. L. J. Fenton. General Counsel Gordon was therefore a "person outside the agency" within the meaning of section 557(d) and the FLRA Rules. 5 C.F.R. § 2414.3(a) (1981). Still, the undisputed purpose of the meeting was to discuss budgetary and administrative matters. It was therefore entirely appropriate. The shared concerns of the Authority are not put on hold whenever the General Counsel prosecutes an unfair labor practice complaint.
 
 
 86
 The discussion relevant to the PATCO case arose only when Ms. Stern delivered a copy of her memorandum regarding decertification of striking unions to Member Applewhaite. Thus, the ex parte contact, such as it was, was entirely inadvertent.[42] More important, the contents of the discussion were entirely innocuous. Neither the General Counsel nor Member Applewhaite expressed any view on the correct statutory interpretation, the General Counsel made no arguments to Member Applewhaite, and the facts of the PATCO case were not mentioned.
 
 
 87
 Some occasional and inadvertent contacts between the prosecuting and adjudicating arms of a small agency like the FLRA may be inevitable. While we cannot countenance any contacts or overlap in functions that threaten to bias administrative adjudications, accidental or passing references to a pending case do not per se deprive a party of a fair proceeding. See 5 U.S.C. § 554(d) (C) (1976); cf. FTC v. Cinderella Career & Finishing Schools, 404 F.2d 1308, 1315 (D.C.Cir.1968) (some mixing of adjudicatory and prosecutorial functions is not a denial of due process). Indeed, it is likely that the content of the brief discussion between Member Applewhaite, General Counsel Gordon and Ms. Stern was less relevant to the merits of the PATCO case than was the information conveyed to the FLRA Members by the General Counsel when he sought their approval to seek an injunction against the strike pursuant to 5 U.S.C. § 7123(d) (Supp. IV 1980). See 5 C.F.R. ch. XIV, app. B (1981); id. § 2414.6(f).[43] Yet, such discussions regarding the initiation of proceedings and the filing of charges violate neither the Administrative Procedure Act nor due process of law. Withrow v. Larkin, 421 U.S. 35, 56-57, 95 S.Ct. 1456, 1469, 43 L.Ed.2d 712 (1975).
 
 
 88
 In hindsight, it may have been preferable if Member Applewhaite had postponed even this general conversation with Ms. Stern or if General Counsel Gordon had temporarily excused himself from Member Applewhaite's office.[44] Nonetheless, we do not believe that this contact tainted the proceeding or unfairly advantaged the General Counsel in the prosecution of the case. Thus, we conclude that the conversation at issue here, even though possibly indiscreet and undesirable, does not void the FLRA Decision in this case.
 
 
 89
 2. Secretary Lewis' Telephone Calls to Members Frazier and Applewhaite
 
 
 90
 Transportation Secretary Lewis was undoubtedly an "interested person" within the meaning of section 557(d) and the FLRA Rules when he called Members Frazier and Applewhaite on August 13. Secretary Lewis' call clearly would have been an improper ex parte communication if he had sought to discuss the merits of the PATCO case. The Secretary explicitly avoided the merits, however, and mentioned only his view on the possibility of settlement and his desire for a speedy decision. On this basis, Solicitor Freehling and Member Frazier concluded the call was not improper. See 5 C.F.R. § 2414.6(b), (d) (1981).
 
 
 91
 We are less certain that Secretary Lewis' call was permissible. Although Secretary Lewis did not in fact discuss the merits of the case, even a procedural inquiry may be a subtle effort to influence an agency decision. See text at note 29 supra. We do not doubt that Member Frazier and Solicitor Freehling concluded in good faith that the communications were not improper, but it would have been preferable for them to heed Congress' warning, to assume that close cases like these are improper, and to report them on the public record.
 
 
 92
 We need not decide, however, whether Secretary Lewis' contacts were in fact improper. Even if they were, the contacts did not taint the proceedings or prejudice PATCO. Secretary Lewis' central concern in his conversations with Member Frazier and Member Applewhaite was that the case be handled expeditiously.[45] Member Applewhaite explicitly told Secretary Lewis that if he wanted the case handled more quickly than the normal course of FLRA business, then the FAA would have to file a written request. If, as A.L.J. Vittone found likely, Member Applewhaite's comments led to the FAA's Motion to Modify Time Limits, that was exactly the desired result. Once the FAA filed a motion, PATCO filed its own responsive motions, and the FLRA was able to decide the timing issue based on the pleadings before it.
 
 
 93
 We believe that the Authority did exactly that. Chairman Haughton was cognizant only of the motions that had been filed. Member Applewhaite had quickly terminated his conversation with Secretary Lewis, and Member Frazier's conversation with Secretary Lewis was at most brief. During the Members' hour-long consideration of the motions, they did not mention Secretary Lewis' calls. In the end, the FLRA denied all of the motions and only reduced the time for filing exceptions from twenty-five days to nineteen days. In these circumstances, and given A.L.J. Vittone's inability to find any effect of the calls on the Members' decision, see Findings at 12, P 35, we cannot find that the disposition of the motions was improperly influenced.
 
 
 94
 Finally, PATCO cannot claim that it was prejudiced. The failure of the Authority to notice Secretary Lewis' calls on the public record did not deprive PATCO of an opportunity to comment: PATCO filed responsive motions. (Surely PATCO cannot argue that fairness requires two opportunities to respond rather than one.) Nor has PATCO suggested how it was ultimately injured by the six-day change in the time for filing exceptions.[46] In these circumstances we conclude that Secretary Lewis' telephone calls do not void the FLRA Decision.
 
 
 95
 3. Member Applewhaite's Dinner with Albert Shanker
 
 
 96
 Of course, the most troublesome ex parte communication in this case occurred during the September 21 dinner meeting between Member Applewhaite and American Federation of Teachers President Albert Shanker-the "well-known labor leader" mentioned in Assistant Attorney General McGrath's affidavit. See Professional Air Traffic Controllers Organization v. FLRA, 672 F.2d 109, 113-15 app. (D.C.Cir.1982). Because allegations arising from this dinner occasioned our order of an evidentiary hearing, A.L.J. Vittone and the participants in the hearing before him centered much of their attention on this incident. We, too, have carefully focused on the Applewhaite/Shanker dinner in our review of the ex parte contacts. We agree-as do all the parties before us-with A.L.J. Vittone's finding that the dinner had no effect on the FLRA Decision in the case. After thorough consideration, we further conclude that the incident does not require a remand to the Authority.
 
 
 97
 At the outset, we are faced with the question whether Mr. Shanker was an "interested person" to the proceeding under section 557(d) and the FLRA Rules. Mr. Shanker argues that he was not. He suggests that his only connection with the unfair labor practice case was his membership on the Executive Council of the AFL-CIO which, unbeknownst to him, had participated as amicus curiae in the oral argument of the PATCO case before the FLRA. This relationship to the proceeding, Mr. Shanker contends, is too tenuous to qualify him as an "interested person" forbidden to make ex parte communications to the Authority Members.
 
 
 98
 As noted above, Congress did not intend such a narrow construction of the term "interested person." See text after note 28 supra. The Senate Committee on Government Operations deleted a provision in the original bill that exempted ex parte communications involving persons who were neither parties, intervenors nor government officials. See S.Rep.No.354, 94th Cong., 1st Sess. 11 (1975), Sunshine Act Sourcebook at 206. The House and Senate Reports agreed that the term covers "any individual or other person with an interest in the agency proceeding that is greater than the general interest the public as a whole may have. The interest need not be monetary, nor need a person be a party to, or intervenor in, the agency proceeding ...." Id. at 36, Sunshine Act Sourcebook at 231. Accord, H.R.Rep.No.880, Pt. I, 94th Cong., 2d Sess. 19 (1975), U.S.Code Cong. & Admin.News 1976, p. 2201, Sunshine Act Sourcebook at 530.
 
 
 99
 We believe that Mr. Shanker falls within the intended scope of the term "interested person." Mr. Shanker was (and is) the President of a major public-sector labor union. As such, he has a special and well-known interest in the union movement and the developing law of labor relations in the public sector. The PATCO strike, of course, was the subject of extensive media coverage and public comment. Some union leaders undoubtedly felt that the hard line taken against PATCO by the Administration might have an adverse effect on other unions, both in the federal and in state and local government sectors. Mr. Shanker apparently shared this concern. From August 3, 1981 to September 21, 1981, Mr. Shanker and his union made a series of widely publicized statements in support of PATCO. Mr. Shanker urged repeatedly in public statements that disproportionately severe punishment not be inflicted on PATCO. He spoke frequently on this subject, was interviewed about the PATCO strike on a nationally televised news program, and published a number of columns in the New York Times discussing the PATCO situation. Findings at 14-15, PP 3-6. Thus, Mr. Shanker's actions, as well as his union office, belie his implicit claim that he had no greater interest in the case than a member of the general public. Regardless of the amicus status of the AFL-CIO, and Mr. Shanker's lack of knowledge thereof, he was an "interested person" within the meaning of 5 U.S.C. § 557(d) (1976).[47]
 
 
 100
 Even if we were to adopt Mr. Shanker's position that he was not an interested person, we are astonished at his claim that he did nothing wrong. Mr. Shanker frankly concedes that he "desired to have dinner with Member Applewhaite because he felt strongly about the PATCO case and he wished to communicate directly to Member Applewhaite sentiments he had previously expressed in public." Shanker's Brief at 8; see Findings at 15, P 9. While we appreciate Mr. Shanker's forthright admission, we must wonder whether it is a product of candor or a failure to comprehend that his conduct was improper. In case any doubt still lingers, we take the opportunity to make one thing clear: It is simply unacceptable behavior for any person directly to attempt to influence the decision of a judicial officer in a pending case outside of the formal, public proceedings. This is true for the general public, for "interested persons," and for the formal parties to the case.[48] This rule applies to administrative adjudications as well as to cases in Article III courts.[49]
 
 
 101
 We think it a mockery of justice to even suggest that judges or other decisionmakers may be properly approached on the merits of a case during the pendency of an adjudication. Administrative and judicial adjudications are viable only so long as the integrity of the decisionmaking processes remains inviolate. There would be no way to protect the sanctity of adjudicatory processes if we were to condone direct attempts to influence decisionmakers through ex parte contacts.
 
 
 102
 We do not hold, however, that Member Applewhaite committed an impropriety when he accepted Mr. Shanker's dinner invitation. Member Applewhaite and Mr. Shanker were professional and social friends. We recognize, of course, that a judge "must have neighbors, friends and acquaintances, business and social relations, and be a part of his day and generation." Pennsylvania v. Local Union 542, International Union of Operating Engineers, 388 F.Supp. 155, 159 (E.D.Pa.1974) (quoting Ex Parte N. K. Fairbank Co., 194 F. 978, 989 (M.D.Ala.1912)). Similarly, Member Applewhaite was not required to renounce his friendships, either personal or professional, when he was appointed to the FLRA. When Mr. Shanker called Member Applewhaite on September 21, Member Applewhaite was unaware of Mr. Shanker's purpose in arranging the dinner. He therefore had no reason to reject the invitation.[50]
 
 
 103
 The majority of the dinner conversation was unrelated to the PATCO case. Only in the last fifteen minutes of the dinner did the discussion become relevant to the PATCO dispute, apparently when Mr. Shanker raised the topic of local approaches to public employee strikes in New York and Pennsylvania. See Findings at 16-17, PP 11-14. At this point, and as the conversation turned to the discipline appropriate for a striking union like PATCO, Member Applewhaite should have promptly terminated the discussion. Had Mr. Shanker persisted in discussing his views of the PATCO case, Member Applewhaite should have informed him in no uncertain terms that such behavior was inappropriate. Unfortunately, he did not do so.
 
 
 104
 This indiscretion, this failure to steer the conversation away from the PATCO case, eventually led to the special evidentiary hearing in this case. The hearing has filled in much of the "factual picture" left incomplete by the McGrath affidavit and the FBI reports. See Professional Air Traffic Controllers Organization v. FLRA, 672 F.2d 109, 113 (D.C.Cir.1982) (per curiam). We now know that Mr. Shanker did not in any way threaten Member Applewhaite during their dinner. Mr. Shanker did not tell Member Applewhaite that if he voted to decertify PATCO he would be unable to get cases as an arbitrator if and when he left the FLRA. Mr. Shanker did not say that he was speaking "for top AFL-CIO officials" or that Member Applewhaite would need labor support to secure reappointment. Moreover, Mr. Shanker did not make any promises of any kind to Member Applewhaite, and Member Applewhaite did not reveal how he intended to vote in the PATCO case. Findings at 17-18, PP 16-17.[51]
 
 
 105
 In these circumstances, we do not believe that it is necessary to vacate the FLRA Decision and remand the case. First, while Mr. Shanker's purpose and conduct were improper, and while Member Applewhaite should not have entertained Mr. Shanker's views on the desirability of decertifying a striking union, no threats or promises were made. Though plainly inappropriate, the ex parte communication was limited to a ten or fifteen minute discussion, often couched in general terms, of the appropriate discipline for a striking public employee union. This behavior falls short of the "corrupt tampering with the adjudicatory process" found by this court in WKAT, Inc. v. FCC, 296 F.2d 375, 383 (D.C.Cir.), cert. denied, 368 U.S. 841, 82 S.Ct. 63, 7 L.Ed.2d 40 (1961).
 
 
 106
 Second, A. L. J. Vittone found that the Applewhaite/Shanker dinner had no effect on the ultimate decision of Member Applewhaite or of the FLRA as a whole in the PATCO case. None of the parties have disputed this finding. Indeed, even Member Frazier, who initiated the FBI investigation of the dinner, testified that "in his opinion the Shanker-Applewhaite dinner did not have an effect on Member Applewhaite ultimate decision in the PATCO case." Findings at 28, P 50.[52]
 
 
 107
 Third, no party benefited from the improper contact. The ultimate decision was adverse to PATCO, the party whose interests were most closely aligned with Mr. Shanker's position. The final decision also rejected the position taken by the AFL-CIO as amicus curiae and by Mr. Shanker in his dinner conversation with Member Applewhaite.
 
 
 108
 Finally, we cannot say that the parties were unfairly deprived of an opportunity to refute the arguments propounded in the ex parte communication. PATCO has not identified any manner in which it was denied a reasonable opportunity to respond or any new arguments which it would present to the FLRA if given an opportunity.[53] Understandably, the FAA does not complain that its interests were injured. Moreover, Mr. Shanker's arguments regarding the severity of decertification paralleled PATCO's own arguments before the FLRA. The FAA and the FLRA General Counsel had a full opportunity to refute these arguments before the Authority.
 
 
 109
 We in no way condone Mr. Shanker's behavior in this case. Nor do we approve Member Applewhaite's failure to avoid discussion of a case pending before the Authority. Nevertheless, we do not believe that the Applewhaite/Shanker dinner, as detailed in A. L. J. Vittone's findings, irrevocably tainted the Authority's decision-making process or resulted in a decision unfair either to the parties or to the public interest.
 
 
 110
 E. Member Applewhaite's Alleged "Personal Interest" in the PATCO Case
 
 
 111
 As we have noted, the special evidentiary hearing ordered in this case has filled in much of the factual picture left incomplete by the McGrath affidavit and the FBI reports. One feature of the picture revealed by the inquiry is the contents of Member Applewhaite's and Mr. Shanker's dinner conversation. A. L. J. Vittone found that near the end of their conversation Member Applewhaite observed that "he was concerned about his prospects for reappointment in July 1982." He also commented that, "because the PATCO case was hotly contested, he would be viewed with disfavor by whichever side he voted against." In response, "Mr. Shanker urged Applewhaite to vote without regard to personal considerations." Findings at 17, P 15.
 
 
 112
 Based essentially on this brief conversation, Member Frazier now proposes that Member Applewhaite had a personal interest in the outcome of the PATCO case. Member Frazier contends that the record shows that Member Applewhaite was concerned that if he voted in favor of PATCO, he would not be reappointed by the Administration, and that if he voted against PATCO (and was not reappointed), his career in labor law would suffer from organized labor's reaction to his vote. Because of these alleged personal interests in the outcome, Member Frazier argues that Member Applewhaite was disqualified from hearing the PATCO case.
 
 
 113
 We do not read as much into this conversation as does Member Frazier. It is not surprising that an agency member appointed by the President might be concerned about his prospects for reappointment. We are not so naive as to believe that such thoughts do not cross a member's mind.[54] Nor would we assume that an Authority Member would believe that his decisions are irrelevant to the President's determination whether to reappoint him. Similarly, it is hardly surprising for Member Applewhaite to recognize that his decision in a hotly contested case would not receive universal approbation. The appropriate question here is not whether Member Applewhaite recognized that his decision might not be universally approved; rather, the correct inquiry is whether Member Applewhaite's concerns rendered him incapable of reaching a fair decision on the merits of the case before him.[55]
 
 
 114
 The cited brief conversation between Member Applewhaite and Mr. Shanker does not demonstrate an inability to fairly decide the case. Courts have long recognized "a presumption of honesty and integrity in those serving as adjudicators." Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975). Accord, NLRB v. Donnelly Garment Co., 330 U.S. 219, 229, 67 S.Ct. 756, 761, 91 L.Ed. 854 (1947); United States v. Morgan, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). Absent a strong showing to the contrary, an agency adjudicator is presumed to act in good faith and to be capable of ignoring considerations not on the record. See, e.g., FTC v. Cement Institute, 333 U.S. 683, 700-03, 68 S.Ct. 793, 803-04, 92 L.Ed. 1010 (1948); Lead Industries Association v. EPA, 647 F.2d 1130, 1178 (D.C.Cir.), cert. denied, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980).
 
 
 115
 Member Frazier argues that there is a strong showing in this case because here we have an open admission of Member Applewhaite's concerns. Such a verbalization of an agency adjudicator's thoughts on the public record, argues Member Frazier, is rare. While it may indeed be rare, we think that is the result of the rarity of evidentiary hearings such as we have ordered here, and not the product of an especially strong personal concern by Member Applewhaite.[56]
 
 
 116
 Indeed, any doubts we might otherwise have about the source of Member Applewhaite's ultimate decision in this case have been dispelled by the evidentiary hearing and the A. L. J.'s findings. Member Applewhaite did believe that he would be viewed with disfavor by whichever side he voted against.[57] But Member Applewhaite explained that this was no different from any arbitration case in which he had ruled-one party wins and the other loses. He testified: "I have always faced that problem(,) so I just have to call it like it is and ... take my chances." Tr. 744. We have no reason to doubt this testimony. Furthermore, A. L. J. Vittone's findings reveal that the PATCO case was never mentioned in Member Applewhaite's contacts with Administration officials. Findings at 32, PP 4-6; at 34-35, PP 8-10, 12. A. L. J. Vittone found that Member Applewhaite never "held out his vote in PATCO as deserving consideration by the Administration with respect to his possible reappointment," id. at 35, P 13, and that his conversations with Administration officials "did not affect in any manner Applewhaite's decision in the PATCO case," id. at 35, P 14. In these circumstances, Member Frazier's concerns about Member Applewhaite's bias are simply inapposite.[58] Thus, we believe that the evidentiary hearing has refuted "even the probability of unfairness." In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). A remand on the basis of personal interest is therefore unnecessary.[59]
 
 F. Conclusion
 
 117
 Our review of the record of the special evidentiary hearing, and of the findings of Judge Vittone, leads us to a simple conclusion: There is no reason to vacate the FLRA decision or to remand the case to the FLRA for any further proceedings. We have not found any ex parte communications that irrevocably tainted the Authority's decision. Nor have the proceedings effected procedural unfairness on any of the parties.
 
 
 118
 This is not to say that the Authority's handling of the case has been a paragon of administrative procedure. It certainly has not. Because "the suggestion of behind-the-scenes machinations (was) intolerable," Professional Air Traffic Controllers Organization v. FLRA, 672 F.2d 109, 113 (D.C.Cir.1982) (per curiam), we ordered an extensive inquiry and gave all participants an opportunity to demonstrate why (if they so believed) the proceedings should be extended or begun anew. We have carefully examined the alleged indiscretions and improprieties. Although we have found one (or possibly two) statutory infringements, we conclude that no parties have been prejudiced by the flaws in the proceedings.
 
 
 119
 Of course, we recognize that it would be possible to vacate the FLRA Decision and to remand for reconsideration. Although that might produce a new record free from procedural defects, it would serve no other useful purpose. We, and all the parties, know the positions of each Authority Member. We know also that those positions are not the misbegotten offspring of improper influences. All of the Members have testified that they would reach identical conclusions upon reconsideration, and we have no reason to doubt their sworn testimony.
 
 
 120
 Moreover, the facts of this case are free from any arguable taint. The extensive inquiry revealed no improper attempts to influence Chief A. L. J. Fenton or his fact-finding. The FLRA did not alter his factual conclusions. The principal issues decided by the Authority, therefore, are legal. We, of course, will independently review those legal issues. Any arguable taint that may remain will therefore be cured. See, e.g., Gulf Oil Corp. v. FPC, 563 F.2d 588, 612 (3d Cir. 1977) ("Judicial review is fully capable of correcting bias as to legal questions"), cert. denied, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978); Marquette Cement Manufacturing Co. v. FTC, 147 F.2d 589, 594 (7th Cir. 1945), aff'd sub nom. FTC v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948).
 
 
 121
 We have already extended the appellate consideration of an important case. The criminal investigation by the FBI and the special procedures that we have employed should put to rest any doubts about the legitimacy of the Authority decision. Because remand would therefore be a futile gesture, we proceed to the consideration of the merits.
 
 
 122
 III. PATCO'S VIOLATION OF THE BAN ON FEDERAL EMPLOYEE STRIKES
 
 
 123
 On the merits of this case, PATCO presents the court with two questions for review. The first question, which is addressed in this Part III., is whether the FLRA's finding that PATCO called, participated in, and condoned a strike is supported by substantial evidence. The second question, which is addressed infra in Part IV., is whether the FLRA properly exercised its discretion under the Act in revoking the exclusive recognition status of PATCO.
 
 A. The Scope of Review
 
 124
 Section 7123(c) of the Civil Service Reform Act declares that "(t)he findings of the Authority with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 5 U.S.C. § 7123(c) (Supp. IV 1980). This language is identical to that governing judicial review of the decisions of the National Labor Relations Board, see 29 U.S.C. § 160(e) (1976), and Congress clearly intended the scope of review of FLRA factual findings to be identical to that of NLRB findings.[60] Thus, although this is one of the first occasions that this court has had to apply the substantial evidence rule in connection with disputed findings in an unfair labor practice hearing before the FLRA, the scope of our review is well-settled. See, e.g., Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); UAW v. NLRB, 392 F.2d 801, 805 (D.C.Cir.1967), cert. denied, 392 U.S. 906, 88 S.Ct. 2058, 20 L.Ed.2d 1364 (1968). The judicial function is merely to review the substantiality of the evidence underlying the agency decision, not to "displace the (agency's) choice between two fairly conflicting views." That test of substantiality is met when the record before the court does not "preclude( ) the (agency's) decision from being justified by a fair estimate of the worth of the testimony of the witnesses or its informed judgment on matters within its special competence or both." Universal Camera, 340 U.S. at 488, 490, 71 S.Ct. at 464, 465.
 
 B. Violation of Section 7116(b)(7)(A)
 
 125
 In this case it fully appears that the record before the FLRA provided a rational justification for its finding that PATCO "call(ed), or participate(d) in, a strike," an unfair labor practice prohibited by 5 U.S.C. § 7116(b)(7)(A) (Supp. IV 1980).[61] As described above, the record contained evidence of simultaneous picketing by striking air traffic controllers at five separate FAA facilities. In each case the picketers carried signs indicating that they were on strike and that they belonged to a particular PATCO Local. In several cases FAA officials, viewing photographs taken during the strike, identified individual picketers as air traffic controllers (including certain PATCO Local officers); many of the persons identified were controllers who were scheduled for work at the times when the photographs were taken. In addition, FAA records also established massive absenteeism on August 3 and thereafter by air traffic controllers nationwide.
 
 
 126
 PATCO objects to the adequacy of this evidence, contending that it establishes only that strikes were conducted by certain PATCO Local unions, while the Respondent before the FLRA was the PATCO National union. Whatever weight PATCO's contention might otherwise have is seriously diminished by the evidence of the simultaneous picketing at numerous work locations and by the evidence of the nationwide scope of absenteeism by controllers on and after August 3. However the evidence is interpreted, it certainly cannot be characterized as "a wildcat strike on the part of one of (PATCO's) Locals." PATCO Reply Brief at 12. The weight of PATCO's contention is even further diminished by the fact that the PATCO National union was the exclusive bargaining agent for all bargaining unit members. For several months prior to August 3, the PATCO National union, and not the Locals, had engaged in collective bargaining with the FAA for a national agreement. The FLRA was entitled to draw a reasonable inference from the national bargaining unit and from the nationwide picketing and absenteeism-viz., that the PATCO National union, and not merely a collection of PATCO Locals, was on strike.[62]
 
 
 127
 Moreover, the FAA introduced into evidence two videotapes of PATCO National union President Robert Poli making statements regarding the strike at news conferences.[63] In the first videotape, Poli is recorded as announcing that the strike would begin on the morning of August 3 if no satisfactory settlement proposal was reached and if tallying of a strike vote revealed the necessary support. PATCO notes that this statement was not an actual strike call, but at most a prediction or a suggestion of conditions precedent to a strike. While what PATCO notes is indeed true, the statement nonetheless carries significant weight in light of the fact that Poli's "predicted" time of the strike exactly coincided with the extensive picketing and massive absenteeism. In the second videotape, Poli was recorded as making the simple statement: "The question is will the strike continue. The answer is yes." PATCO again contends that the statement is "no more than a prediction-a speculation about future events." PATCO Brief at 22-23. While the characterization given Poli's statement by PATCO is not totally inaccurate, it does not undercut the FLRA's finding. Poli's acknowledgement of the strike and his quite certain "prediction" that it would continue negate any attempt by PATCO to disassociate the PATCO National union from the widespread and simultaneous strike activity by PATCO members nationwide.
 
 
 128
 In these circumstances-simultaneous and widespread absenteeism by union members, picketing announcing various union locals as being on strike, and accurate statements by the union president that a strike would take place under certain conditions and then that that strike would continue-we have no difficulty concluding that the FLRA's finding was supported by substantial evidence on the record as a whole. Our conclusion is made more certain by the total absence of record evidence offered by PATCO in refutation. Thus, we affirm the FLRA's finding that PATCO "call(ed), or participate(d) in, a strike" in violation of 5 U.S.C. § 7116(b)(7)(A) (Supp. IV 1980).
 
 C. Violation of Section 7116(b)(7)(B)
 
 129
 PATCO also objects to the conclusion of the FLRA that PATCO committed a separate unfair practice of condoning a strike "by failing to take action to prevent or stop such activity," a violation of 5 U.S.C. § 7116(b)(7)(B) (Supp. IV 1980).[64] After finding that the evidence presented was sufficient to establish the prima facie existence of a strike, Chief A.L.J. Fenton ruled that the burden shifted to PATCO to produce evidence showing that it had taken some action to prevent or to stop the strike.[65] PATCO offered no such evidence.
 
 
 130
 PATCO does not now object to the legal principle followed by Judge Fenton regarding the shifting of the burden; instead, PATCO contends that there was insufficient evidence to shift the burden in this case. PATCO argues that the FLRA General Counsel failed to prove that the PATCO National union was aware of the strike at any time during which it could have taken action to stop it; hence, it argues that the General Counsel failed to establish that National union had any obligation under section 7116(b)(7)(B) to attempt to stop the strike.[66]
 
 
 131
 Given our affirmance of the unfair labor practice finding under section 7116(b)(7)(A), it necessarily follows that the FLRA could conclude that the PATCO National union was aware of the strike and, as a consequence, had a statutory obligation to attempt to stop the strike activity. In addition, we believe that the FLRA was fully justified in taking official notice of proceedings in the District Court for the District of Columbia. During the early morning of August 3, 1981, the District Court issued a restraining order against the PATCO strike. During the evening of that same day, the District Court found both the PATCO National union and its President, Robert Poli, in civil contempt for violation of the restraining order. United States v. Professional Air Traffic Controllers Organization, 107 L.R.R.M. (BNA) 3210 (D.D.C.1981). In these circumstances, PATCO certainly cannot claim lack of knowledge of the strike. On these bases, and because PATCO offered no evidence to indicate that it even attempted to end the strike, we also affirm the FLRA's unfair labor practice finding under 5 U.S.C. § 7116(b)(7)(B) (Supp. IV 1980).[67]
 
 
 132
 IV. REVOCATION OF PATCO'S EXCLUSIVE RECOGNITION STATUS
 
 
 133
 Having determined that the FLRA properly found PATCO in violation of the no-strike provisions of the Civil Service Reform Act, we turn to the second question presented for our review: whether the FLRA properly exercised its discretion under the Act to revoke the exclusive recognition status of PATCO. This inquiry requires us to ascertain: (1) what degree of discretion Congress granted to the FLRA when it enacted section 7120(f); (2) whether the FLRA's exercise of its discretion in this case was proper; and (3) whether the FLRA improperly excluded evidence in this case that was relevant to the exercise of its discretion. We address these issues in order.
 
 
 134
 A. The FLRA's Discretion Under Section 7120(f)
 
 
 135
 This case presents the first occasion for review of the FLRA's revocation of a union's exclusive recognition status pursuant to section 7120(f). Accordingly, we discuss in some detail the scope of the FLRA's discretion under that section. The scope of the FLRA's discretion was the source of some disagreement within the Authority;[68] that disagreement has been renewed before this court.[69] Because the issue is not subject to a ready resolution, we must analyze not only the words of the statute, but also its legislative history.
 
 
 136
 1. The Statutory Basis of the FLRA's Revocation Power
 
 
 137
 Of course, the starting point for the interpretation of any statute is the language Congress employed to express its meaning. E.g., Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); Department of Defense v. FLRA, 659 F.2d 1140, 1151 (D.C.Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). Section 7120(f) states:
 
 
 138
 In the case of any labor organization which by omission or commission has willfully and intentionally, with regard to any strike, work stoppage, or slowdown, violated section 7116(b)(7) of this title, the Authority shall, upon an appropriate finding by the Authority of such violation-
 
 
 139
 (1) revoke the exclusive recognition status of the labor organization, which shall then immediately cease to be legally entitled and obligated to represent employees in the unit; or
 
 
 140
 (2) take any other appropriate disciplinary action.
 
 
 141
 5 U.S.C. § 7120(f) (Supp. IV 1980). The language of this section clearly requires the FLRA to take some disciplinary action when it finds that a union has violated section 7116(b)(7). Section 7120(f)(2) just as clearly announces that the FLRA has some discretion to revoke or not to revoke the exclusive recognition status of a union that, like PATCO, is found to have committed an unfair labor practice by calling, participating in or condoning a strike against the federal government.
 
 
 142
 The inference that the FLRA has some degree of discretion in the enforcement of section 7120(f) is supported by another section of the Act that generally deals with remedies for unfair labor practices, of which union strikes are only a single example. This provision, found in section 7118(a)(7), grants the FLRA the power to issue an order requiring a party found to be guilty of an unfair labor practice (1) to cease and desist from the practice, (2) to renegotiate a collective bargaining agreement, (3) to reinstate an employee with backpay, or (4) to take "such other action as will carry out the purpose of this chapter." 5 U.S.C. § 7118(a)(7) (Supp. IV 1980).[70]
 
 
 143
 At the same time, yet another provision in the same Act, found in section 7103(a)(4), suggests that the FLRA is without discretion in its choice of remedy once it finds that a union has violated the Act's no-strike provisions. In defining "labor organization" under the Act, section 7103(a)(4) states that:
 
 
 144
 (4) "labor organization" means an organization composed in whole or in part of employees, in which employees participate and pay dues, and which has as a purpose the dealing with an agency concerning grievances and conditions of employment, but does not include-
 
 
 145
 ....
 
 
 146
 (D) an organization which participates in the conduct of a strike against the Government or any agency thereof or imposes a duty or obligation to conduct, assist, or participate in such a strike ....
 
 
 147
 5 U.S.C. § 7103(a)(4)(D) (Supp. IV 1980).[71] Broadly construed, this definitional section at least implies that a labor organization found to have violated the Act's no-strike proscriptions may no longer be treated as a "labor organization" under the Act, and hence may not be accorded exclusive recognition status.
 
 
 148
 We hesitate to read so much into a definitional section of a statute, particularly where, as here, that broad reading would contradict a separate section of the same statute that describes the power given to an agency to determine the substantive rights of parties before it.[72] Nevertheless, section 7103(a)(4)(D) arguably clouds the interpretation of section 7120(f). Moreover, even without reference to the statutory definition of a labor organization, section 7120(f) does not plainly declare the extent of the Authority's discretion to revoke a union's exclusive recognition status. Therefore, because the plain words of the statute cannot resolve our inquiry, we must turn to the statute's legislative history for further guidance as to Congress' meaning.
 
 
 149
 2. The Legislative History of the FLRA's Revocation Power
 
 
 150
 Prior to the enactment of Title VII of the Civil Service Reform Act, labor-management relations in the federal sector were governed by Executive Order 11,491. Exec. Order No. 11,491, 34 Fed.Reg. 17,605 (1969), reprinted as amended in 5 U.S.C. § 7301 note (1976 & Supp. I 1977). Executive Order 11,491 contained no provision comparable to the revocation provision of the Civil Service Reform Act. The Executive Order did, however, declare strikes by federal sector unions to be unfair labor practices, id. § 19(b)(4), and excluded a union that engaged in a strike from the Order's definition of a labor organization, id. § 2(e)(2).[73]
 
 
 151
 The inclusion in Title VII of the Civil Service Reform Act of a provision like that found in the predecessor Executive Order, excluding a striking union from the definition of a labor organization, stemmed primarily from an amendment offered on the floor of the House of Representatives. The addition of a section providing for the revocation of a striking union's exclusive recognition status, however, resulted from an amendment offered on the floor of the Senate. In order to more fully understand Congress' intent in enacting sections 7103(a)(4)(D) and 7120(f) of the Act, we must examine these passages of the legislative history and the Conference Report on the final bill.
 
 
 152
 The vehicle for enactment of Title VII of the Civil Service Reform Act in the House of Representatives was an amendment offered by Congressman Udall as a substitute for the bill reported by the House Committee on Post Office and Civil Service.[74] As originally proposed, the Udall substitute contained neither a provision for revoking a striking union's exclusive recognition status nor an exclusion of a striking union from the statutory definition of a labor organization. On the floor of the House, Congressman Erlenborn offered an amendment to the Udall substitute that added the definitional exclusion. The Erlenborn amendment provided that a labor organization would not include "an organization which participates in the conduct of a strike against the Government of the United States or any agency thereof or imposes a duty or obligation to conduct, assist, or participate in such a strike." 124 Cong.Rec. 29,194 (1978), reprinted in Legislative History, supra note 10, at 946. The only explanation in the legislative history of this definitional exclusion, which eventually became section 7103(a)(4)(D) of the Civil Service Reform Act, is found in the following colloquy on the Erlenborn amendment:
 
 
 153
 Mr. FORD of Michigan....
 
 
 154
 Mr. Chairman, I would like to ask the gentleman this question: It is (sic) the understanding of the gentleman from Illinois (Mr. ERLENBORN) that it would still be up to the labor authority to determine whether or not this provision applies?
 
 
 155
 Mr. ERLENBORN. Mr. Chairman, if the gentleman will yield, yes, that is correct. This would leave the discretion in the FLRA as to whether or not the decertification should be applied. It will not happen automatically.
 
 
 156
 Id. at 29,194, Legislative History at 947 (emphasis added). Following this brief exchange, the Erlenborn amendment to the Udall substitute was agreed to by voice vote. Subsequently, the House of Representatives adopted the Udall substitute as the House version of Title VII. Id. at 29,202-03, 29,220-21, Legislative History at 962-63, 964-66.
 
 
 157
 Thus, as initially passed by the House, Title VII of the Civil Service Reform Act did not provide for the revocation of the exclusive recognition status of a union that struck against the government, but did exclude striking unions from the definition of the term "labor organization." As the sponsor of that language made clear on the House floor, however, the definitional exclusion was intended to "leave the discretion in the FLRA" whether or not to apply the exclusion and thereby remove a union from the protections of the statute. No expression of the scope of the FLRA's discretion or guidance for its application was offered.
 
 
 158
 Before the House of Representatives adopted its version of Title VII of the Civil Service Reform Act, the Senate completed action on the bill reported by the Senate Committee on Governmental Affairs, S. 2640, 95th Cong., 2d Sess. (1978), reported in S.Rep.No.969, 95th Cong., 2d Sess. 271-320 (1978), Legislative History at 499-548. The Senate Committee bill closely resembled Executive Order 11,491,[75] and thus excluded striking unions from the definition of labor organizations, id. § 7202(a)(3)(B), S.Rep.No.969, supra, at 273-74, Legislative History at 501-02.[76] However, like the original House bill, the Senate bill did not explicitly provide for the revocation of the exclusive recognition status of a union that struck against the federal government.
 
 
 159
 During Senate debate on the bill, Senator Hatch offered an amendment that, among other things, added section 7217(e) to the bill. That section, the predecessor to section 7120(f) of the Civil Service Reform Act, stated:
 
 
 160
 Any labor organization which by omission or commission has willfully and intentionally violated section 7216(b)(4)(B)[77] shall upon an appropriate finding by the Authority, of such violation, have its exclusive recognition status revoked and it shall cease immediately to be legally entitled and obligated to represent employees in the unit.
 
 
 161
 S. 2640, 95th Cong., 2d Sess. § 7217(e) (1978), Legislative History at 588 (version passed by the Senate). Debate between Senator Hatch and Senators Javits and Metzenbaum made clear that the only decisionmaking authority granted to the FLRA under the proposed section was the power to decide whether or not a charged union had committed an unfair labor practice by striking or illegally picketing, or condoning such action, against the federal government. If that decision was made contrary to the union, revocation of the union's exclusive recognition status was to be mandatory. See 124 Cong.Rec. 27,579-80, 27,584-85 (1978), Legislative History at 1021-22, 1028-30 (debate on Hatch amendment). The Senate adopted the Hatch amendment, id. at 27,588, Legislative History at 1035, and ultimately passed its version of the Civil Service Reform Act, id. at 27,593, Legislative History at 1038.
 
 
 162
 Thus, as initially passed by the Senate, Title VII of the Civil Service Reform Act included a section that explicitly provided for the revocation of the exclusive recognition status of a union that struck against the government. Revocation pursuant to the section was not discretionary, but was mandatory whenever the FLRA found that a union had committed an unfair labor practice by striking against the government, by picketing an agency and interfering with agency operations, or by condoning either forbidden picketing or work stoppage.
 
 
 163
 The House and Senate conferees settled upon a bill that, at least with respect to Title VII, closely tracked the House version. See H.R.Rep.No.1717, 95th Cong., 2d Sess. 152-59 (1978) (Conference Report), Legislative History at 820-27; 124 Cong.Rec. 38,713 (1978), Legislative History at 990 (statement of Rep. Ford). The houses were not in conflict over the language excluding striking unions from the definition of labor organizations, which was identical in both bills, and the conference did not alter that provision. The conferees did, however, make significant liberalizing changes in section 7217(e) of the Senate bill. The conferees eliminated picketing as a possible basis for its application, thereby limiting its reach to "any strike, work stoppage, or slow-down." More important for our present purposes, the conferees made revocation of exclusive recognition status discretionary with the Federal Labor Relations Authority. See 5 U.S.C. § 7120(f) (Supp. IV 1980).
 
 
 164
 The Conference Report devoted only a single paragraph to discussion of section 7217(e) from the Senate bill and its transformation into the final section 7120(f). It stated:
 
 
 165
 The conference report adopts the Senate wording with an amendment. As agreed to by the conferees the provision will not apply to instances where the organization was involved in picketing activities. The amendment also specifies that the Authority may impose disciplinary action other than decertification. This is to allow for instances, such as a wildcat strike, where decertification would not be appropriate. In cases where the Authority finds a person has violated this provision, disciplinary action of some kind must be taken. The authority may take into account the extent to which the organization made efforts to prevent or stop the illegal activity in deciding whether the organization should be decertified.
 
 
 166
 H.R.Rep.No.1717, 95th Cong., 2d Sess. 156 (1978), Legislative History at 824. Both houses passed the conference version of the Civil Service Reform Act after only brief debates which did not touch upon section 7120(f). See 124 Cong.Rec. 33,388-90 (1978), Legislative History at 1039-41 (Senate passage); id. at 34,098-105 (1978), Legislative History at 985-89 (House passage).
 
 
 167
 As we read this statement from the Conference Report and consider as well the language and history of the Civil Service Reform Act, we conclude that Congress intended to grant the Federal Labor Relations Authority discretion to determine the appropriate disciplinary action for unions that commit unfair labor practices in violation of section 7116(b)(7). There are several important considerations that militate in favor of this conclusion. First, the Conference Report states that "disciplinary action other than decertification" may be appropriate in "instances, such as a wildcat strike." By referring to "instances" and citing a wildcat strike as but a single example, the conferees apparently did not intend that example to be the only instance in which revocation would not follow. Had Congress intended wildcat strikes to be the only type of strike allowing a less severe penalty, the Conference Report and the section itself could have expressly so stated. They do not.
 
 
 168
 Second, if disciplinary action short of revocation applied only to wildcat strikes, the discretion expressly granted in subsection 7120(f)(2) would rarely, if ever, be exercised. If a strike or work slowdown was a wildcat action, then the union would not be in violation of section 7116(b)(7)(A) because, by definition, it had not called or participated in the strike. Further, if the union attempted to end the wildcat strike, then it would not be guilty of "failing to take action to prevent or stop" the strike and hence would not be in violation of section 7116(b)(7)(B). In that case, no discipline could be taken against the union, since the union would have committed no unfair labor practice.[78] Thus, providing for disciplinary measures short of revocation only in the case of wildcat strikes would often be meaningless. Courts, of course, are reluctant to adopt an interpretation of a statute that makes a portion superfluous. See, e.g., D. Ginsberg & Sons v. Popkin, 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 521 (1932); Motor & Equipment Manufacturers Association v. EPA, 627 F.2d 1095, 1107-08 (D.C.Cir.1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). We, too, are loathe to embrace such a construction and, therefore, do not read the Conference Report to limit the Authority's discretion only to cases of wildcat strikes.
 
 
 169
 Third, an interpretation of section 7120(f) limiting the Authority's discretion to an inquiry into whether the union made efforts to prevent or stop the strike must also be rejected. The final sentence of the quoted paragraph of the Conference Report clearly allows the Authority to consider this factor, but the sentence is phrased in permissive (i.e., "may take into account") terms. Moreover, nothing in the sentence suggests that this factor, while likely to be highly relevant in many cases, must be the Authority's only concern. Indeed, the structure of section 7120(f) suggests just the opposite. Were "efforts to prevent or stop the illegal activity" the only relevant factor, Congress could have explicitly made revocation turn upon whether a union had violated section 7116(b)(7)(B) or, alternatively, upon whether it had violated both sections 7116(b)(7)(A) and 7116(b)(7)(B). Congress wrote neither of these simple formulations into law, but instead granted the FLRA the more general power to "take any ... appropriate disciplinary action."
 
 
 170
 Finally, we note that our interpretation of the scope of the FLRA's discretion under section 7120(f) is wholly consistent with the other sections of the Act viewed in light of the legislative history. The general remedial authority of the FLRA under section 7118(a)(7) includes the power to order "such ... action as will carry out the purpose of this chapter." 5 U.S.C. § 7118(a)(7)(D) (Supp. IV 1980). The Supreme Court has interpreted similar language in the National Labor Relations Act, 29 U.S.C. § 160(c) (1976), as granting the National Labor Relations Board broad remedial discretion in effectuating the purposes of that Act. See, e.g., Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 215-16, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941); accord, United Steelworkers of America v. NLRB, 646 F.2d 616, 629-30 (D.C.Cir.1981). The legislative history of the Civil Service Reform Act strongly suggests that Congress intended to grant similar discretion to the FLRA to remedy unfair labor practices, including union strikes, in the federal sector. See, e.g., H.R.Rep.No.1403, 95th Cong., 2d Sess. 53 (1978), Legislative History at 699; 124 Cong.Rec. 38,714 (1978), Legislative History at 992-93 (statement of Rep. Ford).[79]
 
 
 171
 The legislative history also reveals that the discretion granted to the FLRA in section 7120(f) is not inconsistent with the exclusion of unions that participate in strikes from the definition of "labor organization" in section 7103(a)(4)(D). The brief House debate on the Erlenborn amendment-the only debate on or legislative elucidation of this subsection-clearly announces that the FLRA is vested with discretion in its application. See 124 Cong.Rec. 29,194 (1978), Legislative History at 946-47 (quoted at page 71 supra ). Therefore, contrary to first impressions from reading the definitional section, section 7103(a)(4)(D) reinforces, rather than detracts from, the conclusion that section 7120(f) vests the FLRA with discretion.
 
 
 172
 Thus, we conclude that section 7120(f) entrusts the Federal Labor Relations Authority with extensive authority to remedy illegal strikes, work stoppages and slowdowns by federal employee unions. The section clearly permits the FLRA to employ the extreme measure of revoking a union's exclusive recognition status-a remedy unknown to private sector labor law-if the union commits or condones any of these unfair labor practices. The Senate and House conferees' rejection of the Senate's section 7217(e), however, establishes that revocation is not intended to be mandatory. Further, we reject an interpretation of the Conference Report that would limit the FLRA's inquiry to a single issue or its discretion to a single type of violation. Rather, we hold that the FLRA has discretion under section 7120(f) to choose an appropriate remedy for any given violation of section 7116(b)(7) of the Civil Service Reform Act.[80]B. The FLRA's Exercise of Its Discretion
 
 
 173
 We have concluded that the FLRA has substantial discretion under section 7120(f) to decide whether or not to revoke the exclusive recognition status of a union found guilty by the FLRA of striking or condoning a strike against the government. A concomitant of this conclusion is that the courts have only a limited role in reviewing the FLRA's exercise of its remedial discretion. Section 7123(c) of the Civil Service Reform Act, 5 U.S.C. § 7123(c) (Supp. IV 1980), directs the court to review the Authority's orders in accordance with section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706 (1976). For our present purposes, therefore, we must determine whether the FLRA's revocation of PATCO's exclusive recognition status was "arbitrary, capricious, (or) an abuse of discretion." Id. § 706(2)(A). Under this standard, our review is highly deferential and we need satisfy ourselves only that "the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent." Greater Boston Television Corp. v. FCC, 444 F.2d 841, 850 (D.C.Cir.1970) (footnote omitted), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); see Ethyl Corp. v. EPA, 541 F.2d 1, 33-37 (D.C.Cir.) (en banc), cert. denied, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). As with judicial review of remedial orders of the NLRB, we will uphold the remedial orders of the FLRA "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943).
 
 
 174
 We have little trouble deciding that the FLRA did not abuse its discretion in this case. First, the FLRA could take official notice that PATCO has repeatedly violated legal prohibitions against striking and other job actions. In 1970, PATCO called a "sick-out" of the air traffic controllers subject to its exclusive representation. "Extensive disruptions in air service resulted as approximately one quarter of the nation's air controllers reported in sick each day between March 24 and April 14 ...." Miller v. Bond, 641 F.2d 997, 999 (D.C.Cir.1981) (per curiam).[81] In 1978, PATCO threatened a nationwide air traffic slowdown. Based on a stipulated record, the union was held in contempt for its actions. Air Transport Association v. Professional Air Traffic Controllers Organization, 453 F.Supp. 1287 (E.D.N.Y.), aff'd mem., 594 F.2d 851 (2d Cir. 1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979). In 1980, PATCO controllers engaged in a work slowdown at Chicago's O'Hare Airport. United States v. Professional Air Traffic Controllers Organization, 653 F.2d 1134, 1136 (7th Cir.), cert. denied, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981). In August 1981, PATCO called the nationwide strike that gives rise to the present action. See text at notes 4-7 supra.
 
 
 175
 Second, all of PATCO's job actions after 1970 occurred while the union was subject to an injunction resulting from its 1970 strike that prohibited such actions. See Air Transport Association v. Professional Air Traffic Controllers Organization, 453 F.Supp. 1287 (E.D.N.Y.), aff'd mem., 594 F.2d 851 (2d Cir. 1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979). Nor could PATCO have had any doubt about the continued validity of that injunction before it commenced its 1981 strike. After the effective date of the Civil Service Reform Act, PATCO petitioned the District Court for the Eastern District of New York for vacatur of its 1970 injunction on the ground that Title VII of the Act had deprived the District Court of jurisdiction to enjoin federal employee strikes. In June 1981, before the most recent strike began, the District Court reaffirmed the validity of its 1970 injunction and denied PATCO's motion. Air Transport Association v. Professional Air Traffic Controllers Organization, 516 F.Supp. 1108 (E.D.N.Y.), aff'd, 667 F.2d 316 (2d Cir. 1981).
 
 
 176
 Third, after PATCO struck on August 3, 1981, additional restraining orders and injunctions directed only at this strike issued. See notes 5-6 supra. PATCO openly defied these injunctions as well.
 
 
 177
 Finally, PATCO's actions before and after August 3, 1981, can only be characterized as defiant. The union threatened its strike, then willfully and intentionally called and participated in it. After the strike commenced, PATCO made no attempt to end it; indeed, PATCO condoned and encouraged it. Even after the striking controllers had been terminated and a majority of the Authority had ordered revocation of its exclusive recognition status, PATCO failed to satisfy Chairman Haughton's request that it end the strike and promise to abide by the no-strike provisions of the Civil Service Reform Act.
 
 
 178
 In these circumstances the FLRA's decision to revoke PATCO's exclusive recognition status was not an abuse of discretion. The union is a repeat offender that has willfully ignored statutory proscriptions and judicial injunctions. It has shown little or no likelihood of abiding by the legal requirements of labor-management relations in the federal sector. If the extreme remedy that Congress enacted cannot properly be applied to this case, we doubt that it could ever properly be invoked.
 
 C. Evidence of Mitigating Factors
 
 179
 PATCO argues on appeal that the FLRA's revocation order must be rejected because the A.L.J. and the Authority failed to grant PATCO a continuance to enable the union to gather and prepare evidence in mitigation of the requested remedy. In the hearings before the A.L.J., PATCO suggested that, if given time, it might produce evidence[82] regarding its claims that the FAA had refused to bargain in good faith, that working conditions for PATCO members were unsafe, and that antiunion animus existed within the FAA. PATCO contends that it was not given the opportunity to prepare this evidence and, as a consequence, it was improperly prevented from presenting and substantiating mitigating factors that were relevant to the exercise of the FLRA's remedial discretion. PATCO claims further that, because of the denial of the requested continuance, the record before the Authority was incomplete, and, therefore, the Authority's decision cannot stand.
 
 
 180
 At the outset, we note that whatever evidence PATCO might have offered could serve only in mitigation of the FLRA's ordered remedy and not as justification of PATCO's actions. Even if mitigating evidence was improperly excluded, it would not affect the conclusion that PATCO committed unfair labor practices in violation of sections 7116(b)(7)(A) and 7116(b)(7)(B).[83] In addition, we note that the Civil Service Reform Act, unlike some state public employee relations acts, does not specifically provide for consideration of the types of mitigating circumstances pointed to by PATCO in this case.[84] Despite the absence of any clear statutory provision for the consideration of the mitigating evidence suggested by PATCO, we do not suggest that such evidence could never be relevant to the exercise of the FLRA's discretion under section 7120(f). Given the Authority's broad discretion, in a particular case evidence of prolonged unsafe working conditions, extreme agency provocation or agency intransigence might affect the Authority's determination of the appropriate remedy under section 7120(f), even though it could not justify a strike in any circumstances.
 
 
 181
 In the present case, however, we do not believe that the FLRA abused its discretion by excluding potentially probative evidence of mitigating circumstances. First, based on the record before us we do not find that PATCO made any satisfactory proffer of evidence in mitigation. The A.L.J. repeatedly tried to discern what evidence PATCO intended to offer in response to the case presented by the FLRA General Counsel. PATCO indicated that it might or might not introduce evidence, and that if it did, that evidence would be in an attempt to mitigate the remedy. PATCO made several suggestions of the type of mitigating evidence it might bring forward, but failed to describe in any detail the nature, content or scope of the evidence.[85] PATCO was required, however, to do more than this in order to make an offer of proof. An offer of proof must consist of specific evidence that the party proposes to introduce, rather than mere argument and conclusory allegations. See, e.g., Duncan Foundry & Machine Works v. NLRB, 458 F.2d 933, 937 (7th Cir. 1972); Amalgamated Clothing Workers of America v. NLRB, 424 F.2d 818, 827-28 (D.C.Cir.1970).[86] In its only proffer that approached this standard, PATCO suggested that it would call certain FAA officials to establish the nature of the air traffic controllers' working conditions, but it did not identify the officials or request subpoenas from the A.L.J. Nor did PATCO identify the testimony it intended to elicit from these adverse, potentially hostile, witnesses. Therefore, this attempt to make an offer of proof also lacked substance. See UAW v. NLRB, 231 F.2d 237, 242-43 (7th Cir.), cert. denied, 352 U.S. 908, 77 S.Ct. 146, 1 L.Ed.2d 117 (1956). PATCO's other suggestions of mitigating evidence were even more vague and conclusory; thus, they also failed to constitute valid offers of proof.[87]
 
 
 182
 Second, given the nature of the evidence PATCO indicated it might produce, we do not believe that the A.L.J. erred in denying PATCO a continuance to develop its case in mitigation of the remedy. "It is well established that the grant or denial of a continuance is within the discretion of the ALJ and will not be overturned absent a clear showing of abuse." NLRB v. Pan Scape Corp., 607 F.2d 198, 201 (7th Cir. 1979). In reaching this decision, the A.L.J. may properly consider the length of the delay requested, the potential adverse effects of that delay, the possible prejudice to the moving party if denied the delay, and the importance of the testimony that may be adduced if the delay is granted. See Consolidated Edison Co. v. NLRB, 305 U.S. 197, 226, 59 S.Ct. 206, 215, 83 L.Ed. 126 (1938); NLRB v. Interboro Contractors, 432 F.2d 854, 860 (2d Cir. 1970), cert. denied, 402 U.S. 915, 91 S.Ct. 1375, 28 L.Ed.2d 661 (1971); NLRB v. Sagamore Shirt Co., 401 F.2d 925, 928 (D.C.Cir.1968) (per curiam).
 
 
 183
 In this case, PATCO requested a thirty-day continuance. At the time of the hearings before the A.L.J., however, the PATCO strike was of some moment. The strike was arguably the most serious unfair labor practice in the federal sector since the enactment of the Civil Service Reform Act. The FLRA General Counsel's prosecution of the unfair labor practice charges was part of a government-wide response to PATCO's national strike. If prompt legal response were impossible in these circumstances, it is likely that Congress' carefully legislated scheme of sanctions in the Civil Service Reform Act would lose much of its credibility, both with federal employee unions and with the public.
 
 
 184
 Nor can we conclude that PATCO was unfairly prejudiced by the necessarily expeditious treatment given to this case. On at least two occasions during the hearings before the A.L.J., PATCO counsel noted that he could not guarantee that PATCO would present any evidence in mitigation of the remedy even "if given a year" to prepare its case.[88] These predictions now appear close to being accurate. PATCO did not identify in any greater detail its mitigating evidence in its briefs before the FLRA, submitted three weeks after the A.L.J. proceedings. Neither has PATCO identified in its briefs before this court, filed over three and six months after the A.L.J. proceedings, the specific evidence that it would have offered in mitigation.
 
 
 185
 In addition, PATCO can hardly claim surprise at the unfair labor practice charges or suggest a lack of opportunity to prepare for the FLRA proceedings. PATCO had been negotiating with the FAA over a new contract for several months. Certainly, the issues that PATCO sought to raise in mitigation of the remedy-the safety of its members' working conditions and the alleged antiunion animus of the FAA during bargaining-were raised or perceived during those negotiations. PATCO concurrently filed an unfair labor practice charge against the FAA stemming from those same negotiations; therefore, whatever factual basis the union had for those charges could not have required an additional thirty days of preparation before it could be presented to the A.L.J., at least by way of proffer. Cf. NLRB v. Interboro Contractors, 432 F.2d 854, 860 (2d Cir. 1970) (whatever evidence Respondent sought to introduce was already within its control), cert. denied, 402 U.S. 915, 91 S.Ct. 1375, 28 L.Ed.2d 661 (1971). Moreover, "PATCO had been threatening to strike for several months prior to the actual strike. Accordingly, PATCO clearly had ample notice of the need for and opportunity to gather evidence with respect to such allegedly mitigating circumstances." PATCO at 25.
 
 
 186
 Finally, we believe that the Authority could decide that the evidence PATCO indicated it might offer in mitigation would not be sufficiently exculpatory to justify a prolonged delay. As noted above, it does not appear from the record that PATCO had specific mitigating evidence in mind when it requested a continuance from the A.L.J. Furthermore, despite the relevance of the mitigating factors suggested by PATCO, the Authority could reasonably conclude that in this case the factors would be overridden by the extreme nature of PATCO's violation. As Chairman Haughton stated:
 
 
 187
 Despite my concern that all relevant evidence going to the remedy is not before us at this time, one overriding fact is clear-PATCO has not made any attempt to end the strike. Unless it ends the strike forthwith, and immediately represents to the Authority that it intends to abide by the no-strike provisions of the Statute, I would view any additional evidence as having no mitigating effect on the penalty to be imposed.
 
 
 188
 PATCO at 35.
 
 
 189
 All things considered, we do not believe that the actions of the FLRA are subject to any serious challenge. For the reasons cited above, we hold that it was not an abuse of discretion for the FLRA to deny PATCO's requested continuance and to reach its decision based on the evidence before it and upon the arguments in mitigation presented in PATCO's brief.[89]
 
 V. ARGUMENTS OF THE AMICI CURIAE
 
 190
 A. Arguments of the American Federation of Government Employees
 
 
 191
 The American Federation of Government Employees ("AFGE") is a federal employee union with approximately 300,000 members. AFGE Brief at 1. The AFGE participated as amicus curiae before the FLRA, and it has filed a brief in that capacity with this court as well. For the most part, AFGE's arguments parallel those raised by PATCO which have already been dealt with in the preceding sections of this opinion. The AFGE does, however, offer two arguments not heretofore addressed. While we find little merit to these additional contentions, we address them briefly in order to dispose of all material points in issue.
 
 
 192
 First, the AFGE contends that the Authority may not delegate to an Administrative Law Judge its power under section 7120(f) to revoke a union's exclusive recognition status. The AFGE notes that section 7105(e)(2) of the Act allows the FLRA to delegate its power to decide unfair labor practices under section 7118, but makes no mention of the FLRA's revocation power under section 7120(f). 5 U.S.C. § 7105(e)(2) (Supp. IV 1980). We find this argument wholly unpersuasive. In this case, the A.L.J. held a hearing on the underlying unfair labor practice complaint against PATCO and recommended findings of fact and an appropriate remedy to the FLRA. The FLRA reviewed the A.L.J.'s recommendations, adopted them as its own factual findings, and decided on its own authority to revoke PATCO's exclusive recognition status. The plain language of section 7120(f) requires no more. See PATCO at 25.
 
 
 193
 Second, the AFGE argues that the Authority may not invoke section 7120(f) at all in the instant proceeding. In support of this argument, the AFGE notes that section 7120 as a whole is entitled "Standards of conduct for labor organizations" and that section 7120(d) empowers the Assistant Secretary of Labor for Labor Management Relations, and not the FLRA, to issue regulations to carry out the purposes of the section and to accept complaints of violations. 5 U.S.C. § 7120(d) (Supp. IV 1980). Thus, according to the AFGE, the FLRA lacks the statutory authority to revoke a striking union's exclusive recognition status under section 7120(f). We cannot accept the AFGE's exaggerated reasoning. The AFGE's argument totally ignores the plain language of section 7120(f), which empowers the Authority to revoke a union's exclusive recognition status, and the legislative history behind the subsection. See text at note 77 supra. The heading of the section of a statute and the placement of a particular subsection cannot cast doubt upon an otherwise unambiguous congressional grant of authority. Habib v. Raytheon Co., 616 F.2d 1204, 1210 n.8 (D.C.Cir.1980).
 
 
 194
 B. Argument of Anthony J. Skirlick, Jr.
 
 
 195
 Mr. Skirlick is a PATCO member and a nonstriking air traffic controller. He correctly points out that his appearance before this court is the first appearance of a nonstriking controller in this or any other proceeding stemming from PATCO's 1981 strike. Mr. Skirlick contends that these legal proceedings have failed to consider the effects of the revocation remedy on the nonstriking controllers, many of whom, according to Mr. Skirlick, are members of a less militant, minority faction within PATCO.
 
 
 196
 Essentially, Mr. Skirlick argues that when the striking PATCO members left their jobs on August 3, they violated federal law. No later than August 5, when President Reagan terminated the striking air traffic controllers, they ceased to be federal employees. Since the strikers were no longer air traffic controllers, Mr. Skirlick argues, they also ceased to be PATCO members. Therefore, when the FLRA revoked PATCO's exclusive recognition status, it decertified a union composed entirely of nonstriking controllers. That union, so composed, had committed no unfair labor practices and therefore could not properly be decertified.
 
 
 197
 Mr. Skirlick's argument obviously depends on his contention that the striking air traffic controllers automatically lost their union membership when their employment was terminated. The record before the FLRA and therefore before this court, however, contains no such finding. The record does not contain a copy of the PATCO Constitution and By-Laws, and we thus cannot confirm Mr. Skirlick's necessary premise. Cf. Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam) (in absence of statutory de novo review, court may not create new evidentiary record on appeal from agency decision). Furthermore, Mr. Skirlick conveniently fails to indicate whether internal union procedures may exist by which a PATCO member can contest his dismissal from the union. Moreover, terminated air traffic controllers may challenge their dismissals from federal employment. See 5 U.S.C. §§ 7511-7513, 7701 (Supp. IV 1980).[90] In that case, a striking air traffic controller's removal from PATCO might be stayed pending the outcome of the appeal of his termination or rescinded if his appeal were ultimately successful. Because Mr. Skirlick cannot support his assertion that PATCO is now "officially" composed only of nonstriking air traffic controllers, we cannot accept his argument that the revocation of PATCO's exclusive recognition status was invalid.
 
 
 198
 Furthermore, insofar as the revocation remedy is concerned, we think Mr. Skirlick's argument must fail even if it is true that PATCO is now "officially" composed only of nonstriking air traffic controllers. PATCO's status as exclusive representative has been revoked because the duly authorized leaders of the National union called, participated in and condoned an unlawful strike. When the strike action commenced, the union leaders were in their positions of authority. When the air traffic controllers walked out, they were at that time still government employees. (Indeed, they could not have been on "strike" or "fired" unless they were government employees.) Therefore, it does not matter that these employees were subsequently fired and then, as a consequence, ceased to be union members. What does matter is that there was an unlawful strike, authorized by the leadership of PATCO and engaged in by a vast majority of the PATCO membership. In these circumstances, the FLRA could properly act to revoke the exclusive representative status of the union.[91]
 
 
 199
 Thus, Mr. Skirlick's argument is novel but specious. The harms that he alleges will accrue to the nonstriking air traffic controllers are a necessary consequence of majority rule. The principle of exclusive representation by the majority union is well established in American labor law, see R. Gorman, Basic Text on Labor Law 374-81 (1976), and we cannot ignore it merely because its implications are occasionally troubling. Cf. Emporium Capwell Co. v. Western Addition Community Organization, 420 U.S. 50, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (principle of majority rule renders attempts by a racial minority to protest an employer's allegedly discriminatory practices outside of the collectively bargained grievance machinery unprotected activities). As intriguing as it may be, Mr. Skirlick's contention is wholly unpersuasive.
 
 
 200
 Finally, we note that we perceive nothing that prevents the presently employed air traffic controllers from attempting to form a new labor organization. See 5 U.S.C. § 7111 (Supp. IV 1980); 5 C.F.R. § 2422.3(a), (d)(3) (1981). If a majority of Mr. Skirlick's co-workers share his view that union representation is desirable, they may acquire the rights and obligations of union representation in the federal sector through the appropriate statutory process.
 
 VI. CONCLUSION
 
 201
 For the foregoing reasons, we find that the conclusion of the Federal Labor Relations Authority that PATCO committed unfair labor practices by striking in violation of sections 7116(b)(7)(A) and 7116(b)(7)(B) of the Civil Service Reform Act is supported by substantial evidence. We also hold that the Federal Labor Relations Authority did not abuse its discretion in denying PATCO a continuance to prepare evidence in potential mitigation of remedy, or in revoking PATCO's exclusive recognition status pursuant to section 7120(f). As a result, we deny PATCO's petition for review and affirm the Decision and Order of the Federal Labor Relations Authority.[92]
 
 
 202
 So ordered.
 
 
 203
 SPOTTSWOOD W. ROBINSON, III, Chief Judge, concurring in part, and concurring in the judgment.
 
 
 204
 I join my colleagues in their construction of the relevant provisions of Title VII of the Civil Service Reform Act,[1] and in their application of those statutory sections to the action of the Federal Labor Relations Authority (FLRA) in this case. I also agree, on review of the extensive record compiled and the careful findings proposed by Administrative Law Judge Vittone,[2] that the ex parte communications which sullied FLRA's handling of the case did not affect its members' ultimate decision, and therefore do not call for a remand. I thus concur in Parts I, III and IV of the court's opinion. I cannot, however, subscribe to Part II. The treatment there accorded the most conspicuous contacts and the tone pervading the discussion tend, I fear, to minify the gravity of the improprieties that occurred, and to understate the culpability of those who initiated and those who received ex parte pleas and approaches.
 
 
 205
 From the special hearing emerges an appalling chronicle of attorneys, high government officials, and interested outsiders apparently without compunction about intervening in the course of FLRA's decisionmaking by means of private communications with those charged with resolving the case on the merits. We have an even more distressing picture of agency decisionmakers-whose role in this formal adjudication concededly approximated that of judges-seemingly ignorant of the substance of the ex parte rules, insensitive to the compromising potentialities of certain official and social contacts, and unwilling to silence peremptorily and firmly improper discussions that did transpire. Although the special hearing disclosed no such taint on the agency's ultimate decision as would require additional corrective proceedings, I feel compelled to review several of these incidents, for in my view the court's opinion administers a mild chiding where a ringing condemnation is in order.
 
 I. THE APPLEWHAITE-GORDON INCIDENT
 
 206
 FLRA General Counsel H. Stephen Gordon was seated in Member Applewhaite's office discussing budgetary and other administrative matters when Ellen Stern, an attorney from the agency's Solicitor's office, brought Applewhaite a memorandum.[3] This document, which had been prepared for the members at the request of Member Frazier, explored the scope of FLRA's discretion in imposing sanctions on a striking union of federal employees.[4]
 
 
 207
 Applewhaite, Stern, and Gordon then proceeded to engage in a 15-minute conversation about the substance of this memorandum.[5] Stern outlined her view on the statutory interpretation question and explained the conclusion she had reached.[6] Applewhaite asked about penalties other than decertification and suggested that Stern research analogous laws in other jurisdictions.[7] Gordon also questioned Stern about remedial alternatives,[8] remarking that he "would have to make some recommendations" if other remedies were possible,[9] and inquired whether her research had included a review of the legislative history.[10] Eventually, Applewhaite turned to Gordon and asked, "How do you feel about this?"[11] Gordon's response was a noncommittal remark that he was a lawyer and "can take any side my client wants me to take."[12] At the time of this incident, the complaint had issued against PATCO, and Gordon's office was prosecuting the unfair labor practice charge.[13] Both Applewhaite and Gordon knew that Stern's memorandum related specifically to the PATCO case,[14] and the remedial problem examined in that memorandum was one of the pivotal legal questions in the litigation.
 
 
 208
 There is no dispute about these facts. Nor is there any dispute that, with respect to ex parte discussions "relevant to the merits" of the PATCO case, Gordon's status was that of an "interested person outside the agency."[15] By the terms of the Administrative Procedure Act, then, Gordon's participation in the discussion of Stern's memorandum was improper. Given this, I think it perilous too readily to dismiss the incident as "innocuous" and "inadvertent."[16]
 
 
 209
 As basis for the first characterization, the court accurately notes that (1) Gordon neither argued to nor asked questions directly of Applewhaite; (2) Applewhaite did not reveal his position; and (3) the facts of the PATCO case were not discussed.[17] However, these factors hardly reduce a prohibited ex parte contact to an indiscreet peccadillo. Patent advocacy is not the sine qua non of ex parte influence. As any experienced trial attorney well knows, a skillful disputant ofttimes can accomplish as much by artfully posing questions as by openly propounding argument. And the potential for effecting a point by subtle indirection clearly is not diminished simply because the questioner directs his queries to a third party in the room. Of no greater meliorating value is the fact that Applewhaite did not actually announce a view on the problem being discussed. Perhaps we ought take comfort that the impropriety was not as great as it might have been; still, it was great enough. The party permitted to witness an internal discussion during which the legal analysis of the decisionmaker on a key issue is evolving enjoys an obvious advantage even if he cannot discern exactly how the decisionmaker ultimately will vote. Able to observe the questions asked, the concerns expressed, and the suggestions made by the decisionmaker, the party can tailor his subsequent presentations accordingly, and so enhance their effectiveness. The third point, the apparent absence of any reference to the specific facts of the PATCO case, is the least palliative of all. Gordon testified unequivocally that he knew that the context of the discussion was the PATCO litigation.[18] Similarly, Applewhaite's testimony reveals he was well aware that PATCO was the impetus for the memorandum.[19] Of what conceivable mitigation is it that the two did not make explicit what both implicitly understood?
 
 
 210
 This incident thus was fraught with opportunities for the kind of ex parte influence that Section 557(d) of the APA was designed to forestall. That those opportunities may not have been seized upon in this particular instance does not lessen the gravity of the departure from the statutorily-prescribed code of conduct. Nor can I accept the suggestion that Applewhaite's and Gordon's failure to observe the ex parte rules can be excused as "entirely inadvertent."[20] The court's observation that "accidental or passing references to a pending case do not per se deprive a party of a fair proceeding"[21] undoubtedly is accurate as a general statement of the law. I think, however, it provides little assistance in determining whether the Applewhaite-Gordon episode irrevocably tainted FLRA's deliberations. A 15-minute discussion of the substance of a legal memorandum prepared for agency members on a critical legal issue of the case is not a mere "passing reference." And although Gordon's presence at the Stern-Applewhaite interchange may initially have been inadvertent, his remaining for and actively participating in the discussion were hardly "accidental." Surely we do not mean to suggest that so long as an interested party does not deliberately place himself in a position to have an ex parte contact he is relieved of all responsibility promptly to terminate his involvement if circumstances take an unexpectedly improper turn.
 
 
 211
 It is one of the facts of administrative life that agencies such as FLRA fulfill, often simultaneously, the several roles of investigator, prosecutor, adjudicator, and policy formulator. Undoubtedly, this commingling of functions makes it more difficult to maintain a strict separation between those personnel who, on any given case, are cast in the role of advocate from those who occupy the position of judge in the matter. Once the agency is engaged in formal adjudication, however, such a separation is mandated by the APA,[22] and is essential to the integrity of the administrative process. The perils of laxness on this point are well illustrated by the Applewhaite-Gordon incident. The prosecutor in an important and controversial case is permitted access to the substance of an internal legal memorandum on a pivotal issue. He hears and participates in discussion of the analysis being formulated on the question. At one point, the decisionmaker, apparently without any conception of the seriousness of what he is about to do, turns to the prosecutor and asks for the latter's opinion on the problem. Although we have accepted Judge Vittone's findings that this incident had no effect on Applewhaite's ultimate decision[23]-and therefore does not compel a remand-surely we ought not even intimate that we condone what happened. The conversation was not merely indiscreet or undesirable; it was, purely and simply, a prohibited ex parte contact that should never have occurred. Gordon had no business remaining in the room once he realized that PATCO was the object of discussion. Applewhaite had no business permitting him to remain, and certainly was grossly at fault in soliciting Gordon's opinion on the issue.[24]
 
 
 212
 The ease with which prosecutors can communicate with adjudicators in the administrative setting demands a heightened degree of vigilance-a particularly keen scrupulousness-on the part of agency personnel. If administrators engaged in formal adjudicatory proceedings will not abide by this standard of care on their own initiative, then courts have no choice save to force them to adhere to it. Brushing aside departures from the standard on grounds that the lapses were the fruit of heedlessness rather than willfulness does no service to the agency or to its processes. The purity of administrative adjudication can be preserved only if the agency is made to see that such thoughtlessness is a problem, not an excuse.
 
 
 213
 II. SECRETARY LEWIS' CALLS TO MEMBERS FRAZIER AND APPLEWHAITE
 
 
 214
 One day before Administrative Law Judge Fenton issued his decision on the merits of the unfair labor practice complaint against PATCO, Secretary of Transportation Lewis personally telephoned Member Frazier.[25] The Secretary stated that he was not calling about the "substance" of the PATCO case;[26] rather, according to Frazier, Secretary Lewis said he wanted to make "abundantly clear" that no meaningful efforts to settle the strike were taking place.[27] He also expressed the desire of the Department of Transportation for expeditious handling of the matter.[28] Frazier responded, "I understand your position perfectly, Mr. Secretary."[29] Hearing that Secretary Lewis intended to call Member Applewhaite as well, Frazier offered to convey the message to his colleague. The Secretary responded, however, that he would make the call himself.[30] Frazier then alerted Applewhaite of the Secretary's imminent communication.[31] Frazier also notified the agency's Solicitor of the call he had received;[32] after discussion, these two concluded that the contact fell within the status request[33] and settlement proposal exceptions[34] to FLRA's ex parte rules.
 
 
 215
 On being informed that the Secretary of Transportation might telephone to express an interest in expedition, Applewhaite asked his executive assistant to find the FLRA regulation governing briefing schedules and time limits in the appeals process.[35] Secretary Lewis did indeed call Applewhaite. The Secretary stated his awareness that FLRA had a backlog of cases, emphasized that PATCO was a very important case, and reiterated that "we do not want to delay it in its decision."[36] Applewhaite, who by this time had been given the pertinent regulation, explained that the Federal Aviation Administration (FAA) would have to file a written request in order to obtain expeditious treatment.[37] Secretary Lewis said he was unaware of that requirement and made known his intent to contact FAA's General Counsel immediately.[38] Within hours,[39] FAA moved to reduce the time for filing exceptions to the administrative law judge's decision from the usual 25 days to seven days. Ultimately, FLRA's members voted to reduce the period to 19 days.
 
 
 216
 The testimony of Frazier and Applewhaite confirms that Secretary Lewis' calls were highly unusual. Both stated that they had never before been contacted by a Cabinet member on a pending case.[40] Applewhaite also explained that persons seeking status information normally contact the staff in lieu of discussing such matters directly with the members.[41] Judge Vittone obviously gave careful scrutiny to the incident but was unable to determine exactly what part the Secretary's calls played in Frazier's and Applewhaite's votes to reduce the filing periods in this case.[42]
 
 
 217
 I find these calls exceedingly troubling; equally disturbing is the lingering uncertainty as to how much influence they exerted on the voting to expedite the case.[43] I concur, however, in the court's conclusion that a remand is unnecessary. PATCO has not shown that it was prejudiced by FLRA's decision to shorten the normal response period by six days. It has failed to disclose, either to the agency or to this court, any evidence it would have adduced or any arguments it would have tendered that could not have been brought forth in the time provided. Accordingly, it has not shown any purpose that would be served by a remand.
 
 
 218
 That, in my view, is not quite the end of the matter, however. Serious questions remain about the propriety of the Secretary's actions. The legislative history of the Government in the Sunshine Act makes clear that Congress, in defining the contacts proscribed in adjudicative proceedings, consciously chose the phrase "communication relevant to the merits" to denote a concept broader than simply a communication bearing on "fact(s) in issue."[44] With respect to FAA's attempt to have the PATCO matter handled more expeditiously than normal, the Secretary's insistence that the case was very important to the Government, and therefore needed to be dealt with rapidly, was a communication on the merits of that issue.
 
 
 219
 Agencies, like courts, promulgate rules of practice to assist outsiders in communicating in proper fashion with decisionmakers. These channels are quite adequate to accommodate any information that legitimately could be sought from or provided to those who will judge the case.[45] For a high government officer to bypass established procedures and approach, directly and privately, members of an independent decisionmaking body about a case in which he has an official interest and on which they will be called to rule suggests, at the minimum, a deplorable indifference toward safeguarding the purity of the formal adjudicatory process. Regardless of the officer's actual intent, such a call could be felt by the recipient as political pressure; regardless of its actual effect, such a call could be perceived by the public as political pressure. Either way, the integrity of the process is dealt a sore blow.
 
 III. THE LOVELL-HAUGHTON INCIDENT
 
 220
 The special hearing revealed another contact which, though admittedly brief, presents, to my mind, improprieties similar to those latent in Secretary Lewis' calls. Malcolm Lovell is the Undersecretary of Labor. One or two days before FLRA announced its decision, Lovell called Chairman Haughton, whom he knows socially and professionally, and enquired when the decision would issue.[46] After Haughton replied that he hoped the opinion would be forthcoming very soon, Lovell said, "I hope there won't be anything embarrassing in it."[47] Haughton responded, "Well, I may be dissenting."[48]
 
 
 221
 Because of Lovell's final remark, his call cannot be relegated to the realm of the inoffensive status inquiry. The legislative history of the Government in the Sunshine Act warns against purported status requests that "in effect amount to an indirect or subtle effort to influence the substantive outcome of the proceedings."[49] Not even indirect or subtle is a statement by the Undersecretary of Labor informing the Chairman of FLRA that he is anxious not only about when the agency's decision will issue but also about whether it will contain anything "embarrassing."[50] While 30 years' acquaintance[51] readily explains why Haughton took the call, it hardly affords license for the impropriety that ensued. I accept Judge Vittone's finding that this incident had no influence on the vote ultimately cast,[52] especially in view of the evidence indicating that Haughton's position had essentially solidified before he spoke with Lovell.[53] If, however, executive officials indeed have no more respect for the inviolability of the formal adjudicatory functions of independent agencies than has been exhibited in this case, then the designation "independent" is in grave danger of becoming an empty title.
 
 IV. THE APPLEWHAITE-SHANKER DINNER
 
 222
 On September 21-when the administrative law judge's decertification recommendation was under submission to FLRA, and the members were intensely engaged in attempting resolution of the important and difficult questions presented-Albert Shanker extended, and Member Applewhaite accepted, an invitation to dinner. Shanker is the President of the American Federation of Teachers and a member of the Executive Board of amicus curiae AFL-CIO; his strong opposition to decertification of PATCO had been well-publicized.[54] The last 15 minutes of their dinner were deliberately utilized by Shanker as the opportunity to advocate his view of the merits of the PATCO case in an effort to persuade Applewhaite to vote favorably to Shanker's position.[55] At no time did Applewhaite attempt to put a stop to Shanker's ex parte inducements.[56]
 
 
 223
 I pause only briefly over Shanker's conduct. His deliberate crusade to sway through private importunity the decision of one acting as judge in a pending case is so far beyond the pale of legally tolerable activity that even the most caustic criticism could not overstate the magnitude of the impropriety. Suffice it to say, I join in the court's conclusion that Shanker was, beyond cavil, an interested party, and in its condemnation of his behavior as an egregious violation of the APA. Far more necessitous of extended comment, in my view, is the conduct of Member Applewhaite. This court should not hesitate to allocate blame squarely where it belongs: at the doorstep of one acting as a judicial officer who, with a solemn responsibility to preserve both the fact and appearance of complete impartiality, first subjected himself to a palpable risk of contamination, and then made no effort to arrest forbidden advocacy when it came.
 
 
 224
 I cannot accede to the assertion that, by itself, a private dinner engagement between Applewhaite and Shanker was not improper.[57] I would have thought it unnecessary this late in the day to defend the precept that one who judges should avoid even the appearance of impropriety.[58] Shanker was a prominent labor official who had been vocal in his partisanship of PATCO's cause;[59] moreover, the powerful labor organization on whose Executive Board he sat was amicus curiae in the case. Can the public really be expected to believe in the fairness and neutrality of the agency's formal adjudicatory processes when one of its decisionmakers permits an outspoken, highly visible official of a participating union to wine and dine him during deliberations on the case?[60]
 
 
 225
 My brethren find justification for Applewhaite's assent to Shanker's invitation by observing that a judge must have friends.[61] It seems to me that gratification of personal inclination is a sorry reason for one acting in a quasi-judicial capacity to place himself in a position where his conduct could spark adverse public comment. One given the power to render decisions in formal adjudicatory proceedings is accorded the highest of honors and dealt the gravest of responsibilities; those who take on this judicial role may no longer participate in the daily intercourse of life as freely as do others. They have a duty to the judicial system in which they have accepted membership fastidiously to safeguard their integrity-at the expense, if need be, of "neighbors, friends and acquaintances, business and social relations."[62] This is their "part" in their "day and generation,"[63] and one who is unwilling to make the sacrifice is unsuited to the office.[64]
 
 
 226
 Going beyond questions about the propriety of Applewhaite's agreement to dine privately with Shanker during the critical deliberative phase of the case, there can be no doubt that their after-dinner discussion of the merits of decertifying PATCO violated the express prohibition of Section 557(d) of the APA. Applewhaite's failure to "steer the conversation away from PATCO" thus was far more than a mere "indiscretion."[65] The moment that Shanker broached the topic of public employee strikes, Applewhaite should have enjoined conversation on that score. While it might be possible to attribute Applewhaite's actions in placing himself in a compromising position to thoughtless imprudence, his unprotesting submission to blatant ex parte advocacy on the merits of a case then pending before the members defies explanation.
 
 
 227
 Judge Vittone determined,[66] and all parties substantially agree, that the Shanker dinner had no impact on Applewhaite's ultimate vote.[67] Accordingly, the court concludes, and I agree, that a remand is unnecessary. This cannot obscure the fact, however, that Applewhaite disregarded his statutory obligation to abjure discussions on the merits of the PATCO case with an interested party.[68] Such remissness on the part of a powerful and highly-placed administrator deserves, by my estimate, a harsher verdict from this court than "unfortunate."[69]
 
 V. CONCLUSION
 
 228
 We are unanimous in our acceptance of Judge Vittone's several determinations that none of the above-described contacts tainted FLRA's final decision.[70] I fear, however, that in announcing that we find no reason to send this case back, the court's opinion comes perilously close to intimating that we discover nothing seriously wrong. Such suggestion, in my view, would be a gross mischaracterization. The record before us may be free of instances of sensational wrongdoing, but it is filled with a pattern of insidious lapses. The casualness with which interested persons privately approached decisionmakers engaged in formal adjudication; the thoughtlessness with which the decisionmakers exposed themselves to such approaches and permitted them to proceed unchecked; the ignorance of, and unconcern for, the principles that underlie the ex parte rules-all these things signal something fundamentally awry.
 
 
 229
 The laxness with which FLRA protected the integrity of its adjudicatory processes in this case ought be a matter of deep concern for this court, which routinely is asked to accord substantial deference to the decisions rendered by the agency on questions of considerable import to federal employees. It ought be a matter of even deeper concern to the agency itself. FLRA will have the respect of the public only when its personnel have sufficient respect for their especial mission to rebuff any attempt to influence or corrupt it. Ultimately, an agency must be the guardian of its own honor. If it permits interested persons to show contempt for its formal adjudicatory processes by the subversion of ex parte pleas and approaches, then those processes will indeed become contemptible.
 
 APPENDIX
 
 230
 RECOMMENDED FINDINGS OF ADMINISTRATIVE LAW JUDGE JOHN M. VITTONE
 
 
 231
 On February 16, 1982, the United States Court of Appeals for the District of Columbia Circuit ordered the Federal Labor Relations Authority (FLRA) to hold an evidentiary hearing to determine the nature, extent, source, and effect of any and all ex parte contacts and other approaches that may have been made to any member or members of the Authority while the appeal from the decision of the Administrative Law Judge in Case No. 3-CO-105 was pending before the Authority. The Court's action was caused by the filing of a Declaration with the Court by J. Paul McGrath, Assistant Attorney General, on December 2, 1981, which described an inquiry by the Department of Justice into the FLRA PATCO proceeding. Further, the Court of Appeals ordered the Authority to obtain through the Office of Personnel Management an administrative law judge from a neutral agency to conduct the evidentiary hearing. The Court also ordered the administrative law judge to permit all parties to Case No. 3-CO-105, the Authority and any member thereof, all persons alleged to have contacted any member of the Authority while Case No. 3-CO-105 was pending, and any other person the administrative law judge considers to have an interest in the matter, to participate fully in the hearing, to present evidence, and to recommend findings. Finally, the Court ordered the administrative law judge to transmit to the Court on or before March 19, 1982, the entire file, including the record of the proceeding, the participants' recommended findings, and the recommended findings of the administrative law judge.
 
 
 232
 On February 19, 1982, the undersigned administrative law judge was selected by the Office of Personnel Management to preside over the hearing ordered by the Court of Appeals. A prehearing conference was scheduled for and held on February 26, 1982. Appearances were entered for FLRA Chairman Ronald Haughton, FLRA Member Henry B. Frazier, III, FLRA Member Leon Applewhaite, the Professional Air Traffic Controllers Organization (PATCO), the Federal Labor Relations Authority (FLRA), the Federal Aviation Administration (FAA), the American Federation of Government Employees (AFGE), Anthony Skirlick pro se (a working controller), and a group of working controllers.
 
 
 233
 After hearing argument from all parties, it was decided that the latter three participants lacked sufficient interest in the subject matter of this proceeding to justify full party status. However, AFGE, Mr. Skirlick, and the group of working controllers were granted amicus status, and were given the opportunity to submit recommended findings at the close of the hearings before the administrative law judge. (Transcript, hereinafter Tr. 37-39)
 
 
 234
 During the conference, it was also decided that the documents under seal with the Court of Appeals were necessary for a full and complete airing of the ex parte issues and the FAA was ordered to request the Court of Appeals to unseal those documents. On February 26, the Court of Appeals unsealed eight documents and these documents were transmitted to all parties.* Various requests for evidence and witnesses submitted by PATCO were also discussed, and the parties were granted the opportunity to file objections to those requests by March 1. Responses to PATCO's requests were submitted by Chairman Haughton, Members Applewhaite and Frazier, the FLRA, the FAA and Robert J. Freehling. The PATCO requests were ruled upon in the undersigned's order of March 2, 1982 and at the hearing.
 
 
 235
 The hearing in this proceeding commenced on March 4, 1982. At the outset of the hearing, Mr. Albert Shanker, through counsel, moved to intervene in this proceeding and this request was granted. At that time, the group of working controllers renewed its motion to fully participate as a party to the proceeding and this request was again denied. (Tr. 191-192)** Hearings were held from March 4 through March 17. The focus of the hearings was on the period August 3 to November 3, 1981, the period of time that the PATCO case was pending at the FLRA. During this time testimony was received from the following individuals:
 
 
 236
 FLRA Member Henry B. Frazier, III;
 
 
 237
 Anthony J. Skirlick, Jr.;
 
 
 238
 Matthew Shannon;
 
 
 239
 Robert J. Freehling, Former FLRA Solicitor;
 
 
 240
 FLRA Member Leon Applewhaite;
 
 
 241
 Albert Shanker, President of the American Federation of Teachers and United Federation of Teachers;
 
 
 242
 FLRA Chairman Ronald Haughton;
 
 
 243
 FLRA Chief Counsel Paul Klein;
 
 
 244
 Robert Bonitati, Special Assistant to the President for Public Liaison;
 
 
 245
 FLRA Deputy Executive Director Harold Kessler;
 
 
 246
 FLRA General Counsel H. Stephan Gordon;
 
 
 247
 FBI Special Agents Larry Knisley and John Paulisick; and
 
 
 248
 Holly Hemphill, Executive Assistant to Member Frazier.
 
 
 249
 During the course of this extensive testimony, it became clear to the undersigned and all parties that the Court's March 19, 1982 deadline would be difficult, if not impossible, to meet. On March 11, the undersigned filed a request, on behalf of all the parties, that the March 19 date be extended until March 26. The Court of Appeals granted this request on March 16, 1982.
 
 
 250
 At the close of the hearing on March 17, 1982, a procedural schedule was established which required that the parties and the amicus parties submit their recommended findings by the close of business on March 25. Pursuant to that order findings were submitted by Chairman Haughton, Members Applewhaite and Frazier, Albert Shanker, PATCO, the FLRA and the FAA. The undersigned's recommended findings now follow.
 
 I BACKGROUND
 
 251
 1. The Federal Labor Relations Authority is composed of three presidentially appointed Members, and administers the Federal Service Labor-Management Relations Statute. 5 U.S.C. § 7104, 7105 (Supp. III 1979).
 
 
 252
 2. The case of Professional Air Traffic Controllers Organization (PATCO) and Federal Aviation Administration, Department of Transportation, FLRA Case No. 3-CO-105 (hereinafter PATCO ), was instituted on August 3, 1981, when FAA filed with the General Counsel of the Authority (who has independent investigatory and prosecutorial authority under 5 U.S.C. § 7104(f) (Supp. III 1979), an unfair labor practice charge, alleging that PATCO was engaging in a strike in violation of 5 U.S.C. § 7116(b)(7) (Supp. III 1979). (Tr. 1639-40)
 
 
 253
 3. The Authority's General Counsel issued an unfair labor practice complaint against PATCO, based upon the charge filed by FAA, on August 3. The case was heard before an Administrative Law Judge of the FLRA on August 10 and 11, 1981. The judge issued his decision on August 14, 1981, and the case was thereupon transmitted to the Authority. (Tr. 222, 1639-41, 2047-48)
 
 
 254
 4. The oral argument held by the Members of the Authority in the PATCO case on September 16, 1981, was the first oral argument ever held by the Members in an unfair labor practice case, and was the second oral argument ever held by the Members since the establishment of the Authority. (Tr. 232, 282)
 
 
 255
 II MEETING BETWEEN MEMBER APPLEWHAITE AND H. STEPHAN GORDON,
 
 FLRA GENERAL COUNSEL
 
 256
 1. Mr. H. Stephan Gordon was at all relevant times the General Counsel of the Federal Labor Relations Authority. The FLRA General Counsel was responsible for the prosecution of the unfair labor practice complaint which was issued on August 3, 1981. (Tr. 2333; 5 U.S.C. § 7104) Under the FLRA regulations concerning ex parte communications, the General Counsel is deemed to be an interested person outside the agency in an unfair labor practice proceeding. (5 C.F.R. § 2414.3)
 
 
 257
 2. On or about August 10, 1981, Mr. Gordon and Member Applewhaite were in Member Applewhaite's office discussing administrative issues unrelated to the PATCO case. (Tr. 809, 812, 836, 837, 1575, 2345) During that discussion, Ms. Ellen Stern, an attorney with the FLRA Solicitor's office, entered Member Applewhaite's office and delivered a memorandum entitled "Decertification of Labor Organization Participating in the Conduct of a Strike in Violation of Section 7116(b)(7) of the Statute" which was prepared at the request of Member Frazier. (Tr. 607-608, 809, 836-38, 1575, 2344; Frazier Exh. 16)
 
 
 258
 3. The Solicitor's office is the general legal advisor of the FLRA, including the Members. In addition, the Solicitor represents the Authority and the General Counsel in various kinds of court actions. (Tr. 662-64, 837)
 
 
 259
 4. Ms. Stern proceeded to discuss her memorandum, which dealt with whether decertification of a labor organization participating in a strike is mandatory or discretionary under the statute, and assuming it is discretionary, what other appropriate disciplinary action may be taken. (Tr. 809-811; Frazier Exh. 16)
 
 
 260
 5. Mr. Gordon remained in Member Applewhaite's office during the discussion. (Tr. 809, 811)
 
 
 261
 6. Member Applewhaite admitted in his testimony that he probably should have asked Mr. Gordon to leave when Ms. Stern came in to discuss the memorandum. (Tr. 838)
 
 
 262
 7. Mr. Gordon asked Ms. Stern whether other remedies were available and whether she had looked at the legislative history. (Tr. 838, 2345)
 
 
 263
 8. Mr. Gordon did not ask Member Applewhaite any questions. (Tr. 811, 838, 1576-1577, 2344-46)
 
 
 264
 9. Member Applewhaite suggested that Ms. Stern do research on the availability of other remedies, and she agreed. (Tr. 809-10, 838)
 
 
 265
 10. Mr. Gordon did not suggest to Member Applewhaite how Applewhaite should decide the PATCO case or make any argument to Member Applewhaite or Ms. Stern. (Tr. 811, 839)
 
 
 266
 11. The discussion lasted 10-15 minutes. (Tr. 839, 2345)
 
 
 267
 12. The discussion concerned the interpretation of the statute, and neither Ms. Stern nor Member Applewhaite indicated any opinion on this subject. (Tr. 2344)
 
 
 268
 13. This discussion was within the context of the PATCO case. (Tr. 2346)
 
 
 269
 14. When Member Applewhaite asked Mr. Gordon for his opinion, Gordon replied: "I am a lawyer and I can take any side my client wants me to take. I don't know which side anybody is on on this" and that was the end of the conversation. (Tr. 2346)
 
 
 270
 15. The conversation had no effect or impact on Member Applewhaite's ultimate decision in the PATCO case.
 
 
 271
 16. Because of the General Counsel's position in the PATCO case, this conversation may have violated section 2414.2 of the FLRA's regulations concerning ex parte communications. (5 C.F.R. § 2414.2)
 
 
 272
 III ANDREW L. LEWIS, JR.
 
 
 273
 1. Andrew L. Lewis, Jr. is the Secretary of Transportation. (Tr. 258)2. On August 13, 1981, at 9:15 a.m., Secretary Lewis telephoned Member Frazier. (Tr. 258, see PATCO Exh. 3, entry for August 13, 1981)
 
 
 274
 3. Secretary Lewis stated to Member Frazier that he was not calling about the substance of the PATCO case. (Tr. 258)
 
 
 275
 4. Secretary Lewis said he wanted the position of the Department of Transportation and the Federal Aviation Administration on the rumors concerning possible settlement efforts of the PATCO strike in the press or the media made clear. (Tr. 258-59) Secretary Lewis wanted Member Frazier to understand that there was no meaningful settlement effort taking place, as far as he was concerned, to settle the strike. (Id.) Secretary Lewis said that the reports one might hear on television or on the radio or read in the newspapers to the contrary, as far as he was concerned, were not true. (Id.)
 
 
 276
 5. Member Frazier was aware of those reports. (Tr. 331)
 
 
 277
 6. Secretary Lewis also stated that the Department of Transportation would appreciate expeditious processing of the case in accordance with the rules of the FLRA when the administrative law judge had issued his recommended decision and order. (Tr. 259)
 
 
 278
 7. Member Frazier replied, "I understand your position perfectly, Mr. Secretary," because his response was intended to be short. He did not wish to discuss the PATCO case or its merits with Secretary Lewis. (Tr. 259, 413-14)
 
 
 279
 8. Member Frazier did not understand Secretary Lewis' call to ask that the case be handled faster than the rules permit. (Tr. 600)
 
 
 280
 9. Secretary Lewis indicated that he had been advised by his staff to call Member Applewhaite also, whom he understood was available in Washington, D. C., at that time. (Tr. 259) Member Frazier confirmed that Member Applewhaite was available in Washington and that as far as Member Frazier knew the Chairman was not available in Washington on that date. (Id.; see 346)
 
 
 281
 10. Member Frazier asked Secretary Lewis if the Secretary wanted Member Frazier to convey the Secretary's message to Member Applewhaite or whether he wanted to call Member Applewhaite himself. Secretary Lewis stated that he would call Member Applewhaite himself. (Tr. 259)
 
 
 282
 11. The conversation between Secretary Lewis and Member Frazier lasted two or three minutes. (Tr. 347, 409)
 
 
 283
 12. Member Frazier had never received a call from a Cabinet level official prior to Secretary Lewis's call, and he perceived such contact as unusual. (Tr. 330)
 
 
 284
 13. Member Frazier discussed Secretary Lewis' telephone call with FLRA Solicitor Robert Freehling. (Tr. 449) Member Frazier described the Secretary's call to Solicitor Freehling as relating to status and settlement. (Tr. 674) Solicitor Freehling advised Member Frazier that the communication from Secretary Lewis did not fall with the ex parte prohibitions in the FLRA regulations. (Tr. 676)
 
 
 285
 14. Member Frazier has never met Secretary Lewis. (Tr. 348)
 
 
 286
 15. Member Frazier did not believe that Secretary Lewis was trying to put pressure on him (Tr. 261)
 
 
 287
 16. On August 13, 1981, soon after Member Frazier's conversation with Secretary Lewis, Member Applewhaite was advised upon arriving at his office by Frazier that Lewis had called Frazier. (Tr. 727)
 
 
 288
 17. Member Frazier told Member Applewhaite that he had given Secretary Lewis Member Applewhaite's telephone number and described the conversation he had had with Secretary Lewis. (Tr. 727)
 
 
 289
 18. Member Applewhaite then advised his executive assistant, Pamela Johnson, that he was expecting a call from Secretary Lewis and requested that she locate the FLRA regulation regarding time limits for processing an appeal from an administrative law judge's decision. (Tr. 728)
 
 
 290
 19. Ms. Johnson found the provision prior to Secretary Lewis calling. (Tr. 728)20. Secretary Lewis called Member Applewhaite shortly thereafter. (Tr. 729)
 
 
 291
 21. Secretary Lewis began the telephone conversation by saying that he was aware that the FLRA had a backlog of cases, but that the PATCO case was very important and stated his concern that the decision not be delayed. (Tr. 729).
 
 
 292
 22. At that point in the conversation, Member Applewhaite interrupted the Secretary to inform him that if he wished to obtain expedited handling of the case, he must comply with the FLRA's Rules and Regulations. Member Applewhaite then cited the applicable section of the FLRA Rules which require a written request for such action. (Tr. 729)
 
 
 293
 23. Secretary Lewis stated that he was unaware that papers had to be filed on this matter. (Tr. 729) Member Applewhaite told Secretary Lewis that if papers were not filed, the matter would be handled in its normal course. (Id.) Secretary Lewis stated he would contact his General Counsel right away. (Id.)
 
 
 294
 24. Member Applewhaite and Secretary Lewis did not discuss any other procedural matters or subjects. (Tr. 729, 874-75, 1021)
 
 
 295
 25. The conversation lasted 1-2 minutes. (Tr. 730)
 
 
 296
 26. Member Applewhaite had never received a call from a Cabinet level official prior to Mr. Lewis' call and he perceived such contact as unusual. (Tr. 860)
 
 
 297
 27. On August 13, 1981, at 2:19 p.m., the FAA filed a Motion to Modify Time Limits for Filing Exceptions which requested that the time limit be reduced to seven days from the usual 25 days. (Tr. 1719, PATCO Exh. 4(b))
 
 
 298
 28. On the afternoon of August 13, 1981, FLRA Chief Counsel Paul Klein received a telephone call from FLRA Solicitor Robert Freehling indicating that he had received the FAA's Motion to Modify, and that he wanted Mr. Klein to review a proposed draft order concerning time limits for filing exceptions. (Tr. 2046, 2050, 2061)
 
 
 299
 29. Mr. Klein received copies of the draft order prepared by Mr. Freehling that same afternoon. (Tr. 1906-1908; PATCO Exhs. 9, 10)[1]
 
 
 300
 30. On August 14, 1981, the FLRA General Counsel filed a Motion to Modify Time Limits for Filing Exceptions which requested the time limit be reduced to no more than seven days. (PATCO Exh. 4(c))
 
 
 301
 31. On August 17, 1981, PATCO filed an Opposition to Motions to Limit Exceptions Filing Time and Motion to Extend Such Time which requested that the time limit be extended to 60 days. (PATCO Exh. 4(d); see PATCO Exh. 4(a))
 
 
 302
 32. At a meeting held on August 18, 1981, in Member Frazier's office, the Members considered the three pending motions, denied all three motions, and decided instead to reduce the 25-day time period prescribed by the FLRA's Rules of Practice to 19 days. (Tr. 1642-43; see PATCO Exh. 4(a))
 
 
 303
 33. At the time of the vote on August 18, modifying the time for filing exceptions to the ALJ's decision, Chairman Haughton did not know that Secretary Lewis had communicated with either of the two other Members. (Tr. 1673 I-J)
 
 
 304
 34. Secretary Lewis' call to Member Applewhaite may have led to the FAA's filing of a motion to reduce the time period for filing exceptions to the judge's decision.
 
 
 305
 35. Secretary Lewis' call had an undetermined effect on Member Applewhaite's and Member Frazier's decision to reduce the time period for filing exceptions to the judge's decision.
 
 
 306
 36. Secretary Lewis' call had no effect on Member Applewhaite's or Member Frazier's ultimate decision on the merits of the PATCO case.
 
 
 307
 IV THE SHANKER-APPLEWHAITE DINNER AND THE FLRA DECISIONAL PROCESS
 
 
 308
 In the McGrath Declaration, it is reported that Member Applewhaite had dinner with a well-known labor leader during the pendency of the PATCO case before the FLRA. At this dinner, it was alleged, the labor leader told Member Applewhaite that if he voted to revoke PATCO's certification, Applewhaite would be unable to obtain employment in the labor field when his FLRA appointment expires. After this dinner, it was alleged that Member Applewhaite's position on revoking PATCO's certification began to change. (McGrath Declaration at 4, see also ALJ Ex. 7) The following findings concern the Applewhaite dinner with the labor leader and the changes in Member Applewhaite's position following the dinner.
 
 A. THE SHANKER-APPLEWHAITE DINNER
 
 309
 1. Albert Shanker has served since 1974 as President of the American Federation of Teachers ("AFT"), AFL-CIO, and since 1964, as President of the AFT's New York City local, the United Federation of Teachers. (Tr. 1387) As President of the AFT, Mr. Shanker is also a member of the Executive Council of the AFL-CIO. (Tr. 1418)
 
 
 310
 2. Through various contacts, Mr. Shanker and Member Applewhaite have become professional and social friends. (Tr. 1419-20, 735) For example, while Mr. Applewhaite was associated with the New York Public Employment Relations Board, he served as a mediator in disputes involving affiliates of the AFT. (Tr. 1391-92) In addition, both men have attended and met at a number of labor-management relations conferences. (Tr. 1391)
 
 
 311
 3. From August 3, 1981 through September 21, 1981, Mr. Shanker and his union made a series of widely publicized public statements in support of PATCO. (Tr. 1397-1403) The AFT urged the public not to fly and directed its own staff not to fly except in cases of emergency. The AFT also contributed money to a PATCO fund. (Tr. 1398)
 
 
 312
 4. Mr. Shanker urged repeatedly in public statements that disproportionately severe punishment not be inflicted on PATCO for engaging in its strike. (Tr. 1399-1400) Mr. Shanker spoke to various groups-including a PATCO rally and an address to teachers-on this subject almost every day. (Tr. 1399) He was interviewed about the PATCO strike on a nationally televised news program. (Tr. 1401) Throughout this period, Mr. Shanker reiterated the view that punishment for illegal strikes by public employees should be designed to bring about settlements or deter future illegal activities, but should not destroy the union or the collective bargaining process. (Tr. 1399-1400)
 
 
 313
 5. Beginning in 1969, Mr. Shanker has authored an opinion column that appears every Sunday in The New York Times in space purchased by the AFT. (Tr. 1401) Since August 3, 1981, Mr. Shanker has published a number of columns discussing the PATCO situation. (Frazier Exhibits 18A-18E)
 
 
 314
 6. On August 16, 1981, Mr. Shanker published a column in The New York Times discussing the federal government's reaction to the PATCO strike. (Shanker Exhibit 3, see also Frazier Exh. 18(a) through (e)) In this column Mr. Shanker reported that the federal government was refusing to negotiate with PATCO; that heavy fines had been levied against PATCO; and that the government was taking legal action to have PATCO's status as an exclusive bargaining agent revoked. In the column Mr. Shanker expressed the view that revocation of PATCO's status would be an exceptionally severe punishment. (Tr. 1403)
 
 
 315
 7. On September 16, 1981, the Authority heard oral argument on PATCO's appeal from the adverse decision of an administrative law judge. The AFL-CIO appeared as amicus curiae. Mr. Shanker was not aware of the AFL-CIO's participation as amicus curiae in the PATCO proceeding. (Tr. 1418-19) Mr. Applewhaite was aware of the AFL-CIO's participation in the PATCO case and of Mr. Shanker's position with the AFL-CIO. (Tr. 909)
 
 
 316
 8. Mr. Shanker was in Washington, D. C. on September 19, 1981, to participate in the Solidarity Day rally. (Tr. 1388; Frazier Exhibit 18A) Mr. Shanker remained in Washington, D. C. during the week of September 20, 1981 in order to attend to a number of business matters. (Tr. 1388-89) Around mid-day on September 21, Mr. Shanker asked his secretary to arrange a dinner appointment with Member Applewhaite that evening. (Tr. 1389-90)
 
 
 317
 9. Mr. Shanker wanted to have dinner with Member Applewhaite because he felt very strongly about the PATCO case, and very much desired that a settlement be reached between the parties. He wanted to communicate directly to Member Applewhaite sentiments he had previously expressed in public statements. (Tr. 1421; see Shanker Ex. 3; see also Frazier Ex. 18a through e)
 
 
 318
 10. On the afternoon of September 21, arrangements were concluded for Mr. Shanker to meet Member Applewhaite for dinner at Harvey's, a restaurant in the District of Columbia selected by Member Applewhaite. (Tr. 1338, 1393) On that same afternoon, September 21, the members of the Authority met to discuss their positions on the PATCO case. (Tr. 229) Member Applewhaite informed Chairman Haughton and Mr. Frazier that Mr. Shanker had called and that Shanker and Applewhaite would be meeting for dinner. (Tr. 736, 1650)
 
 
 319
 11. Member Applewhaite and Mr. Shanker met at Harvey's about 6:30 p. m. (Tr. 1393, 739) They talked for about an hour and a half. (Tr. 1394, 739) Mr. Shanker paid for the dinner. (Tr. 1394) Most of the dinner conversation concerned general topics, such as the Solidarity Day rally and the tuition tax credit referendum to be held in the District of Columbia. (Tr. 1394-96, 741)
 
 
 320
 12. Near the end of the dinner, Member Applewhaite and Mr. Shanker discussed public employee strikes and the PATCO strike for about fifteen minutes. (Tr. 1396, 1406) At no time during the conversation did Member Applewhaite indicate in any way that he believed it improper for him to discuss the issues surrounding the PATCO case with Mr. Shanker. (Tr. 1459)
 
 
 321
 13. The two men discussed various local approaches to strikes by public employees, including the requirements of the Pennsylvania and New York laws concerning strikes by government employees. (Tr. 1403-04, 742, 908) Mr. Shanker said that he had visited England after a strike of firefighters and was surprised that the strike had generated little resentment toward unions. (Tr. 1404)
 
 
 322
 14. Mr. Shanker said that he understood that illegal strikes had to be punished, but he stated his view that the punishment should fit the crime. (Tr. 1405, 1423) He also expressed the view that the revocation of certification as punishment for an illegal strike would be tantamount to "killing a union." (Tr. 906-07) Mr. Shanker's comment was a repetition of views that Member Applewhaite had heard in the media and that Applewhaite knew to be the position of organized labor. (Tr. 1036, 1038)
 
 
 323
 15. Member Applewhaite observed, in closing the conversation, that he was concerned about his prospects for reappointment in July 1982. (Tr. 1407, 744) Mr. Shanker testified that he jokingly said that he could not help secure reappointment because he had no contacts in the White House. (Tr. 1407) Member Applewhaite said that because the PATCO case was hotly contested, he would be viewed with disfavor by whichever side he voted against. (Tr. 1407, 1414) Mr. Shanker then said that Applewhaite had no commitments from anyone. (Tr. 1408, 1427, 1460, 744, 904, 1040) Mr. Shanker urged Applewhaite to vote without regard to personal considerations. (Tr. 1408, 1427, 1460) After these remarks the conversation ended, the two men left the restaurant, and parted. (Tr. 1408)
 
 
 324
 16. Mr. Shanker did not say to Member Applewhaite, in words or substance, "If you vote to revoke the certification of PATCO, you won't be able to get cases as an arbitrator if and when you leave your position in the federal government." (Tr. 1408, 1409, 744-45) Mr. Shanker did not tell Applewhaite, in words or substance, that Mr. Shanker was speaking "for top AFL-CIO officials." (Tr. 1409, 745) Mr. Shanker did not tell Member Applewhaite that Applewhaite would need labor support in order to be reappointed. (Tr. 1450) Mr. Shanker did not in any way threaten Member Applewhaite during their meeting of September 21. (Tr. 1409, 744-45, 754, 758) Mr. Shanker did not make any promises of any kind to Member Applewhaite during their dinner of September 21. (Tr. 1409, 754, 758)
 
 
 325
 17. Mr. Shanker did not offer Member Applewhaite anything of value during the dinner of September 21. (Tr. 1409-10) When Mr. Shanker left Member Applewhaite on September 21, Mr. Shanker did not know how Applewhaite would vote. (Tr. 1427)[2]
 
 
 326
 18. During the period from August 3, 1981 through November 3, 1981, Mr. Shanker did not discuss the PATCO case with either Chairman Haughton or Member Frazier. (Tr. 1432, 1450)
 
 B. THE SEPTEMBER 21 MEETING OF THE MEMBERS
 
 327
 19. Prior to the Shanker-Applewhaite dinner on the evening of September 21, the members of the FLRA met for the first time that day to express formally their respective positions on the PATCO case. The meeting took place in Member Frazier's office at approximately 2:30 p. m. In addition to the members, Robert Freehling, FLRA Solicitor, and Paul Klein, Chief Counsel of the FLRA, attended the meeting. (Tr. 223, 228, 798, 1646, 1882-83)
 
 
 328
 20. Messrs. Haughton, Applewhaite and Frazier were in agreement that they should find that PATCO had engaged in a strike and thereby had committed an unfair labor practice (Tr. 228-230, 1954-56, 907, 1646-47) As to the remedy on the case, Frazier took the position that the exclusive recognition of PATCO should be revoked (Tr. 229, 1646); that PATCO would no longer be a labor organization within the meaning of the statute (Tr. 229, 1647); and that it was unnecessary at that time to pass on the question of whether at some future time PATCO could qualify as a labor organization. (Tr. 229)
 
 
 329
 21. Member Applewhaite also took the position in the meeting on September 21 that the exclusive recognition of PATCO should be revoked, (Tr. 229-30, 1647, 1955-1956; Frazier Exhibit 17;[3] Frazier Exhibit 26) Member Applewhaite also took the position that PATCO would no longer be a labor organization within the meaning of the Statute. (Tr. 229, 1647) However, Member Applewhaite did not believe that revocation was a severe enough penalty, and suggested that PATCO be barred for a specified period of time (1 to 3 years) from seeking to requalify as a labor organization and therefore seeking to reacquire exclusive recognition for that period of time. (Tr. 229-30, 1647, 1955-56, 813)
 
 
 330
 22. Mr. Haughton agreed with the other members that an unfair labor practice had been committed and that PATCO was not a labor organization at that time. However, he favored a suspension, not revocation, of PATCO's collective bargaining status. (Tr. 1647-48)
 
 C. CHANGES IN APPLEWHAITE'S POSITION
 
 331
 23. About 10:00 or 10:30 p. m., on September 21, Chairman Haughton was awakened by a telephone call from Member Applewhaite, who immediately began discussing PATCO. He discussed an approach which was designed to achieve reinstatement of the fired air traffic controllers. It was Haughton's understanding that Applewhaite was considering taking the position that he described over the phone. (Tr. 1651, 1742-44, 1824)24. On that same night, Mr. Applewhaite telephoned Chief Counsel Klein. Applewhaite mentioned the dinner with Shanker. In addition, Applewhaite and Klein discussed possible remedies in the PATCO case, including reinstatement of the controllers, suspension of PATCO's dues checkoff, and imposition of a trusteeship. These remedies were not discussed at the earlier meeting of the members on September 21. The conversation lasted approximately 40 to 45 minutes. (Tr. 819, 1885, 1888, 1970-72) From the afternoon before the dinner to the evening after the dinner, Member Applewhaite had moved from his stated position of revocation with a time ban to consideration of a position designed to reinstate the striking controllers with the FAA.
 
 
 332
 25. On the morning of September 22, Member Frazier went to Member Applewhaite's office to inquire how the dinner with Mr. Shanker went. Member Frazier testified that Member Applewhaite said to him, "Hank, I can't vote to revoke the certification of PATCO." This change surprised Member Frazier. (Tr. 237) Member Frazier testified further that Applewhaite said that the dinner with Mr. Shanker had been a pleasant social occasion for at least the first hour and twenty minutes. During the last ten minutes of the dinner, the conversation turned to PATCO. (Id.) According to Member Frazier, Member Applewhaite reported that Mr. Shanker had said to Applewhaite that if he voted to revoke the certification of PATCO, he would not be able to work as an arbitrator when he left the government, and that Mr. Shanker was speaking for top officials in organized labor. (Tr. 237-238) Further, Member Applewhaite allegedly stated that his conclusion regarding his PATCO vote was tentative, but that he was leaning against revocation at that time. (Tr. 239)
 
 
 333
 26. Member Applewhaite denies that he made the above described comments to Member Frazier on September 22 or any other time. (Tr. 747-752) However, whether through miscommunication on the part of both parties, misunderstanding by Mr. Frazier, or misstatement by Member Applewhaite, Member Frazier left that meeting with a clear belief that the discussion at the Shanker-Applewhaite dinner had caused Member Applewhaite at least to consider less stringent remedies than he had raised at the September 21 meeting of the members.
 
 
 334
 27. Member Frazier then contacted Paul Klein, Chief Counsel of the FLRA, and asked him to prepare a draft concurring and dissenting opinion for him, in addition to preparing a lead decision that Frazier had requested earlier. Frazier told Klein that the request was made because Member Applewhaite might switch his vote in the case. (Tr. 239)
 
 
 335
 28. Member Frazier also informed his executive assistant, Holly Hemphill, about Member Applewhaite's tentative decision not to join Frazier. Mrs. Hemphill was instructed to begin working on a concurring and dissenting opinion. (Tr. 2888-90; Frazier Ex. 33)
 
 
 336
 29. Between September 22nd and October 9th, Member Applewhaite and Chairman Haughton exchanged draft proposals and talked both in person and over the telephone regarding the appropriate remedy in this case. For over two weeks, Member Applewhaite was trying to reach an agreement with the Chairman that involved a penalty other than revocation, either personally or through his representative, Mr. Klein. (Tr. 1655-56, 1834, 1836, 1902-03, 825-28, 1847-49, 1878-81, 1964-68; Frazier Exhibits 19, 28, 29, 30, 31)
 
 
 337
 30. The Chairman received from Member Applewhaite a draft of a proposed opinion on or about October 5. (Frazier Ex. 19; see also Frazier Exhibits 28, 29, 30, and 31; Tr. 1655) The Chairman also discussed remedies with Paul Klein, Applewhaite's principal draftsman and representative when Applewhaite was out of town. The discussions and proposed drafts were attempts by Member Applewhaite to reach an agreement with Chairman Haughton on a position that did not involve revocation of PATCO's certification. (Tr. 1655-57)31. When Chairman Haughton reviewed Member Applewhaite's draft he revisited an issue that he had decided earlier, mainly whether suspension amounted to revocation. He discussed the matter with Klein on at least October 5 and 6. (Tr. 1657, 1834) Although discussions between Applewhaite, Haughton, and Klein involved seeking an accommodation on remedies, Haughton concluded on October 6th or 7th that he could not accept Member Applewhaite's concept of suspension. Chairman Haughton had determined that suspension amounted to a revocation of certification, and he therefore rejected this approach for the same reasons he stated at the September 22 meeting. At that point, Chairman Haughton assumed that he would have to be prepared to dissent from a majority decision in favor of revocation. (Tr. 1657-58)
 
 
 338
 32. October 6, Member Applewhaite told Mrs. Hemphill, Frazier's assistant, that he was having trouble getting together with Chairman Haughton on a decision. Mrs. Hemphill testified that she responded, in a joking manner, that she would be happy to have him join them. He replied, well, maybe so. (Tr. 2891)
 
 
 339
 33. When Mrs. Hemphill realized that Member Applewhaite was serious, she asked him whether he might want to talk with Member Frazier directly. Member Applewhaite responded that he would. Mrs. Hemphill then made arrangements for Frazier to telephone Applewhaite in New York City, for which he was leaving that day. (Tr. 2892; Frazier Ex. 34) Mrs. Hemphill informed Member Frazier of Member Applewhaite's request for a telephone call.
 
 
 340
 34. Member Frazier made the telephone call to New York on October 7. (Tr. 249; Frazier Ex. 36) During the telephone call Member Applewhaite indicated to Member Frazier that it did not appear that Applewhaite and Chairman Haughton would be able to get together. It looked like Member Applewhaite would have to come back to a position in favor of revocation of certification. (Tr. 249) The conversation lasted 12 minutes (Frazier, Ex. 36, p. 4)[4]
 
 
 341
 35. Member Frazier informed Mrs. Hemphill of Member Applewhaite's change in position on October 7. (Tr. 2894)[5]
 
 
 342
 36. On the 8th and 9th of October, Member Applewhaite made his last attempts to reach an agreement with Chairman Haughton. The first was a telephone call on October 8th in which they again discussed a range of penalties other than revocation. (Tr. 1009-10) The second was on October 9th, in a private meeting in the afternoon among Member Applewhaite, Chairman Haughton and Chief Counsel Klein, at which they once again discussed a range of penalties other than revocation. A suspension of PATCO's recognition for a certain period was the central element in all of Member Applewhaite's proposals, but Chairman Haughton could not agree to that remedy. (Tr. 825-828, 1878-81) Their negotiations broke down in the late afternoon on October 9th.
 
 
 343
 37. Member Applewhaite told Mrs. Hemphill on October 9 that he would indeed return to a position in favor of revocation. (Tr. 2894, 828)[6]
 
 D. APPLEWHAITE-FREEHLING DISCUSSIONS
 
 344
 38. On September 22 and September 28 Member Frazier advised Member Applewhaite that he should discuss with Solicitor Robert Freehling the implications of the dinner with Mr. Shanker. (Tr. 239, 242, 534, 666-668) Member Applewhaite discussed the Shanker dinner with Solicitor Freehling on September 28. (Tr. 756)
 
 
 345
 39. Member Applewhaite sought from Mr. Freehling his advice as to the legal ramifications of a hypothetical case where a labor leader from New York, who had been a close friend socially and professionally over a period of years met socially with Member Applewhaite and made mention of the PATCO matter. (Tr. 668-72, 756-759)
 
 
 346
 40. Mr. Freehling advised Member Applewhaite that if there were promises of benefit or threats at the dinner meeting, a crime had occurred, and report must be made to the Office of Professional Responsibility in the Justice Department. (Tr. 669, 698-99) Mr. Freehling advised Member Applewhaite on the FLRA rules on ex parte contacts, explaining precisely what the rules say, what an ex parte contact is, what the exceptions are and what is required if there is an ex parte contact. (Tr. 669-670)
 
 
 347
 41. Mr. Applewhaite did not disclose the details of the conversation between Applewhaite and Shanker concerning PATCO. (Tr. 668-672) Mr. Freehling never asked Member Applewhaite if his position in the PATCO case had changed as a result of the Applewhaite-Shanker dinner. (Tr. 695)
 
 
 348
 42. Mr. Freehling did not advise Member Applewhaite as to whether the Applewhaite-Shanker dinner was a problem. Mr. Freehling did suggest that Mr. Applewhaite discuss the matter with the other members. (Tr. 697)
 
 
 349
 43. On September 28, Member Applewhaite told Chairman Haughton that he had discussed the Shanker dinner with Mr. Freehling and that Mr. Freehling had advised that there was no problem concerning the conversation with Mr. Shanker regarding the PATCO case. Mr. Applewhaite did not discuss with Chairman Haughton the possibility of disclosing the PATCO discussion at the Shanker-Applewhaite dinner in the final PATCO decision of the FLRA. (Tr. 1682, 1729)
 
 
 350
 44. Member Frazier was not present during this conversation between Member Applewhaite and Chairman Haughton. (Tr. 1653-54, 1730-31, 1832-33) Chairman Haughton had no conversations with Member Frazier or Mr. Freehling about the Applewhaite-Shanker dinner meeting. (Id.) Chairman Haughton does not recall any conversation with Member Applewhaite, at which Member Frazier was present, concerning the Shanker-Applewhaite dinner. (Id.)
 
 
 351
 45. Member Frazier later asked Mr. Freehling whether Member Applewhaite had discussed the Shanker dinner conversation with him. Mr. Freehling advised that he had and that Member Applewhaite had concluded that there were no problems involved. (Tr. 244)
 
 E. THE ISSUANCE OF THE DECISION
 
 352
 46. By October 19, all three members had drafted their final opinion for the PATCO case. Drafts were exchanged among the three members. Each wrote responses to the arguments of the others. Each polished his own draft. (Tr. 250-51, 2904)
 
 
 353
 47. The final opinions of the members were issued on October 22, 1981. In that decision, the members found that PATCO had committed an unfair labor practice in violation of the Federal Service Labor-Management Relations Statute. (5 U.S.C. § 7101) Members Frazier and Applewhaite found that the violation required the revocation of PATCO's exclusively recognized representation of the air traffic controllers as a nationwide collective bargaining unit. Chairman Haughton dissented from the remedy. He found the record to be incomplete with respect to the evidence bearing on the remedy, and stated that he was unable to determine what remedy was warranted.
 
 
 354
 48. Member Applewhaite was interviewed by FBI agents Larry Knisley and John Paulisick on October 22 at about noon. (Tr. 851, 2415) Member Applewhaite told the FBI agents basically the substance reported in their FBI report about the interview. (ALJ Ex. 1) Despite Member Applewhaite's testimony to the contrary, he did in fact tell agents Knisley and Paulisick that he considered the Shanker dinner an ex parte contact; that it was his policy to advise the other two authority members about ex parte contacts; that he never changed his position following the dinner; that he never opposed decertification of PATCO; that his position regarding PATCO fell between the two extremes of the other two members; that he desired a three-year suspension for PATCO, which he reduced to a suspension of one year; and that the other two Authority members lied to him about their positions regarding PATCO. (Tr. 2427-29, 2435-36, 2817)
 
 
 355
 49. Following the FBI interviews, Member Applewhaite reported to Chairman Haughton that the agents had praised him for his courage regarding the Shanker dinner and the PATCO case. (Tr. 1855-56, 2437) In fact the FBI agents did not praise Member Applewhaite for his conduct regarding the PATCO matter.
 
 
 356
 50. Member Frazier testified, that in his opinion the Shanker-Applewhaite dinner did not have an effect on Member Applewhaite's ultimate decision in the PATCO case. (Tr. 586)
 
 
 357
 51. The Shanker-Applewhaite dinner had no effect on the ultimate decision of Mr. Applewhaite in the PATCO case. Member Applewhaite's final decision in the PATCO case was substantially the same as the position he discussed at the September 21 meeting of the members.
 
 
 358
 52. Mr. Shanker is associated with the AFL-CIO which was an amicus curiae party in the PATCO proceeding. Counsel for the AFL-CIO participated in the oral argument before the FLRA on September 16, 1981. (See FLRA decision of October 22, 1981, at 3.) Therefore, Mr. Shanker may be an interested person within the meaning of the FLRA regulations (5 C.F.R. § 2414.2 and § 2414.3) concerning ex parte communications.
 
 
 359
 53. The Shanker-Applewhaite dinner may have been a prohibited ex parte communication. (5 C.F.R. § 2414.2)
 
 
 360
 V APPLEWHAITE'S DISCUSSION OF PATCO AT A POLITICAL FUNDRAISER
 
 
 361
 In the McGrath Declaration, it is reported that Member Frazier stated that Member Applewhaite discussed the PATCO case with individuals at a Republican fundraising function in New York City on October 6, 1981. Further, Member Frazier stated that Member Applewhaite had been assured by one or more persons at the fundraiser that if he alienated labor by his vote, he could find many opportunities available to him in the private practice of law in New York. (McGrath Declaration at 4, ALJ Ex. 7 at 3). The following findings concern the events of the Republican fundraiser:
 
 
 362
 1. On October 6, 1981, Member Applewhaite attended a Republican fundraising dinner called "Republican Follies" at the Waldorf Astoria Hotel in New York City. The purpose of the dinner was to introduce gubernatorial candidates. Approximately 200-300 people were present. Member Applewhaite knew at least 50-75 people at the dinner with whom he spoke. (Tr. 763; PATCO Ex. 12)
 
 
 363
 2. Member Applewhaite has no knowledge that anybody from the Executive Branch attended. (Tr. 921)
 
 
 364
 3. Upon learning of Applewhaite's status as a Member of the Federal Labor Relations Authority and its jurisdiction, persons expressed differing views with regard to the PATCO revocation matter, such as "they ought to be decertified" and "I think the President is wrong." (Tr. 764)
 
 
 365
 4. Member Applewhaite responded by making statements such as "Well, there are legal ramifications to both and they have to be studied and decided." (Tr. 764)
 
 
 366
 5. People would comment to Member Applewhaite that he has "got to make a tough decision." (Tr. 764-65)
 
 
 367
 6. Member Applewhaite testified that at the Republican Fundraising dinner he did not discuss the substance of the case, and no promises were made to him relating to the decision he might make on the PATCO case. (Tr. 765-66)7. During Member Frazier's telephone conversation with Member Applewhaite on October 7, Member Applewhaite stated that he had gone to New York for a political fundraiser. At the event, according to Mr. Frazier, Applewhaite said that he had spoken with acquaintances about PATCO and the personal ramifications of this vote. One of the individuals at the fundraiser told Applewhaite that because he was a member of the New York Bar, he could always practice law in New York if he was not reappointed to the FLRA. (Tr. 250, 2430-32; ALJ Ex. 1, ALJ Ex. 7)
 
 
 368
 8. This call lasted 12 minutes. Member Applewhaite does not recall any details of the phone call, but does recall that he told Frazier why he was in New York. (Tr. 1082, 1257, Frazier Ex. 36)
 
 
 369
 9. There is no evidence of record that any promises were made to Member Applewhaite by any persons at the fundraiser to the effect that if he voted for decertification he would have a substantial attorney position available to him.
 
 
 370
 10. There is no evidence of record that any conversation Member Applewhaite had at the "Republican Follies" had any impact on his decision in the PATCO case. (Tr. 765, 767) Even Member Frazier testified that in his judgment the conversations Member Applewhaite may have had at the fundraiser on October 6 had no impact on Member Applewhaite's decision in the PATCO case. (Tr. 584-85)
 
 VI APPLEWHAITE'S REAPPOINTMENT
 
 371
 In the McGrath Declaration, the Court was advised that Member Frazier claimed to have been told by Member Applewhaite that, as a result of the dilemma weighing on his consideration of the PATCO case, Member Applewhaite made an inquiry into whether his reappointment to the FLRA was likely, but learned that no commitment for reappointment could be secured. (McGrath Declaration at 4) Frazier advised the FBI that Applewhaite told him that he (Applewhaite) had made an effort to obtain from "an unknown administration official a commitment for reappointment to the FLRA when Applewhaite's term expired in July of 1982." Further, Frazier told the FBI that Applewhaite acknowledged that he could not obtain the commitment. The following recommended findings concern Member Applewhaite's efforts concerning his reappointment to the FLRA, his desire to become Chairman of the FLRA, and his contacts with Administration officials.
 
 A. Contact with Ed Allison
 
 372
 1. On August 6, 1981, pursuant to prior arrangements made in early or mid-July 1981, Member Applewhaite met with Mr. Ed Allison, Administrative Aide to Senator Paul Laxalt of Nevada. The purpose of the meeting was to discuss Member Applewhaite's qualifications and the fact that a Republican had not been named as Chairman of the Authority. (Tr. 724, 1096)
 
 
 373
 2. This meeting took place at Mr. Allison's office in the Russell Senate Office Building and lasted approximately 15 minutes. (Tr. 724-725, Frazier Ex. 4)
 
 
 374
 3. At the August 6 meeting, Mr. Allison and Member Applewhaite discussed the latter's experience in the labor relations field and his administrative background. Mr. Allison requested a copy of Member Applewhaite's biography. Allison concluded the meeting by informing Applewhaite that he would advise Senator Laxalt of Applewhaite's credentials and that, if appropriate, further contact would be made with the White House concerning Applewhaite's appointment to the chairmanship of the FLRA. (Tr. 725)
 
 
 375
 4. During the August 6 meeting, there was no discussion of Member Applewhaite's reappointment for another term on the FLRA nor did the two men discuss the PATCO case. (Id.)
 
 
 376
 5. On or about August 13, 1981, Member Applewhaite stopped by Mr. Allison's office to deliver the promised biographical sketch. He was in the office for no more than 3 minutes and delivered the material to Mr. Allison's secretary. The PATCO case was not mentioned in this second visit to Mr. Allison (Tr. 725-6, 1096-97, Frazier Ex. 4)6. There is no evidence of record or indication of any kind that the meeting and conversation between Member Applewhaite and Mr. Allison had any effect on Member Applewhaite's deliberations or decision in the PATCO proceeding.
 
 B. Contact with Robert Bonitati
 
 377
 1. Robert F. Bonitati serves as Special Assistant to the President for Public Liaison. In that position, Mr. Bonitati serves as liaison to organized labor. (Tr. 2072-2073) Member Applewhaite was aware of Mr. Bonitati's duties. (Tr. 1134)
 
 
 378
 2. In July 1981 and on August 4, 1981, Member Applewhaite telephoned Robert F. Bonitati to advise Mr. Bonitati that the services of the Federal Service Impasses Panel (FSIP) were available as a possible vehicle for settlement of the PATCO labor dispute. (Tr. 2080-2081, 2084-2086)
 
 
 379
 3. Both conversations were very brief and concerned only the Federal Service Impasses Panel (Id.) The August 4 conversation lasted one or two minutes. (Tr. 2086) Mr. Bonitati was aware of the availability of the FSIP before Member Applewhaite called. (Tr. 2085) Member Applewhaite and Mr. Bonitati did not discuss the merits of the PATCO labor dispute during the July or August 4 telephone conversations. (Tr. 2081, 2086)
 
 
 380
 4. On October 9, 1981, Mr. Bonitati's secretary placed a telephone call to Member Applewhaite at 10:55 A.M. The purpose of the call was to inquire when the PATCO decision would be announced because the FLRA had announced previous decision dates that had proved to be incorrect. The call was not completed and Mr. Bonitati did not talk with Applewhaite. (Tr. 2088-2089; Tr. 2142, 2159, 2173, FAA Ex. 2)
 
 
 381
 5. Later that same day, October 9, Mr. Bonitati and Member Applewhaite met at a reception following the swearing in of Mr. Malcolm Lovell as Undersecretary of Labor. This meeting was the first time that both men had met in person and the meeting lasted only a few minutes. (Tr. 20-21, 2090-91, 2156, 2158)
 
 
 382
 6. At the Lovell reception, Mr. Bonitati told Member Applewhaite that he had tried to reach him that morning and that he wanted to know why the FLRA kept putting out the story that it was going to announce its decision within the next week. Member Applewhaite responded that the decision would be out the following Thursday or Friday at the very latest. Member Applewhaite also indicated that there were some problems with Members on leave and that everybody was not at the Authority at the same time to do all the necessary paperwork.[7] (Tr. 2091-92, 2100, 2142-45)
 
 
 383
 7. Member Applewhaite's prediction as to the timing of the PATCO decision proved to be incorrect. (Tr. 2092) Member Applewhaite and Mr. Bonitati did not discuss the merits of the PATCO revocation case during their conversation on October 9, 1981 (Tr. 2093, 720) Member Applewhaite did not tell Mr. Bonitati anything concerning the substantive positions then being taken by any of the members. (Tr. 2093)
 
 
 384
 8. Mr. Bonitati did not attempt to obtain any information about the substance or merits of the PATCO proceeding pending at the FLRA during any conversation with Member Applewhaite. (Tr. 2186) Mr. Bonitati did not attempt to influence the FLRA decision in his contacts with Member Applewhaite, or express a preference as to how the decision should come out. (Tr. 2186)
 
 
 385
 9. About mid-November 1981 and after the PATCO decision had been issued, Applewhaite and Bonitati met for lunch. During this luncheon meeting, there was no discussion of PATCO, the PATCO proceeding, or Member Applewhaite's reappointment. (Tr. 2133-2136, 719-720)
 
 
 386
 10. During the pendency of the PATCO case before the FLRA, Mr. Bonitati did not discuss with Member Applewhaite the latter's reappointment to the FLRA or Member Applewhaite's chances of becoming Chairman of the agency. (Tr. 2095-97, 2137). The only time that Member Applewhaite's possible reappointment was raised with Mr. Bonitati was in a brief comment at the close of a meeting between both individuals on January 6, 1982. (Tr. 2097-98)
 
 
 387
 11. Member Frazier testified that any discussion Member Applewhaite may have had about seeking a reappointment commitment from the Administration, if there was such a discussion, had no impact or effect upon Member Applewhaite's decision in the PATCO case. (Tr. 583-586)
 
 
 388
 12. There is no evidence of record that Member Applewhaite's possible reappointment was discussed by him with anyone associated with or representing the Administration prior to November 3, 1981. (Tr. 2096)
 
 
 389
 13. There is no evidence of record that Member Applewhaite held out his vote in PATCO as deserving consideration by the Administration with respect to his possible reapportionment or designation as Chairman.
 
 
 390
 14. Member Applewhaite's contacts and conversation with Mr. Bonitati did not affect in any manner Applewhaite's decision in the PATCO case.
 
 VII OTHER CONTACTS
 A. KENNETH BLAYLOCK
 
 391
 1. Kenneth Blaylock is President of the American Federation of Government Employees. (Tr. 262) Mr. Blaylock sits on the Executive Council and on the Public Employees Department of the AFL-CIO. (Tr. 576, 1411)
 
 
 392
 2. Between August 3, 1981 and October 22, 1981, Chairman Haughton had three contacts with Kenneth Blaylock. (Tr. 1673 D-E)
 
 
 393
 3. Chairman Haughton has known Kenneth Blaylock for a number of years in a professional capacity. (Tr. 1670-71)
 
 
 394
 4. During August or early September, the time Chairman Haughton was at Martha's Vineyard, he had a telephone conversation with Kenneth Blaylock. Mr. Blaylock reported on his efforts to get the PATCO case settled. He mentioned that he had talked with Secretary Lewis, Donald Devine, of the Office of Personnel Management, and Robert Poli, President of PATCO. (Tr. 1673-D)
 
 
 395
 5. Chairman Haughton, on his way home from work one evening, met Mr. Blaylock for a drink at the International Inn during the time the PATCO case was before the members. Mr. Blaylock reported on settlement efforts. He did not inquire about what the authority was doing with the case, nor did he suggest what ought to be done. (Tr. 1673-E)
 
 
 396
 6. Mr. Blaylock telephoned Chairman Haughton a day or two prior to October 22, 1981. Mr. Blaylock inquired as to the status of the PATCO case, telling Chairman Haughton he did not care which way the decision went, but that the decision ought to be issued. Chairman Haughton replied that he hoped the decision would be issued soon. (Tr. 1673E)
 
 
 397
 7. The contacts between Mr. Blaylock and Chairman Haughton had no effect on Chairman Haughton's decision in the PATCO case.
 
 
 398
 8. On or about September 3, 1981, Mr. Blaylock called Member Applewhaite and stated that he was trying to reach the Members and said that he realized that Member Applewhaite was the only one of the three Members in the office at that time. (Tr. 731, 890)
 
 
 399
 9. Mr. Blaylock stated during the telephone conversation that he was trying to reach the three authority members to advise them that settlement discussions were taking place in the PATCO strike situation. Member Applewhaite stated that he assumed there were ongoing settlement efforts, but that such discussions had no bearing on the case before the authority. Mr. Blaylock agreed and stated that he understood Mr. Applewhaite's position. Blaylock then inquired as to the status of the PATCO case. Mr. Applewhaite responded that there were several motions pending including a motion for oral argument. He indicated that oral argument was a possibility, but no decision had been made with respect to granting oral argument as of that date. Blaylock concluded the conversation by stating that he would be talking to the other two Authority members. (Tr. 731, 732, 735, 890)
 
 
 400
 10. Member Applewhaite had no other conversations with Mr. Blaylock, in person or by telephone, during the pendency of the PATCO matter. (Tr. 735)
 
 
 401
 11. Mr. Blaylock's conversation with Member Applewhaite had no effect on Member Applewhaite's decision in the PATCO case. (Tr. 735)
 
 
 402
 12. Member Frazier had at least three telephone conversations and one personal meeting with Mr. Blaylock during the pendency of the PATCO case. (Tr. 262)
 
 
 403
 13. During an August 17, 1981, telephone conversation initiated by Mr. Blaylock, Mr. Blaylock asked Member Frazier if they could meet so that he could brief Member Frazier on his efforts to settle the PATCO case. Mr. Blaylock and Member Frazier agreed to meet later that afternoon. (Tr. 262-263)
 
 
 404
 14. At the meeting, Mr. Blaylock asked about the status of the PATCO case and Member Frazier told him that the FLRA had just gotten the case from the judge on the preceding Friday (August 14). (Tr. 263)
 
 
 405
 15. Mr. Blaylock told Member Frazier that the President of the AFL-CIO had asked him to serve as an intermediary mediator to try to get the parties together to settle the case. (Tr. 263, 603)
 
 
 406
 16. Mr. Blaylock told Member Frazier that in his efforts to seek a settlement of the FAA/PATCO matter it was his intention to meet with Mr. Poli of PATCO, Secretary Lewis and other officials of DOT and FAA, the General Counsel of the FLRA, and possibly Mr. Donald Devine, the Director of the Office of Personnel Management. (Tr. 263, 603)
 
 
 407
 17. Mr. Blaylock asked Member Frazier what he thought of what Mr. Blaylock had outlined. (Tr. 264)
 
 
 408
 18. Member Frazier told Mr. Blaylock that it was the policy of the Federal Labor Relations Authority to encourage informal settlements among the parties of unfair labor practice cases, but that meant settlement by all the parties. Member Frazier also said that the settlement would have to be submitted to the Members of the Federal Labor Relations Authority for approval. Member Frazier advised he would do his best to promote the policy to encourage settlements of unfair labor practices so long as the settlement was consistent with the purposes and policies of the statute. (Tr. 264, 603)
 
 
 409
 19. Member Frazier reported the contents of his conversation with Mr. Blaylock to Mr. Freehling, the Solicitor of the FLRA. (Tr. 265; see Tr. 673)
 
 
 410
 20. Mr. Freehling and Member Frazier agreed that the conversation involved an inquiry concerning the status of the case and an inquiry concerning settlement of the case and, therefore, it was permitted under the Authority's rules. (Tr. 265, PATCO Exh. 2, 5 C.F.R. § 2414.6(b), (d))
 
 
 411
 21. On two or three other occasions, Mr. Blaylock telephoned Member Frazier to give him a status report on Mr. Blaylock's efforts to settle the PATCO matter. (Tr. 265-66, 603-04)
 
 
 412
 22. In each of those conversations, Mr. Blaylock told Member Frazier whom he had spoken with or whom he was attempting to speak with. Mr. Blaylock also asked in each of the conversations the status of the case, and whether the Authority was about to issue its decision at any time in the near future. (Tr. 266, 604)
 
 
 413
 23. Member Frazier responded to Mr. Blaylock's inquiries about the time the decision might issue by telling him that the matter was under active consideration and that the Members were working hard to reach a decision. (Tr. 266)
 
 
 414
 24. The only topics Mr. Blaylock raised with Member Frazier were requests concerning the status of the case and reports to Member Frazier concerning the nature of Mr. Blaylock's negotiations as an intermediary in an attempt to find a settlement in the case. (Tr. 417)
 
 
 415
 25. Member Frazier did not believe that Mr. Blaylock was trying to influence his decision in the PATCO case. (Tr. 267)
 
 
 416
 26. Mr. Blaylock's conversations with Member Frazier had no effect on Member Frazier's decision in the PATCO case.
 
 
 417
 27. Member Frazier did not report to Solicitor Freehling concerning conversations with Mr. Blaylock other than the first conversation because, in Member Frazier's judgment, the substance of the conversations was the same and Solicitor Freehling's advice concerning the first conversation would apply equally to the later conversations. (Tr. 268)
 
 B. MALCOLM LOVELL
 
 418
 28. Malcolm Lovell is the Undersecretary of Labor.
 
 
 419
 29. Chairman Haughton has known Malcolm Lovell for over 30 years. (Tr. 1670) Their relationship is both personal and professional. (Tr. 1670)
 
 
 420
 30. On October 9, 1981, Chairman Haughton attended the swearing-in of Mr. Malcolm Lovell as Undersecretary of Labor and the reception following. (Tr. 1673-B) Several comments, such as "you got a tough case," were made to Chairman Haughton by people at the reception regarding PATCO, but there was no discussion of the merits. (Tr. 1673-C)
 
 
 421
 31. A few days or a week after the swearing-in of Mr. Lovell, Chairman Haughton had lunch with Mr. Lovell in the latter's office. There was a discussion of the PATCO case. Mr. Lovell described it as a "hot case". Chairman Haughton commented that it was a good case for the Department of Labor to stay out of and that, according to the newspapers, Administration decisions are being made at the highest levels. (Tr. 1673-C) Chairman Haughton testified that that luncheon had no effect on his decision in the PATCO case. (Tr. 1760)
 
 
 422
 32. A day or two before the PATCO decision issued, Mr. Lovell called Chairman Haughton inquiring when the decision would issue. The Chairman replied that he hoped it would issue soon. Lovell commented that he hoped there would not be anything embarrassing in it. Chairman Haughton replied he might be dissenting. (Tr. 1673-C and D)
 
 
 423
 33. None of the conversations and meetings between Chairman Haughton and Malcolm Lovell had any effect on Chairman Haughton's decision in the PATCO case.
 
 C. JOHN LEYDEN
 
 424
 34. John Leyden is the Executive Vice President of the Public Employee Department of the AFL-CIO. (Tr. 1669-70)
 
 
 425
 35. Chairman Haughton has known John Leyden on a professional basis for three years. (Tr. 1669-70)
 
 
 426
 36. Chairman Haughton received a phone call from John Leyden a "day or so before October 22" inquiring when "the case was coming out." Chairman Haughton indicated he hoped it would be soon. This conversation took about 30 seconds. (Tr. 1671-72)
 
 
 427
 37. On October 27, 1981, five days after the FLRA's decision in the PATCO case was issued, Chairman Haughton attended a "brown bag lunch" at which John Leyden spoke. John Leyden stated to Chairman Haughton that "I understand you will be hearing from PATCO on your dissent." The Chairman replied "they had better hurry up because today is the fifth day." (Tr. 1672)
 
 
 428
 38. None of Chairman Haughton's conversations with Mr. Leyden had any effect on Chairman Haughton's decision in this case.
 
 D. RICHARD LEIGHTON
 
 429
 39. On October 22, 1981, Chairman Haughton issued a "conditional dissent," which stated that he would support revocation if PATCO did not satisfy certain conditions within 5 days. On October 27, 1981, Chairman Haughton's executive assistant, Steven Schwartz, was called by unidentified PATCO officials as to their response to the decision, advising that PATCO's Board of Directors would be meeting that day. (Tr. 1662-3, 1673F, 1752)
 
 
 430
 40. At approximately 5:00 p. m. on October 27, 1981 Richard Leighton, Counsel for PATCO, spoke with Chairman Haughton. Because Chairman Haughton knew that Mr. Leighton was calling about PATCO's response to the five-day time period set forth in Chairman Haughton's October 22, 1981 opinion, he transferred the Leighton call to Schwartz. (Tr. 1673F)
 
 
 431
 41. Chairman Haughton received that same afternoon, by hand delivery, a letter addressed to him by Mr. Leighton, indicating that copies of the letter were being sent to Members Applewhaite and Frazier. The letter advised Chairman Haughton that PATCO took the legal position that it had until October 29, 1981, not October 27, 1981, to file a response to Chairman Haughton's October 22, 1981 decision, under its interpretation of the FLRA's regulations. (Tr. 1673F, G, 1753-54; Haughton Exh. 6)
 
 
 432
 42. The letter did not indicate that PATCO served it on opposing counsel, nor was Chairman Haughton aware of any such service. (Haughton Exh. 6, Tr. 1754-55)
 
 
 433
 43. The PATCO-Leighton contacts had no effect on Chairman Haughton's November 3, 1981 decision.
 
 E. DOLPH SAND
 
 434
 44. Dolph Sand is an attorney with the Federal Aviation Administration who was the FAA's representative in the PATCO revocation proceeding before the FLRA. (Tr. 2195-96; ALJ Exh. 3)
 
 
 435
 45. Member Frazier telephoned Mr. Dolph Sand on October 28, 1981. (Tr. 459)
 
 
 436
 46. On October 28, 1981, the FLRA and Department of Justice, representing FAA, were working together to defend the October 22 decision of the FLRA which had been appealed to the Court of Appeals. (Tr. 459-460)
 
 
 437
 47. The purpose of the call to Mr. Sand was to tell him that a document in the PATCO matter had been served in person on Member Frazier and to ask Mr. Sand whether he would like to pick up a copy since it was being served by mail on FAA. (Tr. 459)
 
 
 438
 48. Member Frazier did not discuss the underlying merits of the FAA/PATCO case with Mr. Sand when he came by the office to pick up a copy of the document. Mr. Sand picked up the document and left. (Tr. 460)
 
 
 439
 49. Member Frazier did not ask Mr. Freehling about the propriety of contact with Mr. Sand because Member Frazier's final decision had issued and it was being defended in Court by FLRA and DOJ. (Tr. 460)
 
 
 440
 50. On October 29, Mr. Sand telephoned Member Frazier to say that FAA did not intend to do anything in response to the document. (Tr. 460)
 
 
 441
 51. Harold Kessler serves as Deputy Executive Director of the FLRA. (Tr. 2190)
 
 
 442
 52. Mr. Kessler is privy to the decisional process in many cases before the FLRA. (Tr. 2228) He frequently provides the members with recommendations as to the outcome of a case and points out problems that may arise with respect to a case. (Tr. 2193)
 
 
 443
 53. Harold Kessler received many calls from people inquiring as to when the PATCO decision would be issued. (Tr. 2196-2200)
 
 
 444
 54. He had two or three conversations with Dolph Sand, in which Mr. Sand inquired as to when a decision would be issued. (Tr. 2197)
 
 
 445
 55. Mr. Kessler has had a professional relationship with Mr. Sand for seven or eight years. (Tr. 2195)
 
 
 446
 56. Approximately one or two weeks before the PATCO decision was issued by the Authority, Mr. Sand called Mr. Kessler and expressed a sense of urgency that the FAA needed the decision to be issued. (Tr. 2196-2197)57. Mr. Kessler told Mr. Sand that Kessler would make sure that Mr. Sand's sense of urgency was conveyed to the members. (Tr. 2197) There is no evidence that Mr. Kessler actually conveyed this message to the members nor that Mr. Sand's call had any effect on the decisional process in the PATCO case.
 
 
 447
 58. Mr. Kessler saw nothing improper in Mr. Sand's calls to him. (Tr. 2198)
 
 
 448
 59. No other party to the PATCO proceeding contacted Mr. Kessler. (Tr. 2250)
 
 
 449
 F. CHIEF ADMINISTRATIVE LAW JUDGE JOHN FENTON
 
 
 450
 60. On August 4, 1981, Members Applewhaite and Frazier met Chief Administrative Law Judge John Fenton for lunch. (Tr. 327, 722)
 
 
 451
 61. During that meeting, they discussed procedural aspects of the PATCO matter, but did not discuss the merits of the case. (Tr. 723)
 
 
 452
 62. Members Frazier and Applewhaite urged Judge Fenton to assign a capable judge to the case and, if possible, to assign the case to himself. (Tr. 327)
 
 
 453
 63. The FAA/PATCO matter was not before Judge Fenton at the time of the meeting. (Tr. 327)
 
 
 454
 64. Member Frazier talked to Judge Fenton on several occasions from August 3 through August 14. (Tr. 326-328; PATCO Exh. 3)
 
 
 455
 65. Members Frazier and Applewhaite never discussed the merits of the FAA/PATCO matter with Judge Fenton. (Tr. 326, 723)
 
 
 456
 66. Member Applewhaite had no other contacts with Judge Fenton during the pendency of the PATCO case. (Tr. 723)
 
 
 457
 67. The contacts between Members Frazier and Applewhaite with Judge Fenton had no effect on the decisional process in the PATCO case.
 
 G. MATTHEW SHANNON-ANTHONY SKIRLICK
 
 458
 68. Anthony Joseph Skirlick, Jr., is a radar air traffic controller for the Federal Aviation Administration at the Los Angeles Air Route Traffic Control Center in Palpville, California. (Tr. 351)
 
 
 459
 69. Mr. Skirlick is a member of the PATCO. (Tr. 351)
 
 
 460
 70. On or about October 1, 1981, Mr. Skirlick filed a motion to intervene in the PATCO unfair labor practice proceeding pending before the FLRA. (Tr. 354)
 
 
 461
 71. Matthew D. Shannon was an attorney adviser on the operations staff of the FLRA during the period August 3, 1981, through November 3, 1981. (Tr. 367)
 
 
 462
 72. In that capacity, it was Mr. Shannon's major responsibility to review documents filed with the FLRA to ensure that they had been served on all parties and to determine whether the document required immediate attention. This was Mr. Shannon's major responsibility with respect to the PATCO case. (Tr. 367-68)
 
 
 463
 73. Mr. Shannon had no personal contact with anyone in a decision-making capacity with respect to the PATCO case while it was pending with the FLRA. (Tr. 369)
 
 
 464
 74. Mr. Shannon is no longer employed by the FLRA. (Tr. 366-67)
 
 
 465
 75. On October 15, 1981, a telephone conversation took place between Mr. Skirlick and Mr. Shannon. (Tr. 355, 369)
 
 
 466
 76. The purpose of Mr. Skirlick's call was to ascertain the status of his motion to intervene. (Tr. 356, 370)
 
 
 467
 77. Mr. Shannon informed Mr. Skirlick during that telephone conversation that the motion for intervention had been denied. (Tr. 375, 378-79; see PATCO Exh. 6, p. 2, lines 5-9)
 
 
 468
 78. Mr. Shannon did not tell Mr. Skirlick that the Administration was bringing pressure on the FLRA to issue a decision quickly. (Tr. 371-72)
 
 
 469
 79. No one inside or outside the FLRA ever indicated to Mr. Shannon that the Administration was bringing pressure on the FLRA to issue a decision quickly. (Tr. 371)80. Mr. Shannon has no personal knowledge of any pressure by the Department of Transportation or the Federal Aviation Administration on anyone in a decision-making capacity at the FLRA. (Tr. 373)
 
 VIII DISCUSSION
 
 470
 In my recommended findings, I have made certain findings which may require some additional explanation. Accordingly, the following discussion is provided to put those findings in perspective.
 
 
 471
 I have found that the telephone calls on August 13, 1981 from Secretary Lewis to Members Frazier and Applewhaite may have had some undetermined effect on their decision to limit the time for filing exceptions to the administrative law judge's decision. Both members testified that the calls had no effect on their August 18, 1981 decision. However, the Secretary told Member Frazier that he wanted expeditious processing of the case within the FLRA's rules and he stated his concern to Member Applewhaite that the case not be delayed. Both members described the Secretary's call as unusual. Later that same day, August 13, the FAA filed a motion to limit the time for filing exceptions from 25 to 7 days. It is quite likely that the FAA motion was filed in accordance with the advice concerning the FLRA regulations given to Mr. Lewis by Member Applewhaite.
 
 
 472
 The evidence of record does not permit an evaluation of how much of an effect the calls had on the two members, but I believe that the Secretary's phone call did play at least some minimal part in their decision to reduce the prescribed 25 day period to 19 days. However, it should be noted that I do not believe that the Secretary's calls had any effect on the merits of final decision in the PATCO case.
 
 
 473
 In my findings, I find that the meeting between Member Applewhaite, General Counsel Gordon, and Ellen Stern on August 10, 1981 may have been a prohibited ex parte communication. It is clear that the Stern memorandum concerned the PATCO case. There was no other case pending at the FLRA at that time to which the memorandum could have been related. Mr. Gordon testified that the discussion took place within the context of the PATCO case. As noted, Mr. Gordon is the FLRA General Counsel. The General Counsel is defined as a "person outside this agency" when his representative is prosecuting an unfair labor practice proceeding. The General Counsel was responsible for the prosecution of the PATCO case before the administrative law judge. In fact the PATCO case was being heard before the judge on August 10. Even Member Applewhaite testified at that time that he expected exceptions to be filed to the judge's decision. (Tr. 944) In view of all of the above, and even though Applewhaite and Gordon described the discussion as abstract, the discussion may have been a prohibited ex parte communication. However, the discussion was very short, general in nature, and very early in the processing of the PATCO case. Accordingly, I do not believe that it had any effect upon Member Applewhaite's deliberations and final decision in the PATCO case.
 
 
 474
 On August 4, 1981, Members Frazier and Applewhaite met with Chief Administrative Law Judge John Fenton at lunch to discuss the procedural aspects of the PATCO case. During that discussion, it was suggested that Judge Fenton appoint a capable judge, preferably himself, to hear the PATCO case. No party has argued in its recommended findings that this luncheon meeting was improper. Further, I do not believe that it had any impact or effect on the FLRA's decision in the PATCO case. However, that finding does not mean that such practices should be condoned.
 
 
 475
 It is clearly possible that the special selection or assignment of a judge to a particular case could raise substantial problems. There is no evidence that Judge Fenton's assignment of the PATCO case to himself raises any problems in this proceeding. However, the practice of agency heads suggesting that a particular judge be assigned to conduct a particular case should be avoided at the FLRA and all other federal agencies. Such a practice may conflict with 5 U.S.C. § 3105,[8] and may raise questions of administrative fairness in those agencies which may attempt to influence the selection of a judge.
 
 
 476
 Mr. Shanker is closely associated with the AFL-CIO. He is president of one of the AFL-CIO's affiliated unions and sits on the Executive Council of the AFL-CIO. The AFL-CIO was an amicus curiae party to the proceeding and participated in the oral argument before the FLRA. The AFL-CIO is clearly an interested party in the PATCO proceeding. Therefore Mr. Shanker may also be an interested party outside the FLRA.
 
 
 477
 It is for those reasons that the Shanker-Applewhaite dinner may have been an unauthorized communication in violation of the FLRA ex parte communications regulations (5 C.F.R. § 2414). The discussion does not fall within the exceptions contained in 5 C.F.R. 2414.6(d). It is clear that Mr. Shanker's message to Mr. Applewhaite was that revocation of certification was a drastic remedy out of proportion to the violation. However, as stated in my findings, I do not believe that the dinner had any effect on the final decision of the FLRA in the PATCO case. At the very most, the effect was transitory in nature, and occurred from September 21 to October 9.
 
 
 478
 The most troubling part of this proceeding has been the conflict between the testimony of Members Frazier and Applewhaite with respect to the Shanker-Applewhaite dinner. On the whole, I find Mr. Shanker's testimony regarding that dinner to be credible. There is no direct evidence that Mr. Shanker told Member Applewhaite that Applewhaite would not be able to obtain arbitration cases after leaving the FLRA if he voted for PATCO's decertification. Nor is there any direct evidence that Shanker made any promises or threats to Applewhaite.
 
 
 479
 Accepting Mr. Shanker's (and Member Applewhaite's) version of the dinner events does not resolve the conflict between Member Frazier and Member Applewhaite's testimony concerning their meeting of September 22, 1981. As stated in my findings, I believe that Member Frazier was troubled by Member Applewhaite's statements at the September 22 meeting and left that meeting with the impression that the events at the dinner has caused Applewhaite to change his position from revocation to suspension of PATCO's certification. Whether Mr. Frazier's impression was the result of a miscommunication between both men, a misstatement by Member Applewhaite, or a misinterpretation by Mr. Frazier, I cannot determine on this record. However, I do believe that Mr. Frazier's actions following the September 22 meeting was based on an honest concern for the decision-making process at the FLRA.
 
 
 480
 On the whole, I have found Mr. Frazier's and Mr. Haughton's testimony to be credible. On the other hand, Member Applewhaite's testimony, in substantial parts, was confusing, contradictory, and in some respects, incredible. A review of Member Applewhaite's testimony demonstrates his sometimes confusing and contradictory testimony. This tendency toward confusion was noted by two witnesses examined by Mr. Applewhaite's counsel. (See Mr. Shanker's testimony, Tr. 1433-36, and Agent Knisley's testimony 2773-74)
 
 
 481
 With respect to credibility, there are a number of statements by Member Applewhaite which I find difficult to accept. Member Applewhaite disputed many of the statements attributed to him in the FBI report. (ALJ, Ex. 1) However, it is difficult to believe that the report could be so inaccurate. In fact, both agents who interviewed Member Applewhaite testified credibly that it was an accurate reflection of the interview. Member Applewhaite testified that he never thought about reappointment until last December or January, 1982 (Tr. 896, 1176). Yet he discussed the question of reappointment with Chairman Haughton and Member Frazier, and raised the subject with Mr. Shanker on September 21. (Tr. 1407, 1681-82, 1246-50) Further, he discussed the possibility of becoming Chairman with Senator Laxalt's Administrative Aide on August 6, 1981. (Tr. 724-25, 1096-97) Member Applewhaite could not remember the names of friends he spoke with or visited before the FBI interview on October 22. (Tr. 1347-48) Further, Member Applewhaite could not recall any of the details of his 12 minute phone call with Mr. Frazier on October 7. (Tr. 1082) Finally, Member Applewhaite testified that the FBI agents appeared to understand his situation and told him they did not see any problem. (Tr. 1501) In fact, Member Applewhaite told Chairman Haughton that the agents praised him and told him he had courage. (Tr. 1855-56) Agent Knisley denied making any such statements, and it is extremely doubtful that FBI agents praise the people they are investigating. (Tr. 2437)
 
 SUMMARY
 
 482
 Accordingly, it is found that the possible ex parte contacts and approaches described at the hearing did not have any effect on the final decision of the members of the FLRA in the PATCO case.
 
 
 483
 /s/ Respectfully submitted,
 
 
 484
 /s/ John M. Vittone
 
 
 485
 /s/ JOHN M. VITTONE
 
 
 486
 /s/ Administrative Law Judge
 
 March 26, 1982
 
 487
 MacKINNON, Circuit Judge (concurring).
 
 
 488
 Subject to the fact that I might differ in the characterization of some of the ex parte contacts, I concur in Judge Edwards' opinion but wish to record some additional comments.
 
 
 489
 1. While the immediate strike was against the Federal Aviation Authority (FAA) it was really against the United States, and the principal victims were the citizens of the United States. Such was clearly the intention of the Professional Air Traffic Controllers' Organization (PATCO and Union). The scheme of the strike was that the convenience of the nation's 265 million citizens would be held hostage to the Union's demands. This is an essential characteristic of most strikes against the government of the United States. The strikers attempt to use the monopoly position that government occupies in various fields as a stranglehold to extort their demands. PATCO obviously believed that its strike would effectively bring the nation to its knees and force the government to give in to its demands. It was a flagrant attempt to misuse the exclusive control over the nation's airways that government has established to serve its citizens.
 
 
 490
 2. The Union contends that it did not have adequate time to prepare its factual and legal defense to the unfair labor practice charges. If this claim is valid it demonstrates the irresponsibility of the Union. PATCO had been threatening a nationwide strike for a long time. If it was serious in this threat, and its subsequent actions indicate that it was, PATCO should have had the complete substantiation for its position ready, and immediately available, to defend such a monstrous attempt to paralyze the entire nation's principal means of transporting its citizens and its mail.
 
 
 491
 3. The number of ex parte contacts that were disclosed at the remand hearing is appalling, as are the statements by counsel that such contacts were nothing more than what is normal and usual in administrative agencies and even in courts of law. That statement is categorically denied insofar as our courts are concerned. If that ever turns out to be true some very severe penalties are going to be meted out. The conduct of Shanker, as described above, was the most serious, but the telephone calls by the Secretary of Transportation were also objectionable. Union and cabinet officers, and all citizens, will have to realize that officials of the administrative agencies engaged in adjudicating rights and interests are not their hand maidens. In deciding such cases the government officials act in a quasi-judicial capacity and ex parte contacts that attempt to "back door" the adjudicative process, with respect to the merits or discipline, are highly improper and illegal. In this connection 18 U.S.C. § 1505 should be noted. This section of the Criminal Code provides that it is an offense if one "corruptly ... endeavors to influence, obstruct or impede the due and proper administration of the law under which (a) proceeding is being had before (an) ... agency of the United States ..." (emphasis added). Private contacts with agency officials, with respect to pending adjudicatory matters, by interested parties or their agents, that endeavor to affect the decisional process, however subtle such contract may be, are corrupt endeavors to influence the "due and proper administration of the law" and those who so attempt may be indicted. The authorized punishment is imprisonment for not more than five years, or a $5,000 fine, or both. 18 U.S.C. § 1505.
 
 
 492
 4. Shanker argues that his dinner with member Applewhaite "had no effect on the decision" and hence is of no moment. That is like the man charged with attempted murder asserting the indictment should be dismissed because his shot missed the intended victim. In my opinion Shanker and his Teacher's Union were both "interested parties" within the meaning of 5 U.S.C. 557(d) (1976) of the Administrative Procedure Act.
 
 
 493
 5. As to the remedy here, it is my opinion that Congress indicated by the terminology it used, and in the applicable legislative history, that "revocation" of the union's certification was the preferred remedy for unlawful strikes.
 
 
 494
 The Federal Labor Management Relations Act provides:
 
 
 495
 § 7116(b) .... (I)t shall be an unfair labor practice for a labor organization ...
 
 
 496
 (7)(A) to call, or participate in, a strike, work stoppage, or slowdown, or picketing of an agency in a labor-management dispute if such picketing interferes with an agency's operations, or
 
 
 497
 (B) to condone any activity described in subparagraph (a) of this paragraph by failing to take action to prevent or stop such activity ...
 
 
 498
 5 U.S.C. § 7116(b)(7).
 
 
 499
 Labor organizations that violate this section of the Act by willfully engaging in prohibited strikes, and strike related activity, are subject to the penalties imposed by Congress in § 7120(f). This section of the statute is clear and distinct. It provides:
 
 
 500
 (f) In the case of any labor organization which by omission or commission has willfully and intentionally with regard to any strike, work stoppage, or slowdown, violated section 7116(b)(7) of this title, the (Federal Labor Relations) Authority shall, upon an appropriate finding by the Authority of such violation-
 
 
 501
 (1) revoke the exclusive recognition status of the labor organization, which shall then immediately cease to be legally entitled and obligated to represent employees in the unit; or
 
 
 502
 (2) take any other appropriate disciplinary action.
 
 
 503
 5 U.S.C. § 7120(f) (emphasis added).
 
 
 504
 PATCO was in clear violation of § 7116(b)(7) and the Authority so found. With such finding, revocation of PATCO's "exclusive recognition status" was almost automatic and that was the penalty imposed. Its prior misconduct (see P 6, infra ) was further justification for the decision of the Authority. The Union attacks this revocation of its exclusive recognition status as being too harsh and contends that subsection (f)(2) confers a broad discretion in the Authority to impose some lesser punishment. Be that as it may, the Authority's decision was clearly appropriate. When Congress wrote the statute it clearly indicated, by placing decertification in the forefront of the remedy section, that revocation was to be preferred. The reference to other appropriate disciplinary action was added for completeness. There is no indication that Congress intended other disciplinary action to be taken where the violation was clear. Subsection (2) seems to be addressed more to situations where the responsibility for a strike might be diffused, unclear, or not properly chargeable to the Union as would be the case with a wildcat strike, or a strike by a limited number of union members, or locals, that the union leadership were making every valid effort to stop, or where the strike might have resulted from an improper lock out, or in any other instance of diminished Union responsibility. The argument that subsection (2) vests a broad discretion is directed at reducing the disciplinary action, and this case is not an appropriate one for any lesser discipline.
 
 
 505
 6. It is also important to remember that subject strike by PATCO violated a prior injunction obtained in 1970 in New York. The union knew this and had previously attempted to have the court vacate that 1970 injunction. Then, having failed to have the injunction set aside, they struck against the government and in violation of the injunction. PATCO is a repeat offender.
 
 
 
 [1]
 The first codification of the long-standing prohibition of federal employee strikes was in the Labor Management Relations Act of 1947, ch. 120, § 305, 61 Stat. 136, 160. (Prior to 1947, federal employees were expressly prohibited from striking by various appropriation acts that prohibited the expenditure of appropriated funds to pay the salaries of any striking employees. See, e.g., Third Urgent Deficiency Appropriation Act of 1946, ch. 425, § 201, 60 Stat. 262, 268.) Congress repealed § 305 of the Labor Management Relations Act in 1955, replacing it with the predecessors to the current Code provisions. Act of Aug. 9, 1955, ch. 690, 69 Stat. 624 (codified at 5 U.S.C. §§ 118p-118r (1958))
 Even before the codification of the ban on federal employee strikes, the prohibition was apparently understood. See Act of Aug. 24, 1912, ch. 389, § 6, 37 Stat. 539, 555 (codified at 5 U.S.C. § 652 (1926)) (implication by negative pregnant). This proviso to a 1912 Post Office appropriations act was eventually transformed into the current language of 5 U.S.C. § 7101 (Supp. IV 1980).
 The prohibition of federal employee strikes was held to be constitutional in United Fed'n of Postal Clerks v. Blount, 325 F.Supp. 879 (D.D.C.) (three-judge court) (per curiam), aff'd mem., 404 U.S. 802, 92 S.Ct. 80, 30 L.Ed.2d 38 (1971).
 
 
 [2]
 In 1962, President Kennedy promulgated Executive Order 10,988, which established a limited system of collective bargaining in the federal government. However, labor organizations that asserted the right to strike, or assisted or participated in any strike against the federal government, were excluded from the protections of the Executive Order. Exec. Order No. 10,988, § 2, 27 Fed.Reg. 551, 552 (1962)
 
 
 [3]
 Exec. Order No. 11,491, § 19(b)(4), 34 Fed.Reg. 17,605, 17,613 (1969). Until the enactment of the Civil Service Reform Act, Executive Order 11,491, as amended, served as the legal basis for labor-management relations in the federal government. See 5 U.S.C. § 7301 note. (1976 & Supp. I 1977)
 
 
 [4]
 Only 2,308 of the 9,034 controllers scheduled to work beginning with the 11:00 a. m. shift on August 3 reported. Attendance increased somewhat on succeeding days, so that by Saturday, August 8, 3,434 of the 9,286 scheduled controllers reported. During the first five days of the strike, the FAA was required to cancel some 26,000 flights and operated at 69 percent of normal capacity. Professional Air Traffic Controllers Org., No. 3-CO-105, slip op. at 3 (Aug. 14, 1981) (Fenton, A.L.J.) (hereinafter cited as ALJ ). The ALJ Decision is reprinted in the Joint Appendix at pages 261-71
 
 
 [5]
 E.g., United States v. Professional Air Traffic Controllers Org., 524 F.Supp. 160 (D.D.C.1981) (temporary restraining order); Graham v. Professional Air Traffic Controllers Org., 524 F.Supp. 160 (D.D.C.1981) (same); see generally PATCO Seeks Help from AFL-CIO as FAA Moves To Fire Strikers, 924 Gov't Empl.Rel.Rep. (BNA) 5 (Aug. 10, 1981)
 
 
 [6]
 E.g., United States v. Professional Air Traffic Controllers Org., 107 L.R.R.M. (BNA) 3210 (D.D.C.1981) (civil contempt); United States v. Phillips, 527 F.Supp. 1361 (N.D.Ill.1981) (criminal contempt); see, e.g., United States v. Restor, 529 F.Supp. 579 (W.D.Pa.1982) (sentencing for criminal contempt); United States v. Haggerty, 528 F.Supp. 1286 (D.Colo.1981) (indictments for striking in violation of 5 U.S.C. § 1918 dismissed on ground that contempt citation was criminal after PATCO members were fired and that prosecution would therefore violate Double Jeopardy Clause); United States v. Professional Air Traffic Controllers Org., 525 F.Supp. 820 (E.D.Mich.1981) (civil contempt fines vacated after firing of striking controllers); United States v. Professional Air Traffic Controllers Org., 524 F.Supp. 160 (D.D.C.1981) (civil contempt order vacated after firing of striking controllers)
 
 
 [7]
 On the morning of the first day of the strike, President Reagan gave the striking controllers 48 hours to return to work or forfeit their jobs. Air Traffic Controllers Strike, 17 Weekly Comp.Pres.Doc. 845 (Aug. 3, 1981). Those who did not return to work on their first scheduled shift after 11:00 a. m. on August 5 were terminated. See Professional Air Traffic Controllers Org. v. United States Dep't of Transp., 529 F.Supp. 614 (D.Minn.1982). We express no view here as to the legality of those dismissals, either individually or en masse
 
 
 [8]
 ALJ at 2; Transcript of Aug. 10, 1981 Hearing, Jt. App. 51-52. In its opinion holding PATCO and Robert Poli in contempt, the District Court for the District of Columbia referred to what was apparently the same statement, supporting the inference that Poli's statement was made after the restraining order had issued. United States v. Professional Air Traffic Controllers Org., 107 L.R.R.M. (BNA) 3210, 3211 (D.D.C.1981)
 
 
 [9]
 In the course of the August 10 Hearing, PATCO counsel stated:
 At this point, Your Honor, PATCO takes the position that the scheduling of the hearing itself has prevented PATCO from adequately preparing to defend the case, to rebut the case, things of that nature.
 I would like to proffer to the Court what PATCO would have done or would do in the future, given the opportunity, to present a case to the Court; and where I am going with this proffer is at the end I will request that the Court grant sufficient time for PATCO to accumulate witnesses.
 ....
 PATCO, if given the opportunity-and when I say proffer, again, because of the nature of the argument that I am making, because we have basically been past-posted (sic) in this matter, things are going too rapidly-when I say proffer, I am not saying PATCO will do it if given a year.
 Transcript of Aug. 10, 1981 Hearing, Jt.App. 177-78 (emphasis added).
 
 
 [10]
 On August 9, 1981, PATCO filed unfair labor practice charges with an FLRA Regional Director alleging that the FAA had failed to bargain in good faith with PATCO, both from July 31 to August 3 and after the strike began on August 3. Federal Aviation Admin., Dep't of Transp., Case No. 3-CA-2729; Jt.App. 338-39. On August 25 the Regional Director declined to issue a complaint based on PATCO's charges, concluding that the FAA had met and negotiated with the union from July 31 to August 3 and that the FAA's duty to bargain with PATCO was suspended on August 3, 1981, when the union began engaging in an unlawful strike. Jt.App. 344-47. PATCO appealed the Regional Director's decision not to issue a complaint to the FLRA General Counsel, Jt.App. 348-59, who denied the union's appeal on September 21. Jt.App. 360-62. The Civil Service Reform Act does not provide for judicial review of the General Counsel's decision not to issue an unfair labor practice complaint. See 5 U.S.C. §§ 7118(a)(1), 7123(a) (Supp. IV 1980); H.R.Rep.No.1403, 95th Cong., 2d Sess. 52 (1978), reprinted in Subcomm. on Postal Personnel and Modernization of the House Comm. on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, at 698 (Comm. Print 1979) (hereinafter cited as Legislative History); 5 C.F.R. § 2423.10(e) (1981)
 
 
 [11]
 See Transcript of Aug. 10, 1981 Hearing, Jt.App. 179-87
 
 
 [12]
 Transcript of Aug. 11, 1981 Hearing, Jt.App. 226. At one point, union counsel suggested that PATCO had been "prevented from putting on evidence." Id. at 234. Judge Fenton immediately pursued the issue by telling counsel: "I would like to be clear on those respects in which you think you have been prevented from coming forward with evidence.... You know, I would like particulars as to who, what, however you would attempt to prove that in fact no unlawful work stoppage has taken place." Id. at 234-35. In response, PATCO counsel stated:
 I would not like to bind or bound my clients at this time to the arguments that we will make. We have no evidentiary evidence in the record. Therefore, certainly that is the limits of what we can put on in terms of factual information. However, we will make as many legal arguments as we possibly can in order to defend our clients against the heaviest penalty that the government can bring down upon it. I don't know what more I can say in that regard.
 Id. at 235-36.
 
 
 [13]
 Transcript of Aug. 10, 1981 Hearing, Jt.App. 187-88; Transcript of Aug. 11, 1981 Hearing, Jt.App. 233-37, 254. It is questionable whether PATCO did, in any formal sense, make an offer of proof during the proceedings before the A.L.J. See note 12 supra. PATCO certainly did not specify the potential witnesses it sought or the testimony it would have attempted to elicit from them. Indeed, on at least two occasions during the proceeding, PATCO counsel stressed the lack of any assurance that PATCO would present any evidence in mitigation even if granted its requested continuance. See Jt..App. 174-75; note 9 supra
 
 
 [14]
 PATCO further excepted to the ALJ Decision on three additional grounds: (a) that the A.L.J. erred in not consolidating the hearing with PATCO's unfair labor practice charges against the FAA; (b) that the A.L.J. failed to give reasoned consideration to PATCO's brief; and (c) that the A.L.J. may have had ex parte contacts with the FAA or with the FLRA General Counsel
 By the time the FLRA Decision was issued, the FLRA General Counsel had decided not to issue a complaint on PATCO's refusal to bargain charges against the FAA; ground (a) was therefore effectively mooted. See note 10 supra. The FLRA also rejected arguments (b) and (c), respectively, because the ALJ Decision did address the arguments raised in PATCO's brief (despite a period of only four hours between the filing of PATCO's brief and the issuance of the ALJ Decision), and because the allegation of ex parte contacts was based only on speculation arising from the FAA and the FLRA General Counsel filing motions to limit the time for taking exceptions before the ALJ Decision had even issued. PATCO does not renew any of these arguments before this court.
 
 
 [15]
 Pursuant to its rules, 5 C.F.R. § 2429.9 (1981), the FLRA granted requests by the American Federation of Government Employees ("AFGE") and the AFL-CIO to present oral arguments as amici curiae. The AFGE also filed an amicus brief before the Authority
 
 
 [16]
 As Member Frazier pointed out in his opinion, the scheduling of the hearing was consistent with the Civil Service Reform Act, 5 U.S.C. § 7118(a)(6) (Supp. IV 1980), and with the FLRA Rules, 5 C.F.R. § 2423.12(b)(3) (1981), both of which provide that an unfair labor practice hearing shall be held not earlier than five days after service of the complaint. Member Frazier also opined: "(T)he scheduling of the hearing was justified in view of the apparent adverse effects of the strike at the time of such scheduling." Professional Air Traffic Controllers Org., 7 F.L.R.A. No. 10, slip op. at 9-10 (Oct. 22, 1981) (hereinafter cited as PATCO ). The FLRA Decision is reprinted in the Joint Appendix at pages 294-332
 
 
 [17]
 Member Frazier also concluded that revocation of PATCO's exclusive recognition status was called for even if the Authority possessed broad statutory discretion: "(T)he Authority is without discretion in these circumstances to impose a lesser remedy under the mandate of section 7120(f). In any event, even assuming a broader discretion, PATCO's exclusive recognition status must be revoked in the circumstances of the present case." PATCO at 25 (emphasis added); see id. at 25-28
 
 
 [18]
 Member Applewhaite expressed no view with respect to the relevance of the arguments that PATCO tentatively offered in mitigation of the remedy
 
 
 [19]
 The entire Statement of the PATCO Executive Board reads as follows:
 On October 22, 1981, the Federal Labor Relations Authority issued a decision in Case Number 3-CO-105 in which members Applewhaite and Frazier voted to revoke PATCO's Exclusive Recognition. Chairman Haughton indicated that the record in the case was incomplete and, therefore, he could not join the majority opinion. However, he indicated that he would reverse himself and join the majority if, within 5 days, PATCO did not end the strike and represent to the Authority that it would comply with the provisions of the Federal Labor Management Relations Statute, including its no-strike provision.
 PATCO agrees with Chairman Haughton's finding that the record in this matter is incomplete and, therefore, defective.
 As PATCO understands Chairman Haughton's decision, the only way that we could comply would be to order our members to return to work. However, PATCO's members have been locked out by their former employer and could not return even if so ordered.
 The preceding notwithstanding, however, in an effort to comply with Chairman Haughton's decision, and to the extent of our ability to comply, when the FAA ends its lock-out, PATCO would immediately order all of its members to return to work.
 PATCO also acknowledges, and intends to comply to the extent that it can with, its obligations to conduct itself in conformance with all aspects of the Federal Labor Management Relations Statute, including those procedures for impasse resolution.
 PATCO EXECUTIVE BOARD
 October 27, 1981
 Jt.App. 334.
 
 
 [20]
 This court has jurisdiction to review the FLRA Decision and Order pursuant to 5 U.S.C. § 7123(a) (Supp. IV 1980). The FLRA has not cross-petitioned for enforcement
 
 
 [21]
 See, e.g., Home Box Office, Inc. v. FCC, 567 F.2d 9, 58-59 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); United Air Lines v. CAB, 281 F.2d 53, 58 (D.C.Cir.1960); Sangamon Valley Television Corp. v. United States, 269 F.2d 221, 225 (D.C.Cir.1959); WKAT, Inc. v. FCC, 258 F.2d 418, 419-20 (D.C.Cir.1958) (per curiam)
 
 
 [22]
 See Findings at 5-7. ("Findings " refers to the Recommended Findings of Administrative Law Judge John M. Vittone filed with this court on March 26, 1982.)
 
 
 [23]
 The Solicitor is the general legal advisor of the FLRA, including the Members. The Solicitor also represents the FLRA on appeals from FLRA orders and in other legal proceedings
 
 
 [24]
 See Findings at 8-12
 
 
 [25]
 See id. at 13-28
 
 
 [26]
 The AFL-CIO presented oral argument to the FLRA in the PATCO case as amicus curiae. Mr. Shanker, however, was unaware of the amicus status of the AFL-CIO at all times relevant to our consideration
 
 
 [27]
 Chairman Haughton chose not to comment on his colleagues' contacts and accordingly limited his arguments to a defense of his own conduct
 
 
 [28]
 Section 557(d) provides:
 (d)(1) In any agency proceeding which is subject to subsection (a) of this section, except to the extent required for the disposition of ex parte matters as authorized by law-
 (A) no interested person outside the agency shall make or knowingly cause to be made to any member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding, an ex parte communication relevant to the merits of the proceeding;
 (B) no member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of the proceeding, shall make or knowingly cause to be made to any interested person outside the agency an ex parte communication relevant to the merits of the proceeding;
 (C) a member of the body comprising the agency, administrative law judge, or other employee who is or may reasonably be expected to be involved in the decisional process of such proceeding who receives, or who makes or knowingly causes to be made, a communication prohibited by this subsection shall place on the public record of the proceeding:
 (i) all such written communications;
 (ii) memoranda stating the substance of all such oral communications; and
 (iii) all written responses, and memoranda stating the substance of all oral responses, to the materials described in clauses (i) and (ii) of this subparagraph;
 (D) upon receipt of a communication knowingly made or knowingly caused to be made by a party in violation of this subsection, the agency, administrative law judge, or other employee presiding at the hearing may, to the extent consistent with the interests of justice and the policy of the underlying statutes, require the party to show cause why his claim or interest in the proceeding should not be dismissed, denied, disregarded, or otherwise adversely affected on account of such violation; and
 (E) the prohibitions of this subsection shall apply beginning at such time as the agency may designate, but in no case shall they begin to apply later than the time at which a proceeding is noticed for hearing unless the person responsible for the communication has knowledge that it will be noticed, in which case the prohibitions shall apply beginning at the time of his acquisition of such knowledge.
 (2) This subsection does not constitute authority to withhold information from Congress.
 5 U.S.C. § 557(d) (1976).
 
 
 [29]
 The exception for status reports is repeated in the FLRA Rules. 5 C.F.R. § 2414.6(b) (1981)
 
 
 [30]
 By way of example, the Senate Report suggested that:
 (T)he interests of justice might dictate that a claimant for an old age benefit not lose his claim even if he violates the ex parte rules. On the other hand, where two parties have applied for a license and the applications are of relatively equal merit, an agency may rule against a party who approached an agency head in an ex parte manner in an effort to win approval of his license.
 S.Rep.No.354, supra, at 39, Sunshine Act Sourcebook at 234.
 The legislative history also notes that the dismissal provisions of §§ 556(d) and 557(d)(1)(D) supplement, rather than replace, an agency's authority to censure or dismiss an official who engages in illegal ex parte communications and to prohibit an attorney who violates § 557(d) from practicing before the agency. Id. at 38, Sunshine Act Sourcebook at 233. See 5 C.F.R. § 2414.9(b), (c) (1981).
 
 
 [31]
 In Home Box Office, for example, the court found it possible to uphold FCC rules relating to subscription broadcast television based on the public record. The court also found no indication that the persons who had participated in challenged ex parte contacts had benefited from the final rules. For these reasons, the court permitted the rules to remain in effect pending an evidentiary hearing to determine the nature and source of any ex parte communications. 567 F.2d at 58-59. If ex parte contacts rendered agency decisions void ab initio, then the court in Home Box Office could not have taken the action that it did
 
 
 [32]
 We have also considered the effect of ex parte communications on the availability of meaningful judicial review. Where facts and arguments "vital to the agency decision" are only communicated to the agency off the record, the court may at worst be kept in the dark about the agency's actual reasons for its decision. United States Lines v. FMC, 584 F.2d 519, 541 (D.C.Cir.1978). At best, the basis for the agency's action may be disclosed for the first time on review. If the off-the-record communications regard critical facts, the court will be particularly ill-equipped to resolve in the first instance any controversy between the parties. See id. at 542. Thus, effective judicial review may be hampered if ex parte communications prevent adversarial decision of factual issues by the agency. Cf. 5 U.S.C. § 554(d)(1) (1976) (employee presiding at the reception of evidence may not consult a person or party on a fact in issue without notice and opportunity for all parties to participate)
 
 
 [33]
 Compare, e.g., WKAT, Inc. v. FCC, 296 F.2d 375, 383 (D.C.Cir.) ("corrupt tampering with the adjudicatory process"), cert. denied, 368 U.S. 841, 82 S.Ct. 63, 7 L.Ed.2d 40 (1961), with United Air Lines v. CAB, 309 F.2d 238, 241 (D.C.Cir.1962) (nothing "savoring of corruption or attempt to corrupt"). If the ex parte contacts are of such severity that an agency decision-maker should have disqualified himself, vacation of the agency decision and remand to an impartial tribunal is mandatory. Cf. Cinderella Career & Finishing Schools v. FTC, 425 F.2d 583, 591-92 (D.C.Cir.1970) (failure of single member of agency to disqualify himself for bias requires vacation of agency decision)
 
 
 [34]
 See, e.g., Action for Children's Television v. FCC, 564 F.2d 458, 476 (D.C.Cir.1977) (whether the contacts "may have materially influenced the action ultimately taken"); United States Lines v. FMC, 584 F.2d 519, 539 (D.C.Cir.1978) ("the spectre of substantial influence on the ... decision"); Jacksonville Broadcasting Corp. v. FCC, 348 F.2d 75, 80 (D.C.Cir.) (order "in significant part the result of extra-judicial representations and influence"), cert. denied, 382 U.S. 893, 86 S.Ct. 186, 15 L.Ed.2d 150 (1965)
 
 
 [35]
 See, e.g., Home Box Office, Inc. v. FCC, 567 F.2d 9, 58 (D.C.Cir.), cert. denied, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); Peck, Regulation and Control of Ex Parte Communications with Administrative Agencies, 76 Harv.L.Rev. 233, 266 (1962)
 
 
 [36]
 Compare, e.g., Sierra Club v. Costle, 657 F.2d 298, 398-99 (D.C.Cir.1981) ("decisive point ... is that EDF itself has failed to show us any particular document or documents to which it lacked an opportunity to respond, and which also were vital to EPA's support for the rule"), and Rogers Radio Communication Serv. v. FCC, 593 F.2d 1225, 1233-34 (D.C.Cir.1978) (ex parte communication "not secret or surreptitious"), with, e.g., United States Lines v. FMC, 584 F.2d 519, 538-39 (D.C.Cir.1978) (party unaware of contacts which had undetermined influence)
 
 
 [37]
 See, e.g., Sangamon Valley Television Corp. v. FCC, 294 F.2d 742 (D.C.Cir.1961) (new proceeding ordered where agency composition had changed and original record was four years old)
 
 
 [38]
 On October 20 or 21, 1981, Undersecretary of Labor Malcolm Lovell inquired of Chairman Haughton (whom Lovell had known for over 30 years) when the FLRA Decision would issue. See Findings at 39-40. Mr. Dolph Sand, an FAA attorney, made similar inquiries of Mr. Harold Kessler, the Deputy Executive Director of the FLRA. See id. at 43-44. In neither case were the merits of the case discussed. These contacts fall within the status report exception. 5 U.S.C. § 551(14) (1976)
 
 
 [39]
 Mr. Kenneth Blaylock, the President of the American Federation of Government Employees, contacted all three FLRA Members between August 3 and October 22, 1981. In each of these contacts the conversation was limited to Mr. Blaylock inquiring about the status of the case and Mr. Blaylock informing the Members of his attempts to negotiate a settlement to the PATCO strike. In no instance were the merits of the case discussed. Solicitor Freehling advised Member Frazier that the contacts were not impermissible ex parte communications under the status report and settlement exceptions of the FLRA Rules. Findings at 35-39; see 5 C.F.R. § 2414.6(b), (d) (1981)
 In passing on these contacts we need not decide whether, as PATCO contends, the settlement exception in the FLRA Rules is in conflict with the strictures of § 557(d). It suffices that these discussions were not relevant to the merits of the unfair labor practice proceeding and that A. L. J. Vittone found that none of the contacts had any effect on the Members' decisions in the case. See also note 45 infra.
 
 
 [40]
 Chairman Haughton had brief, off-the-record communications with Mr. John Leyden and Mr. Richard Leighton regarding the final date on which PATCO could respond to Chairman Haughton's conditional dissent. The contacts regarded the appropriate interpretation and application of the FLRA Rules, 5 C.F.R. § 2429.21 (1981), were unrelated to the merits, and had no effect on the outcome. Findings at 40-42
 
 
 [41]
 On October 6, 1981, Member Applewhaite attended a Republican fund-raiser in New York City. Upon learning of his position, various persons made passing remarks to Member Applewhaite about the PATCO case. Member Applewhaite did not discuss the substance of the case. No promises were made to Member Applewhaite by any persons at the fund-raiser, and A. L. J. Vittone found that the conversations at the fund-raiser had no impact on Member Applewhaite's decision. Findings at 28-30
 Over several months Member Applewhaite had contacts with a Senate staff member and with an Administration official about his possible appointment as FLRA Chairman and about his reappointment, respectively. The PATCO case was discussed in none of these instances, and they had no effect on Member Applewhaite's decision. Robert Bonitati, Special Assistant to the President for Public Liaison, also made an inquiry on October 9, 1981, about the expected date of issuance of the FLRA Decision. The substance of the case was not discussed. Findings at 30-35.
 
 
 [42]
 The Senate Report on the Government in the Sunshine Act notes that "an agency may rule against a party for making an ex parte communication only when the party made the illegal contact knowingly." S.Rep.No.354, 94th Cong., 1st Sess. 39 (1975), Sunshine Act Sourcebook at 234; see 5 U.S.C. § 557(d)(1)(D) (1976). General Counsel Gordon's "contact" regarding the PATCO case cannot be considered "knowing" since it resulted only from Ms. Stern's chance appearance. Thus, PATCO's suggested response to this contact-that the case be remanded to the FLRA and the FLRA General Counsel be ordered to show cause why his interest should not be dismissed-is inapplicable
 
 
 [43]
 PATCO argues that the General Counsel need not, and should not, convey information relevant to the merits of a case to the Authority Members when he seeks their approval under § 7123(d) to pursue temporary relief against an unfair labor practice. PATCO's argument misses the mark. The likelihood of success on the merits is a relevant judicial concern in granting temporary injunctive relief. In addition, the Civil Service Reform Act allows a court to order temporary relief only if the Authority establishes "probable cause that an unfair labor practice is being committed." 5 U.S.C. § 7123(d) (Supp. IV 1980). It would defy logic to hold that the General Counsel may not discuss to some degree the merits of an unfair labor practice complaint with the Authority Members before seeking temporary judicial relief
 
 
 [44]
 Member Applewhaite conceded during the evidentiary hearing that he should have asked General Counsel Gordon to leave when Ms. Stern came in to discuss her memorandum. Findings at 6, P 6
 
 
 [45]
 Secretary Lewis' comments on the possibility of settlement were apparently intended to remove a possible barrier to a speedy resolution of the unfair labor practice complaint. The FLRA favors the amicable settlement of labor disputes, see 5 U.S.C. § 7101(a)(1)(C) (Supp. IV 1980), and Secretary Lewis may have felt that the Authority would postpone its decision if it believed the news reports that meaningful settlement negotiations were ongoing
 PATCO argues that Secretary Lewis' statements regarding settlement possibilities are improper (i) because his statements do not fall within the exception in the FLRA Rules for "communications proposing settlement," 5 C.F.R. § 2414.6(d) (1981), and (ii) because, even if his statements fall within the exception, the exception is in conflict with § 557(d) and therefore invalid. We need not pass upon the scope of the exception in the FLRA Rules for settlement communications or upon its validity. But cf. NLRB v. Sanford Home for Adults, 669 F.2d 35, 37 (2d Cir. 1981) (applying identical NLRB exemption for ex parte communications regarding settlement). Like Secretary Lewis' comments relating directly to speedy consideration of the case, these comments did not taint the proceedings or prejudice PATCO. A.L.J. Vittone expressly found that Secretary Lewis' calls had no effect on the ultimate decision of the PATCO case. Findings at 12, P 36.
 
 
 [46]
 Because Secretary Lewis' comments related only to the desired speed of the FLRA's disposition rather than to the merits of the case, PATCO is required to make a stronger showing of prejudice from that contact and any consequent acceleration of the case before the proceeding may be voided. See Gulf Oil Corp. v. FPC, 563 F.2d 588, 610-11 (3d Cir. 1977), cert. denied, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978)
 PATCO's principal argument on timeliness relates to Chief A.L.J. Fenton's denial of a request to continue the hearing on the unfair labor practice complaint. This argument is entirely separate from any concern with the six-day difference in time to file exceptions to Chief A.L.J. Fenton's recommended decision. PATCO's principal argument on timeliness is addressed in Part IV.C. infra.
 
 
 [47]
 Mr. Shanker suggests that "(s)ince there is no sanction available against amici, it is reasonable to assume that the ex parte rules are not intended to apply in these circumstances." Shanker's Brief at 14. This argument is simply a non sequitur. The principal purpose of the ex parte rules is not to punish violators, but to preserve the integrity of the administrative process. Even when a nonparty is the source of an ex parte communication, a proceeding may be voided if the decision is irrevocably tainted. In such a case, the principal purpose of the statute would be served, even though a direct sanction against the violator might be unavailable. Cf. S.Rep.No.354, 94th Cong., 1st Sess. 39 (1975), Sunshine Act Sourcebook at 234 (inadvertent ex parte contact not a basis for sanction against a party, but nonetheless voids an irrevocably tainted proceeding)
 
 
 [48]
 Similarly, Mr. Shanker's previous expression of his sentiments in the mass media did not give him license to expound them directly to the agency decisionmaker in an off-the-record conversation
 
 
 [49]
 Even Mr. Shanker seems to recognize as much. He testified that he has never talked to a Member of the National Labor Relations Board when his union had a case pending before the Board. Tr. 1449
 
 
 [50]
 Member Applewhaite informed Chairman Haughton and Member Frazier of his dinner plans; neither of them suggested that the meeting between Member Applewhaite and Mr. Shanker was improper. By itself, it was not
 
 
 [51]
 Member Applewhaite did not attempt to hide his dinner with Mr. Shanker from Member Frazier and Chairman Haughton or from Authority officials. Although the conversation should have been disclosed on the public record, see 5 U.S.C. § 557(d)(1)(C) (1976); 5 C.F.R. § 2414.8 (1981), Member Applewhaite was advised by Solicitor Freehling about the FLRA Rules and then concluded that public disclosure was unnecessary. Findings at 25-26, PP 38-42
 
 
 [52]
 In concluding that the dinner had no ultimate effect on Member Applewhaite's decision, A.L.J. Vittone did not dismiss the possibility that it may have had some temporary impact. A.L.J. Vittone commented: "At the very most, the effect was transitory in nature, and occurred from September 21 to October 9." Findings at 49. We do not read A.L.J. Vittone's statement as a finding that there was a transitory effect, but only as a suggestion that there might have been such an effect and as a statement that he could not confirm or deny its existence. Our independent review of the record leaves us even more dubious of a temporary impact
 First, we believe that A. L.J. Vittone (who is not himself a labor lawyer) may have misunderstood the severity of the position Member Applewhaite took at the September 21 meeting of the FLRA Members. Member Applewhaite favored a revocation of PATCO's exclusive recognition status for a fixed period of one to three years. Member Frazier, on the other hand, favored an indefinite revocation. A.L.J. Vittone concluded that Member Applewhaite's position was more severe. See Findings at 19, P 21. That, however, was not necessarily the case. Depending on the standards for and the likelihood of vacating an indefinite revocation, a fixed-term revocation might be either more or less severe. If indeed Member Applewhaite's position before the September 21 dinner was less severe than Member Frazier's, then Member Applewhaite's negotiations with Chairman Haughton after the dinner may not represent any fundamental change in position.
 Second, A.L.J. Vittone failed to make any findings regarding a telephone conversation between FLRA Chief Counsel Klein and Member Applewhaite after the September 21 meeting and before the Applewhaite/Shanker dinner. According to uncontroverted testimony by both Chief Counsel Klein and Member Applewhaite, Member Applewhaite expressed some concern that he had been perceived as unduly harsh in the earlier meeting. They made arrangements to meet the next day to further discuss Member Applewhaite's position. Tr. 813-15, 1883-85. This conversation (which we have no reason to believe did not occur) suggests that Member Applewhaite's position was flexible before he had dinner with Mr. Shanker. Therefore, we cannot conclude that any perceived change in position after the dinner necessarily resulted from it.
 Finally, we believe that A.L.J. Vittone's failure to dismiss the possibility of a transitory effect resulted in part from his failure to credit some of Member Applewhaite's testimony when it conflicted with Member Frazier's. A.L.J. Vittone credited Member Frazier's testimony even though he did not permit an inquiry into Member Frazier's motives in commencing the FBI investigation. Under the circumstances-Member Frazier's two-week delay in initiating the investigation, Member Frazier's failure to report the Applewhaite/Shanker dinner on the public record, and Member Frazier's failure to suggest that Member Applewhaite disqualify himself-reasonable questions might have been raised about Member Frazier's motives. The answers to these questions might well have reflected on Member Frazier's credibility. While we do not conclude that Member Frazier acted improperly, we believe that A.L.J. Vittone lacked all the information relevant to his credibility determinations.
 In sum, we are unable to say whether the Applewhaite/Shanker dinner had even a transitory influence on Member Applewhaite's position. We cannot conclude that there was no effect, but the record evidence clearly precludes us from finding that there was such an effect either. We believe that this strengthens A.L.J. Vittone's conclusion that the dinner had no effect on the FLRA's ultimate decision.
 
 
 [53]
 During oral argument, counsel for PATCO suggested that Mr. Shanker's reference to the PATCO "strike" may have undercut his argument that the FLRA General Counsel had failed to prove the existence of a strike by a PATCO National union. See Part III.B. infra. We hardly believe that Mr. Shanker's single statement to Member Applewhaite in a sea of media attention to the "PATCO strike" prejudiced PATCO's argument. We are reinforced in this belief by our review of the evidence of a strike
 
 
 [54]
 As A.L.J. Vittone commented: "I think we all understand that people who are appointed to these jobs are interested in being reappointed." Tr. 1554. The hearing revealed, not surprisingly, that Member Frazier had discussed the prospects for his own reappointment in 1980 with his colleagues. Tr. 1553-54, 1557-58
 
 
 [55]
 We, too, sit as judges in "hotly contested" cases. Inevitably, our decisions are found unsatisfying to some parties and scholarly commentators. Our recognition of that fact, however, does not mean that we "play to the gallery." Rather, we apply our understanding of the law to the best of our ability. Although (to paraphrase Justice Jackson) we are neither final nor infallible, our fallibility-and the criticism that accompanies it-does not mean that we are biased
 
 
 [56]
 Member Frazier understandably does not argue that the mere recognition of concern about reappointment is cause for disqualification. If that were the case, then all agency members (other than those who have no desire to be reappointed) would be subject to disqualification
 Member Frazier's argument that a public expression of concern about reappointment demonstrates a strong personal interest requiring disqualification might be persuasive in another context. But it is not here, where a private remark to a personal friend became public only through a special hearing ordered for entirely different reasons.
 
 
 [57]
 Similarly, whichever way he voted might affect his chances for reappointment. If he voted "for" PATCO, he might be viewed harshly by the Administration; if he voted "against" PATCO, he might not receive support from organized labor that might be important to his reappointment
 
 
 [58]
 Indeed, Member Frazier's position before this court is contradicted to some extent by his statement before A.L.J. Vittone. Member Frazier testified that "any discussion Member Applewhaite may have had about seeking a reappointment commitment from the Administration, if there was such a discussion, had no impact or effect upon Member Applewhaite's decision in the PATCO case." Findings at 34-35, P 11
 
 
 [59]
 Cf. Comment, Administrative Bias: An Update, 82 Dick.L.Rev. 671, 673 (1978) (suggesting that the "appearance of bias" test for disqualification, instead of actual bias, is in part the result of courts' reluctance to inquire into the mental processes of decisionmakers)
 
 
 [60]
 See, e.g., 124 Cong.Rec. 25,722 (1978) (remarks of Rep. Ford), reprinted in Legislative History, supra note 10, at 856; 124 Cong.Rec. 27,590-91 (1978), Legislative History at 1036-38 (amendment of Sen. Stevens)
 
 
 [61]
 Section 7116(b)(7) provides:
 (b) For the purpose of this chapter, it shall be an unfair labor practice for a labor organization-
 ....
 (7)(A) to call, or participate in, a strike, work stoppage, or slowdown, or picketing of an agency in a labor-management dispute if such picketing interferes with an agency's operations, or
 (B) to condone any activity described in subparagraph (A) of this paragraph by failing to take action to prevent or stop such activity ....
 5 U.S.C. § 7116(b)(7) (Supp. IV 1980).
 
 
 [62]
 This is not to say that such an inference could never be defeated by other evidence offered by the respondent union showing that work stoppages were in fact purely the result of local union actions. PATCO, however, produced no such evidence
 
 
 [63]
 Both videotaped statements are quoted in Part I.B. of this opinion. See text at note 8 supra. PATCO repeatedly refers to these videotapes as "unauthenticated." E.g., PATCO Brief at 7, 22; but see Fed.R.Evid. 901(b) (5). We note that there is no formal requirement of authentication before the FLRA. See 5 U.S.C. § 7118(a)(6) (Supp. IV 1980); 5 C.F.R. § 2423.17 (1981). If the videotapes were falsified or potentially misleading, it was within PATCO's power to offer testimony discrediting or explaining them
 
 
 [64]
 For the text of this section, see note 61 supra
 
 
 [65]
 Chief A.L.J. Fenton interpreted § 7116(b)(7)(B) as requiring the respondent to "come forward with ... exculpating evidence" in order to avoid an unfair labor practice finding after the General Counsel established a prima facie case of a work stoppage or strike. ALJ at 4. While the General Counsel bears the burden of proving an unfair labor practice, we agree with the A.L.J. that § 7116(b)(7)(B) should be interpreted to require the union to produce evidence that it attempted to prevent or stop a strike. Were the section interpreted differently, it would require the General Counsel to prove a negative-that the respondent union did not try to prevent or stop a strike-and would also require the General Counsel to prove facts peculiarly within the control of the opposing party-what actions the respondent union did or did not take. Common sense and established principles of evidence disfavor unnecessarily placing such difficult, perhaps impossible, burdens on a party. See, e.g., Allstate Fin. Corp. v. Zimmerman, 330 F.2d 740, 744 (5th Cir. 1964)
 
 
 [66]
 Because we find that PATCO was in fact aware of this strike, and thus had an affirmative obligation under the statute to attempt to stop it, we express no view as to what knowledge about members' actions may be presumed or even required. Suffice it to say that we do not believe that a veil of ignorance should be an easily assumed shield from unfair labor practice charges having to do with strike activity
 
 
 [67]
 PATCO also argues that after the mass firings of striking air traffic controllers on August 5, see note 7 supra, it was legally disabled from ending the work stoppage and hence could not be found in violation of § 7116(b)(7) (B). PATCO relies primarily upon United States v. Professional Air Traffic Controllers Org., 524 F.Supp. 160 (D.D.C.1981), in which the District Court held that PATCO could not be held in contempt of its no-strike order after compliance was made impossible by the August 5 firings. We, of course, express no view at this time on the District Court decision, but even if we accept the logic of its holding, it does not avail PATCO. Even if PATCO was unable to violate § 7116(b)(7)(B) after August 5, that does not deny or rescind PATCO's violation of the section by failing to take action to prevent the strike before August 3 and by failing to take action to stop the strike between August 3 and August 5
 
 
 [68]
 As noted in Part I.B. supra, Chief A.L.J. Fenton and Member Frazier both believed that § 7120(f) granted the Authority relatively little discretion in deciding whether to revoke a striking union's exclusive recognition status. They thought that the exercise of the Authority's discretion turned exclusively on the culpability of the union in calling the strike and the efforts of the union to end the strike once it began. Chairman Haughton and Member Applewhaite, however, took a broader view of the Authority's discretion. Haughton and Applewhaite did not enumerate all of the factors that they though relevant to deciding if revocation would be warranted, but interpreted Congress' action as leaving that decision to the Authority on a case-by-case basis
 
 
 [69]
 PATCO, of course, would interpret § 7120(f) as granting the FLRA broad discretion to consider any number of factors in making its revocation decision. The FAA, on the other hand, suggests that Member Frazier's limited view of the Authority's discretion is preferable. The FLRA Solicitor, forced to defend a unanimous FLRA Decision stemming from divergent views of the FLRA Members, understandably avoids taking a firm stance regarding the scope of the Authority's discretion. The FLRA Solicitor nevertheless argues, in effect, that whatever the scope of the statutorily granted discretion, the FLRA properly exercised it in this case
 
 
 [70]
 Section 7118(a)(7) states:
 If the Authority (or any member thereof or any individual employed by the Authority and designated for such purpose) determines after any hearing on a complaint under paragraph (5) of this subsection that the preponderance of the evidence received demonstrates that the agency or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, then the individual or individuals conducting the hearing shall state in writing their findings of fact and shall issue and cause to be served on the agency or labor organization an order-
 (A) to cease and desist from any such unfair labor practice in which the agency or labor organization is engaged;
 (B) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requiring that the agreement, as amended, be given retroactive effect;
 (C) requiring reinstatement of an employee with backpay in accordance with section 5596 of this title; or
 (D) including any combination of the actions described in subparagraphs (A) through (C) of this paragraph or such other action as will carry out the purpose of this chapter.
 5 U.S.C. § 7118(a)(7) (Supp. IV 1980) (emphasis added). See also id. § 7105(g)(3) (Supp. IV 1980).
 
 
 [71]
 Another subsection of the Act excludes from the definition of employee "any person who participates in a strike in violation of section 7311 of this title." 5 U.S.C. § 7103(a)(2)(v) (Supp. IV 1980)
 
 
 [72]
 Indeed, if read expansively, the definitional reach of § 7103(a)(4)(D) would sweep much more broadly than the remedial provision in § 7120(f). As Member Frazier noted, § 7103(a)(4)(D) refers not "to revocation of certification as such, but to elimination of the union as a 'labor organization' for all purposes." PATCO at 19 n.33
 
 
 [73]
 The Order also provided, rather opaquely, that once "recognition of a labor organization has been accorded, the recognition continues as long as the organization continues to meet the requirements of this Order applicable to that recognition." Id. § 7(c). Arguably, this section might have been construed to allow the Federal Labor Relations Council, the predecessor to the Federal Labor Relations Authority, to revoke a union's recognition status under Executive Order 11,491. However, no such cases have been cited to us on this appeal
 During debate on Title VII in the House of Representatives, Congressman Erlenborn expressed the view that "under the Executive order an illegal strike by Federal employees causes the union that has been certified as the bargaining agent to lose their (sic) status as exclusive agent." 124 Cong.Rec. 28,794 (1978), reprinted in Legislative History, supra note 10, at 879. What basis Congressman Erlenborn had for this statement-the sole expression of such a viewpoint in either House or Senate debate-is unclear.
 
 
 [74]
 Congressman Udall termed his substitute a "middle ground" between the pro-labor version reported by the House Committee and a pro-management substitute offered by Congressman Collins. 124 Cong.Rec. 29,182 (1978), Legislative History at 923. Compare id. at 29,174-82, Legislative History at 907-22 (Udall substitute) with H.R. 11,280, 95th Cong., 2d Sess. (1978), reported in H.R.Rep.No.1403, 95th Cong., 2d Sess. 288-345 (1978), Legislative History at 376-433 (Committee bill) and 124 Cong.Rec. 29,16 7-73 (1978), Legislative History at 894-905 (Collins substitute). The Collins substitute would largely have codified the provisions of Executive Order 11,491. See id. at 29,173-74, Legislative History at 905-07 (remarks of Rep. Collins)
 
 
 [75]
 See, e.g., S.Rep.No.969, 95th Cong., 2d Sess. 12 (1978), Legislative History at 749
 
 
 [76]
 The Senate Committee Report offered no explanation of the definitional exclusion. See S.Rep.No.969, supra, at 97-98, Legislative History at 757-58. It therefore neither supports nor disputes the House view that the exclusion of striking unions from the Act was meant to be discretionary with the FLRA
 
 
 [77]
 Section 7216(b)(4)(B) of the Senate bill declared that any union that condoned a strike, work stoppage, slowdown, or picketing that interfered with agency operations was guilty of an unfair labor practice. S. 2640, 95th Cong., 2d Sess. § 7216(b)(4)(B) (1978), S.Rep.No.969, 95th Cong., 2d Sess. 296-97 (1978), Legislative History at 524-25; compare 5 U.S.C. § 7116(b)(7)(B) (Supp. IV 1980). Senator Hatch intended by reference to § 7216(b)(4)(B) of the Senate bill to also include violations of § 7216(b)(4)(A), which prohibited active union involvement in strikes, work stoppages, slowdowns, or picketing that interfered with agency operations; he stated that "(B) ... by implication include(s) (A)." 124 Cong.Rec. 27,584 (1978), Legislative History at 1028
 
 
 [78]
 We intimate no view as to what attempts by a union to end a wildcat strike would, if unsuccessful, satisfy the union's statutory obligations under § 7116(b)(7)(B)
 
 
 [79]
 In some respects Congress granted the FLRA broader remedial authority than is possessed by the NLRB. Under § 7118(a)(7)(B), for example, the FLRA may impose certain provisions of a collective bargaining agreement on the parties and may make those provisions retroactively effective. See 124 Cong.Rec. 38,714 (1978), Legislative History at 992-93 (statement of Rep. Ford). Such authority is denied the NLRB by § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d) (1976). H. K. Porter Co. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). The differences in the FLRA's and the NLRB's remedial authority, however, do not imply that the agencies have unequal discretion when acting within the scope of their respective remedial authorities
 
 
 [80]
 In prior reviews of FLRA decisions, this Circuit has recognized the "principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." National Fed'n of Fed. Employees v. FLRA, 652 F.2d 191, 193 (D.C.Cir.1981) (quoting Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969)); accord, Department of Defense v. FLRA, 659 F.2d 1140, 1153 n.74, 1161-62 (D.C.Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 1443, 71 L.Ed.2d 658 (U.S.1982). In this regard, we note that our interpretation today of the extent of the Authority's remedial discretion under § 7120(f) affirms the views of a majority of the Authority
 
 
 [81]
 See, e.g., Ogden v. Department of Transp., 430 F.2d 660 (6th Cir. 1970) (denying stay of disciplinary discharge of striking air traffic controllers); United States v. Moore, 427 F.2d 1020 (10th Cir. 1970) (affirming stay of discharges resulting from 1970 strike); Henson v. United States, 321 F.Supp. 122 (E.D.La.1970) (denying injunction against disciplinary discharge of striking controllers); Herriges v. United States, 314 F.Supp. 1352 (D.Mont.1970) (denying injunction against disciplinary discharge of striking controllers); United States v. Professional Air Traffic Controllers Org., 312 F.Supp. 189 (D.Minn.1970) (restraining order and injunction against sick-out; civil contempt for violations); Air Transp. Ass'n v. Professional Air Traffic Controllers Org., 313 F.Supp. 181 (E.D.N.Y.) (restraining order, continued violation and injunction against strike), vacated in part sub nom. United States v. Professional Air Traffic Controllers Org., 438 F.2d 79 (2d Cir. 1970), cert. denied, 402 U.S. 915, 91 S.Ct. 1373, 28 L.Ed.2d 661 (1971). See also Professional Air Traffic Controllers Org., 1 A/SLMR 71 (disqualifying PATCO from certification under Exec. Order 11,491 due to 1970 strike), vacated, 1 A/SLMR 268 (1971). See generally Note, The Legal Consequences of a Deliberate Air Traffic Controller Slowdown, 8 N.Ky.L.Rev. 155 (1981)
 
 
 [82]
 See notes 9-13 and accompanying text supra
 
 
 [83]
 Distinctions between types of strikes, such as are drawn in the private sector between "economic strikes" and "unfair labor practice strikes," see e.g., Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); see generally R. Gorman, Basic Text on Labor Law 339-43, 618-19 (1976), are not recognized in the federal sector. The Civil Service Reform Act simply makes no distinction between types of strikes or the reasons for them. PATCO therefore cannot argue, and we do not believe it does, that while strikes by federal employee unions in general are banned, its strike was not. See Bennett v. Gravelle, 451 F.2d 1011 (4th Cir. 1971), cert. dismissed, 407 U.S. 917, 92 S.Ct. 2451, 32 L.Ed.2d 692 (1972)
 
 
 [84]
 Compare 5 U.S.C. § 7120(f) (Supp. IV 1980) with, e.g., N.Y.Civ.Serv.Laws § 210(3)(f) (McKinney Supp. 1981-82): "In fixing the duration of the (striking union's) forfeiture (of rights to dues withholding), the board ... may consider ... (ii) whether, if so alleged by the employee organization, the appropriate public employer or its representatives engaged in such acts of extreme provocation as to detract from the responsibility of the employee organization for the strike."
 
 
 [85]
 Even Chairman Haughton, the FLRA Member most receptive to PATCO's argument that it was unfairly prevented from presenting mitigating evidence, stated: "I do not know what additional evidence, if any, PATCO would produce to support its contention that revocation of its exclusive recognition status is not appropriate in the circumstances of this case." PATCO at 35
 
 
 [86]
 In a case similar to this, the NLRB commented:
 We are cognizant of the following circumstances in connection with the Respondent's offer of proof. It was couched in general and conclusionary terms and failed to recite the identity or description of the witnesses, or other evidence, to be introduced by the Respondent. Further, the offer did not delineate the nature, content, or scope of any such prospective evidence with any degree of exactitude. Indeed, the form of the offer more nearly approximated a bare contention by the Respondent rather than an offer of proof.
 Union Elec. Steel Corp., 140 N.L.R.B. 138, 138 n.1 (1962).
 
 
 [87]
 The cases principally relied upon by PATCO are readily distinguishable. See Catholic Medical Center v. NLRB, 589 F.2d 1166 (2d Cir. 1978); NLRB v. Process & Pollution Control Co., 588 F.2d 786 (10th Cir. 1978); Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2d Cir. 1965), cert. denied, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966); Donnelly Garment Co. v. NLRB, 123 F.2d 215 (8th Cir. 1941). In Catholic Medical Center, detailed evidence was accepted and findings made, but these were then excluded from consideration in the agency's decision. 589 F.2d at 1169-70. In Process & Pollution Control and Scenic Hudson, detailed and specific evidence was tendered, but was rejected by the agencies. 588 F.2d at 789; 354 F.2d at 618-19. Thus, the facts of these cases differ significantly from PATCO's general, conclusory and conditional offer of evidence in mitigation here. Finally, Donnelly Garment has at best limited precedential value. In the decision PATCO cites, the Eighth Circuit denied enforcement of an NLRB order. After remand and further proceedings, the NLRB issued virtually the same order. Relying on similar reasoning, the Eighth Circuit again denied enforcement, 151 F.2d 854 (8th Cir. 1945), and the Supreme Court reversed, NLRB v. Donnelly Garment Co., 330 U.S. 219, 67 S.Ct. 756, 91 L.Ed. 854 (1947)
 
 
 [88]
 Transcript of August 10, 1981 Hearing, Jt.App. 178. See note 9 supra
 
 
 [89]
 We also note that the denial of PATCO's requested continuance did not eliminate other procedures available to PATCO to vindicate its asserted injuries. As provided for by the Civil Service Reform Act, PATCO filed unfair labor practice charges with the FLRA General Counsel alleging that the FAA had refused to bargain in good faith. See note 10 supra. Had the General Counsel issued a complaint against the FAA, the results of that proceeding could have been considered in mitigation of the remedy directed by the FLRA at PATCO. PATCO's charges against the FAA, however, were ultimately rejected by the General Counsel. Thus, PATCO's argument that the FAA refused to bargain in good faith was considered in full accordance with the Act
 In addition, PATCO never sought relief for its asserted injuries before the Federal Services Impasses Panel. To the extent that PATCO's safety complaints were unresolved due to a negotiation impasse with the FAA, and to the extent that its refusal to bargain charge against the FAA stemmed from the same negotiation impasse, PATCO could have resorted to the Impasses Panel. See 5 U.S.C. § 7119(c) (Supp. IV 1980). PATCO chose not to do so.
 
 
 [90]
 The legitimacy of President Reagan's dismissal of striking air traffic controllers is not an issue before us. We therefore express no view in its regard
 
 
 [91]
 If we accepted Mr. Skirlick's argument, then § 7120(f) could never be applied to any union with a constitutional provision that makes continued federal employment a condition of membership. Surely, Congress did not intend that unions could use § 7103(a)(2)(v) as a means of avoiding the discipline expressly sanctioned in § 7120(f)
 
 
 [92]
 As noted in Part II. of this opinion, we also hold that there is no reason to vacate the FLRA Decision or to remand the case for any further proceedings due to any ex parte communications. First, we have found no ex parte communications that irrevocably tainted the Authority's decision. Second, we have concluded that the proceedings before the FLRA did not effect any procedural unfairness on any of the parties. Finally, because the ex parte contacts issue already has been fully and adequately addressed during the special evidentiary hearing before Judge Vittone, and because the facts of this case are free from any arguable taint, we have concluded that a remand of this case would be a futile gesture
 
 
 [1]
 Pub.L.No.95-454, 92 Stat. 1111, 1191 (1978) (codified at 5 U.S.C. §§ 7101 et seq. (Supp. IV 1980))
 
 
 [2]
 In response to our order of February 16, 1982, Judge Vittone prepared lengthy and detailed recommended findings on numerous incidents within the ambit of our mandate to explore "any and all ex parte communications and other approaches that may have been made to any member or members of FLRA while the PATCO case was pending before it." Professional Air Traffic Controllers Org. v. FLRA, 217 U.S.App.D.C. 256, 260, 672 F.2d 109, 113 (1982). These findings appear as an appendix to this opinion, and hereinafter are cited as "ALJ Findings."
 
 
 [3]
 ALJ Findings at 6, P 2
 
 
 [4]
 Id. at 6, PP 2, 4
 
 
 [5]
 Id. at 6-7, PP 4-12; Transcript ("Tr.") 839, 2345
 
 
 [6]
 Tr. 809, 838, 1576-1577
 The finding that "neither Ms. Stern nor Member Applewhaite indicated any opinion on this subject," ALJ Findings at 7, P 12, appears to be a slight misreading of the cited portion of Gordon's testimony. What Gordon said was that "(n)either Ms. Stern nor Member Applewhaite indicated in any way which way Member Applewhaite wanted to come out." Tr. 2344 (emphasis added). Applewhaite testified, "I asked her, is decertification the only remedy possible? So she said, well, that seems to be the way it would go." Tr. 809-810. This testimony is consistent with the fact that Stern's memorandum, submitted as Frazier Exhibit 16, not only set out the problem and surveyed the relevant statutory language and legislative history but also reached a specific conclusion: The Authority possessed discretion to impose a lesser penalty than decertification only when the union had not actively encouraged and participated in illegal strike activity. See Frazier Ex. 16 at 7.
 
 
 [7]
 ALJ Findings at 7, P 9; Tr. 810, 838-839. Applewhaite was interested not only in the remedial provisions of other federal labor laws but also in the treatment of public employee strikes in various state statutes
 
 
 [8]
 ALJ Findings at 7, P 7
 
 
 [9]
 Tr. 811
 
 
 [10]
 ALJ Findings at 7, P 7
 
 
 [11]
 Tr. 2346
 
 
 [12]
 ALJ Findings at 7, P 14
 
 
 [13]
 The conversation took place on August 10, 1981, one week after the General Counsel had issued the unfair labor practice complaint, and on the very day the case was being heard on the merits before Administrative Law Judge Fenton. See ALJ Findings at 5, P 3 & at 6, P 2
 
 
 [14]
 Tr. 809-812, 2346. See also ALJ Findings at 7, P 13
 
 
 [15]
 5 U.S.C. § 557(d)(1)(A) (1976) ("no interested person outside the agency shall make or knowingly cause to be made to any member of the body comprising the agency ... an ex parte communication relevant to the merits of the proceeding"). FLRA regulations specifically provide that the General Counsel shall be deemed a "person outside this agency" when he is "prosecuting an unfair labor practice proceeding before the Authority." 5 C.F.R. § 2414.3(a) (1982)
 
 
 [16]
 Majority Opinion (Maj.Op.) at 567
 
 
 [17]
 Id. See also id. at 558
 
 
 [18]
 When asked at the hearing whether he understood "at the time that this discussion was in the context of the PATCO matter," Gordon responded, "Of course." Tr. 2346
 
 
 [19]
 See generally Tr. 809-812
 
 
 [20]
 Maj.Op. at 567
 
 
 [21]
 Id
 
 
 [22]
 See 5 U.S.C. § 557(a), (d)(1) (1976)
 
 
 [23]
 See ALJ Findings at 7, P 15; 47-48
 
 
 [24]
 My colleagues speculate that "the content of the brief discussion between Member Applewhaite, General Counsel Gordon and Ms. Stern was less relevant to the merits of the PATCO case than was the information conveyed to the FLRA Members by the General Counsel when he sought their approval to seek an injunction against the strike...." Maj.Op. at 41-42. As we have not in this case defined precisely the latitude of permissible contacts between an agency's general counsel and its members at those early points in proceedings when decisions regarding the pursuit of emergency injunctive relief must be made, we have had no occasion to assess the legitimacy of Gordon's communications with the members in that regard. Furthermore, irrespective of whether those prior discussions were proper, the stage in the PATCO case where such contacts were necessary had passed at the time the Applewhaite-Gordon-Stern incident occurred. By August 10, the roles of Gordon as prosecutor and Applewhaite as adjudicator were firmly solidified; on that very day, the case was being heard on the merits before one of the agency's administrative law judges. Gordon's continued presence at and participation in Stern's briefing of Applewhaite was hardly less serious or more defensible than would have been the presence and participation of FLRA's counsel-on-appeal in a conference between a judge on this panel and his law clerk
 
 
 [25]
 Secretary Lewis called Frazier on August 13; the administrative law judge's decision recommending decertification of PATCO issued the following day. See ALJ Findings at 5, P 3; 8, P 2
 
 
 [26]
 Id. at 8, P 3; Tr. 258
 
 
 [27]
 Tr. 259. See ALJ Findings at 8, P 4
 
 
 [28]
 ALJ Findings at 8, P 6
 
 
 [29]
 Id. at 8, P 7
 
 
 [30]
 Id. at 9, PP 9-10
 
 
 [31]
 Id. at 10, PP 16-17
 
 
 [32]
 Id. at 9, P 13
 
 
 [33]
 FLRA regulations exclude from the definition of prohibited ex parte communications "(o)ral or written requests for information solely with respect to the status of a proceeding." 5 C.F.R. § 2414.6(b) (1982). See 5 U.S.C. § 551(14) (1976) (defining ex parte communication to exclude "requests for status reports on any matter or proceeding")
 
 
 [34]
 Also excluded, by FLRA regulation, from the definition of prohibited contacts are "(o)ral or written communications proposing settlement or an agreement for disposition of any or all issues in the proceeding." 5 C.F.R. § 2414.6(d) (1982). There is no statutory analog to this exclusion. I find considerable merit in PATCO's point that a call encouraging the agency to hasten its decision because no settlement efforts were under way can scarcely be classified as an oral communication proposing settlement. I agree with the court, however, that in the circumstances we need not pass upon the scope or validity of § 2414.6(d) of FLRA's regulations
 
 
 [35]
 ALJ Findings at 10, P 18
 
 
 [36]
 Tr. 729. See also id. at 864; ALJ Findings at 10, P 21
 
 
 [37]
 ALJ Findings at 10-11, PP 22-23
 
 
 [38]
 Id. at 11, P 23
 
 
 [39]
 See id. at 11, P 27
 
 
 [40]
 See id. at 9, P 12; 11, P 26
 
 
 [41]
 Tr. 893-894. Moreover, when asked if it was his experience "that a person seeking a status report on a proceeding would not call up more than one decision-maker for a status report during the same time period," Member Applewhaite responded, "No, I do not see why they would seek status of several." Tr. 894
 
 
 [42]
 See ALJ Findings at 12, P 35. Judge Vittone explained, "The evidence of record does not permit an evaluation of how much of an effect the calls had on the two members, but I believe that the Secretary's phone call did play at least some minimal part in their decision to reduce the prescribed 25 day period to 19 days." Id. at 47. To the extent the court's opinion suggests that Judge Vittone could find no effect from these calls, see Maj.Op. at 568, I respectfully suggest that the proposed findings have been misread
 
 
 [43]
 I have no difficulty, however, in accepting Judge Vittone's finding that the Secretary's calls had no impact on the members' ultimate decision on the decertification question. See ALJ Findings at 12, P 36
 
 
 [44]
 See S.Rep.No.354, 94th Cong., 1st Sess. 36 (1975) (quoting then-existing language in APA)
 
 
 [45]
 If the Secretary was concerned that the agency might postpone a decision because of false settlement rumors, the proper course would have been for him to contact his General Counsel and enquire what procedural mechanism FAA could employ to apprise the members of the true state of affairs. Presumably, one of the reasons that FAA retains a General Counsel is to secure professional advice about what steps the agency can and ought to take to protect and advance its interests in legal proceedings
 
 
 [46]
 ALJ Findings at 39-40, PP 29, 32
 
 
 [47]
 Tr. 1673-D. See ALJ Findings at 40, P 32
 
 
 [48]
 Tr. 1673-D. See ALJ Findings at 40, P 32
 
 
 [49]
 S.Rep.No.354, supra note 44, at 37
 
 
 [50]
 Conceivably, this statement could have been made in a context and tone in which it could have been taken humorously. There is, however, no recommended findings on this score, and Haughton's response indicates that he did not perceive Lovell's statement as a facetious, off-the-cuff remark; rather, he replied in a serious vein by intimating his disagreement with the other two members
 
 
 [51]
 See Maj.Op. at 596 n.38
 
 
 [52]
 See ALJ Findings at 40, P 33
 
 
 [53]
 See generally Tr. 1647-1663
 
 
 [54]
 ALJ Findings at 13, P 1; 15-16, PP 7-10
 
 
 [55]
 Id. at 15, P 9; 16, P 12. At the special hearing, and again before this court, Shanker has frankly admitted that his purpose in arranging the dinner was to subject Applewhaite to suasion on the issue of decertification
 
 
 [56]
 Id. at 16, P 12
 
 
 [57]
 See Maj.Op. at 570-571 & n.50
 
 
 [58]
 Of the numerous iterations of this fundamental principle, perhaps none is clearer or more emphatic than the Supreme Court's admonition: "(T)o perform its high function in the best way 'justice must satisfy the appearance of justice.' " In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955), quoting Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11, 16 (1954)
 
 
 [59]
 ALJ Findings at 14, PP 3-6
 
 
 [60]
 The court points out that Applewhaite did not actually know of Shanker's intentions. Maj.Op. at 571. Nonetheless, he had ample reason to stop and deliberate about the propriety of acceptance. His relationship with Shanker was not such that an invitation to dinner was a matter of course; Applewhaite testified that he had never before dined privately with Shanker. Tr. at 903. Member Frazier testified that when Applewhaite mentioned his dinner plans, the two speculated about Shanker's purpose, see Tr. at 233-234, 493-499, and the PATCO case was mentioned at least in passing, see id. at 234, 497, 507. In any event, Applewhaite well knew Shanker's position in the labor field; more specifically, he knew that Shanker was on the Executive Board of an organization that was appearing as amicus curiae in the PATCO case. ALJ Findings at 15, P 7. Given all this, it is appalling that Applewhaite could have been completely insensitive to the dangers lurking in a private dinner engagement with a prominent labor leader during FLRA's deliberations on a notorious labor case
 
 
 [61]
 Maj.Op. at 570
 
 
 [62]
 Id. at 570, quoting Pennsylvania v. Local Union 542, Int'l Union of Operating Eng'rs, 388 F.Supp. 155, 159 (E.D.Pa.1974)
 
 
 [63]
 Id
 
 
 [64]
 For similar reasons, I cannot join in the court's apologia for Applewhaite's perception of a personal "dilemma" created by the PATCO case. See Maj.Op. at 573-574. I agree that Applewhaite's concern did not constitute, in the circumstances, a "personal interest" in the outcome such as would require disqualification, but I would not be so quick to validate it by suggesting it was quite understandable. There seems little question that Applewhaite felt keenly the career ramifications of his vote. Perhaps this sensitivity was not atypically acute, although I do not detect the basis for the court's conclusion on this point, see Maj.Op. at 574. Perhaps it is an inescapable product of creating such positions as political term appointments. However, concern for the personal consequences of an impending decision is neither a desirable nor a proper element in the judicial calculus. It is something to be struggled against, not acquiesced in
 
 
 [65]
 Maj.Op. at 571
 
 
 [66]
 ALJ Findings at 28, P 51; 49
 
 
 [67]
 I take no view on whether the Shanker dinner had a transitory effect on Applewhaite's position. As the court points out, the absence of a recommended finding on the September 21 afternoon telephone call from Applewhaite to Klein makes it difficult for us to assess Judge Vittone's conclusion that there may have been a period when Applewhaite was swayed by Shanker's arguments. See Maj.Op. at 571-572 n.52. On the one hand, Judge Vittone may simply have overlooked that call in sorting through the mountain of evidence presented; on the other hand, he may have considered Applewhaite's action in calling Haughton and Klein to propose a compromise position immediately after returning home from the dinner, see ALJ Findings at 20, PP 23-24, as an indication that Shanker's exhortation was a contributing-even if not the sole-factor in Applewhaite's search for a moderate solution. If we needed to resolve the point, which we do not, the appropriate course would be to remand to the administrative law judge for additional findings
 
 
 [68]
 See 5 U.S.C. § 557(d)(1)(B) (1976) ("no member of the body comprising the agency ... shall make or knowingly cause to be made to any interested person outside the agency an ex parte communication relevant to the merits of the proceeding")
 
 
 [69]
 See Maj.Op. at 571 ("Had Mr. Shanker persisted in discussing his views of the PATCO case, Member Applewhaite should have informed him in no uncertain terms that such behavior was inappropriate. Unfortunately, he did not do so.")
 
 
 [70]
 I am somewhat puzzled by the court's repeated assertion that remand of this case would be a "futile gesture." See Maj.Op. at 566, 575, 592 n.92. It is my understanding that we are not remanding because no one has demonstrated that a remand is necessary. The hearing held at our behest was a thorough exploration of the nature, extent, and impact of all ex parte pleas and approaches undertaken in the relevant time period. All interested parties have had an opportunity to comment on what was revealed. Although prohibited contacts did occur, we have discerned no prejudicial effect on the agency's final decision. In sum, we were not shown any extant problem requiring a remand to correct. If by "futility" the court means simply this, then I am in agreement. If however, use of the term implies a powerlessness on our part to have ordered remediation had we perceived such a problem, I must respectfully but vigorously disagree
 
 
 *
 The unsealed documents were received into the record as ALJ Exhibits 1 through 8
 
 
 **
 On March 2, 1982, counsel for the working controllers filed with the administrative law judge a motion to reconsider the ruling at the prehearing conference to deny the working controllers full party status and to grant them only amicus status
 
 
 [1]
 A comparison of PATCO Exhibits 9 and 10 with PATCO Exhibit 4a, the FLRA order establishing time limits, demonstrates that the documents are not similar for the most part
 
 
 [2]
 Member Applewhaite may have made some comments during the discussion of PATCO regarding his possible position or possible alternatives. Mr. Shanker found those comments confusing and could not understand them. (See Tr. 1427-28)
 
 
 [3]
 Member Applewhaite testified that Frazier Exhibit 17 is not his notes of the September 21 meeting (Tr. 1381-84). He could not recall to which meeting the notes referred. However, a review of Frazier Exhibit 17 demonstrates that the notes are probably from the September 21 meeting. There is no other meeting after September 21 to which the notes could refer
 
 
 [4]
 This is the same phone call between Frazier and Applewhaite on October 7 during which they discussed the "Republican Follies" fundraiser. (See pp. 611-613, infra.)
 
 
 [5]
 On page 2894 of this transcript, the date reported as the 17th (line 2) is incorrect. The reporting service has advised me that the reporter's notes show the date on line 2 to be October 17. However, the context of the testimony shows that October 7 is the date intended by the witness
 
 
 [6]
 On Page 2894 of this transcript, the date reported as the 19th (line 18) is incorrect. The reporting service has informed me that the reporter's notes for line 18 show that the date should be October 9
 
 
 [7]
 Applewhaite and Bonitati's testimony conflict as to where their conversation took place. Applewhaite testified that it occurred during a telephone call (Tr. 720) Bonitati testified that the call was not completed and the discussion took place during a chance meeting at the Lovell reception. (Tr. 2090-91) In all other respects concerning this conversation, the testimony of both men is essentially similar
 
 
 [8]
 The statute provides, in part, that administrative law judges be assigned to cases in rotation so far as practicable